# In the United States Court of Appeals for the District of Columbia Circuit

---

**STATE OF NEBRASKA, ET AL.,**

*Petitioners,*

*v.*

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,**

*Respondents,*

**ALLIANCE OF NURSES FOR HEALTHY ENVIRONMENTS, ET AL.,**

*Intervenors.*

---

On Petition for Review from the United States
Environmental Protection Agency
(No. EPA–HQ–OAR–2022–0985)

---

## INITIAL BRIEF FOR STATE PETITIONERS

---

MICHAEL T. HILGERS
Attorney General of Nebraska

Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
Fax: (402) 471-3297

ERIC J. HAMILTON
Solicitor General
eric.hamilton@nebraska.gov

ZACHARY B. POHLMAN
GRANT D. STROBL
Assistant Solicitors General

Counsel for Petitioner State of
Nebraska

Additional counsel listed after the
signature block

## I. Parties and Amici

*Petitioners* in Case No. 24-1129 are the State of Nebraska, State of Alabama, State of Alaska, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of Utah, Commonwealth of Virginia, State of West Virginia, and State of Wyoming (collectively, "State Petitioners").

*Petitioners* in Case No. 24-1133 are Warren Petersen, President of the Arizona State Senate; Ben Toma, Speaker of the Arizona House of Representatives; and the Arizona Trucking Association.

*Petitioners* in Case No. 24-1157 are the Western States Trucking Association, Inc. and Construction Industry Air Quality Coalition, Inc.

*Petitioners* in Case No. 24-1207 are the American Fuel and Petrochemical Manufacturers, California Asphalt Pavement Association, California Manufacturers & Technology Association, Consumer Energy Alliance, Domestic Energy Producers Alliance, Energy Marketers of America, International Association of Machinists and Aerospace Workers Lodge No. 823, Louisiana Mid-Continent Oil & Gas Association, National

Association of Convenience Stores, Petroleum Alliance of Oklahoma, Texas Oil & Gas Association, and Western States Petroleum Association.

*Petitioners* in Case No. 24-1208 are the American Petroleum Institute, American Farm Bureau Federation, National Corn Growers Association, and Owner-Operator Independent Drivers Association.

*Petitioners* in Case No. 24-1209 are the American Free Enterprise Chamber of Commerce; Diamond Alternative Energy, LLC; ICM, Inc.; Indiana Soybean Alliance; Iowa Soybean Association; Minnesota Soybean Growers Association; North Dakota Soybean Growers Association; Ohio Soybean Association; and South Dakota Soybean Association.

*Petitioner* in Case No. 24-1210 is the Clean Fuels Alliance America.

*Petitioner* in Case No. 24-1214 is the Transport Project.

*Respondents* are the United States Environmental Protection Agency and Michael S. Regan in his official capacity as Administrator of the United States Environmental Protection Agency.

*Intervenors* on behalf of Respondents are (1) the Alliance of Nurses for Healthy Environments, American Lung Association, American Public Health Association, Appalachian Mountain Club, Clean Air Council, Environmental Defense Fund, Environmental Law & Policy Center, Natural Resources Defense Council, Public Citizen, and Sierra Club; (2) the State of Arizona, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maine, State of

Maryland, Commonwealth of Massachusetts, State of Michigan, State of Minnesota, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island, State of Vermont, State of Washington, and State of Wisconsin; the District of Columbia; the City and County of Denver; and the Cities of Chicago, Los Angeles, and New York; (3) the Center for Community Action and Environmental Justice and Rio Grande International Study Center; (4) Ford Motor Company; (5) CALSTART; and (6) Zero Emission Transportation Association.

## II.   Ruling Under Review

The ruling under review is "Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles—Phase 3," published at 89 Fed. Reg. 29,440 (April 22, 2024) ("the rule").

## III.   Related Cases

This Court has consolidated the following cases with Case No. 24-1129: *Petersen, et al. v. EPA*, No. 24-1133; *Western States Trucking Ass'n, et al. v. EPA*, No. 24-1157; *American Fuel & Petrochemical Manufacturers, et al. v. EPA*, No. 24-1207; *American Petroleum Institute, et al. v. EPA*, No. 24-1208; *American Free Enterprise Chamber of Commerce, et al. v. EPA*, No. 24-1209; *Clean Fuels Alliance America v. EPA*, 24-1210; *The Transport Project v. EPA*, No. 24-1214.

/s/ Eric J. Hamilton
ERIC J. HAMILTON

# TABLE OF CONTENTS

Page

Certificate as to Parties, Rulings, and Related Cases...............i

Table of Authorities.................................................................v

Glossary ..................................................................................x

Introduction ............................................................................1

Statement of Jurisdiction.........................................................1

Statement of Issues .................................................................2

Statutes and Regulations .........................................................2

Statement of the Case .............................................................2

Summary of the Argument ......................................................4

Standing ..................................................................................5

Standard of Review .................................................................9

Argument..................................................................................9

    I.   The Rule Exceeds EPA's Statutory Authority............................9

        A.   Forced electrification of heavy-duty vehicles is a major question.................................................................10

            1.   The rule is economically significant...............................10

            2.   The rule is politically significant. ..................................15

            3.   The rule vastly expands the agency's power. .................17

        B.   EPA lacks clear congressional authorization. ......................19

    II.  The Rule Is Arbitrary and Capricious. ........................................21

        A.   EPA ignored significant harms to the electric grid's reliability. ..............................................................22

        B.   EPA improperly analyzed the "social cost of greenhouse gases." .................................................25

        C.   EPA's cost-benefit analysis is flawed....................................28

Conclusion ..............................................................................31

Certificate of Compliance ......................................................39

Certificate of Service .............................................................40

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021) (per curiam)................................. *passim*

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018) ........................................ 30

*Benton Cnty. Wind Farm LLC v. Duke Energy Ind., Inc.*,
843 F.3d 298 (7th Cir. 2016) ............................................ 16

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) ............................................... 12, 18

*Competitive Enter. Inst. v. Fed. Commc'ns Comm'n*,
970 F.3d 372 (D.C. Cir. 2020) ............................................ 6

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*,
901 F.2d 107 (D.C. Cir. 1990) ............................................ 6

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
793 F.2d 1322 (D.C. Cir. 1986) ........................................... 6

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ................................................... 21, 27

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ..................................................... 10

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016) ..................................................... 15

*Gonzales v. Oregon*,
546 U.S. 243 (2006) ..................................................... 15

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ..................................................... 16

## Cases—continued

*Int'l Harvester Co. v. Ruckelshaus,*
478 F.2d 615 (D.C. Cir. 1973) ........................................ 25, 26

*Iowa v. EPA,*
No. 23-114 (D.C. Cir) ........................................................ 15

*Massachusetts v. EPA,*
549 U.S. 497 (2007) ......................................................... 2, 9

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
463 U.S. 29 (1983) ......................................................... 21, 26

*Nat'l Ass'n of Home Builders v. EPA,*
682 F.3d 1032 (D.C. Cir. 2012) .................................... 21, 28

*Nat'l Petrochemical & Refiner Ass'n v. EPA,*
287 F.3d 1130 (D.C. Cir. 2002) ......................................... 9

*Nebraska v. Cliff,*
No. 2:24-cv-1364 (E.D. Cal.) .............................................. 15

*Ohio v. EPA,*
144 S. Ct. 2040 (2024) ...................................................... 21

*Ohio v. EPA,*
98 F.4th 288 (D.C. Cir. 2024) ............................................. 9

*PG&E v. State Energy Res. Conservation & Dev. Comm'n,*
461 U.S. 190 (1983) ........................................................... 16

*RJR Nabisco v. Eur. Cmty.,*
579 U.S. 325 (2016) ........................................................... 26

*Sierra Club v. Ga. Power Co.,*
180 F.3d 1309 (11th Cir. 1999) ......................................... 16

*Small Ref. Lead Phase-Down Task Force v. EPA,*
705 F.2d 506 (D.C. Cir. 1983) ........................................... 21

# Cases—continued

*Smith v. United States,*
    507 U.S. 197 (1993).............................................................. 26

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016)................................................................ 5

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016)........................................ 22, 25

*Texas v. EPA,*
    No. 22-1031 (D.C. Cir.) ..................................................... 18

*Tri-State Generation & Transmission Ass'n v. Shoshone
    River Power, Inc.,*
    805 F.2d 351 (10th Cir. 1986)........................................... 16

*Truck Trailer Mfrs. Ass'n v. EPA,*
    17 F.4th 1198 (D.C. Cir. 2021)....................................... 4, 20

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n,*
    590 U.S. 604 (2020)........................................................... 16

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014)....................................... 10, 12, 18, 19

*Washington v. Glucksberg,*
    521 U.S. 702 (1997)........................................................... 15

*West Virginia v. EPA,*
    597 U.S. 697 (2022)................................................. *passim*

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992)............................................................. 8

## Statutes

16 U.S.C. § 824(b) ..................................................................... 16

**Statutes—continued**

42 U.S.C.
    § 7401(b)(1)..................................................................26
    § 7521(a)(1)..............................................2, 19, 20, 21
    § 7607(b)(1)...............................................................1, 2
    § 7607(d)(9)(A)........................................................9, 21

Mont. Code Ann.
    § 60-2-203......................................................................7
    § 60-2-204......................................................................7

Neb. Rev. Stat. § 39-2105(1)..............................................7

**Other Authorities**

*2017 and Later Model Year Light-Duty Vehicle Greenhouse
    Gas Emissions and Corporate Average Fuel Economy
    Standards*, 77 Fed. Reg. 62,624 (Oct. 15, 2012)..................20

*Agenda 47*, Donald J. Trump, https://perma.cc/EM9V-S6JT
    (Sept. 24, 2024) ..................................................................15

*Carbon Pollution Emission Guidelines for Existing Stationary
    Sources: Electric Utility Generating Units*,
    80 Fed. Reg. 64,662 (Oct. 23, 2015) ..................................10

EPA, *Resource Adequacy Analysis: Final Rule Technical
    Memorandum* 3, 9 (Mar. 2024), https://perma.cc/LCP8-
    759T.....................................................................................22

*EPA's Power Sector Modeling Platform 2023 Using IPM*
    (Apr. 25, 2024), https://perma.cc/ZNL7-DJLE ...............23, 24, 25

*Greenhouse Gas Emissions Standards and Fuel Efficiency
    Standards for Medium- and Heavy-Duty Engines and Vehicles*,
    76 Fed. Reg. 57,106 (Sept. 15, 2011) ....................................3

*Greenhouse Gas Emissions Standards for Heavy-Duty
    Vehicles—Phase 3*, 89 Fed. Reg. 29,440 (Apr. 22, 2024) ...........*passim*

## Other Authorities—continued

Office of Management & Budget,
    *Circular No. A-4* (Nov. 9, 2023) ............................................................ 26
    *Circular No. A-4* (Sept. 17, 2003) ................................................... 27, 28

U.S. Dep't of Energy, *Multi-State Transportation
    Electrification Impact Study* (Mar. 2024) ..................................... 14, 22

## Glossary

EPA        U.S. Environmental Protection Agency

IPM        Integrated Planning Model

RIA        Regulatory Impact Analysis

RTC        Response to Comments

TEIS       U.S. Dep't of Energy, *Multi-State Transportation Electrification Impact Study* (March 2024).

The rule   *Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles—Phase 3*, 89 Fed. Reg. 29,440 (Apr. 22, 2024).

## INTRODUCTION

Today, something other than an internal-combustion engine powers just one tenth of one percent of all heavy-duty vehicles. EPA wants to increase that figure exponentially in the next seven years. Under the rule challenged here, electric trucks would make up 45 percent of all heavy-duty vehicles sold by 2032. *Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles—Phase 3*, 89 Fed. Reg. 29,440, 29,568 (Apr. 22, 2024). The rule's electrification of the Nation's trucking fleet decides a major question. Accordingly, the rule is lawful only if Congress clearly authorized EPA to suppress the production of internal-combustion vehicles in favor of electric ones. No statute gives EPA that highly consequential power, and EPA has never claimed the power to require companies to sell electric heavy-duty vehicles. This forced transition to electric trucks will increase transportation costs, hike prices for basic goods, and strain the electric grid. It will also increase the cost of procuring the trucks that State Plaintiffs need to carry out essential state services like plowing snow and repairing roads. This Court should reverse EPA's rule.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to review the rule under 42 U.S.C. § 7607(b)(1). The rule is a "standard under section 7521." 42 U.S.C. § 7607(b)(1). State Petitioners petitioned for review on May 13, 2024,

which was "within sixty days" of the rule's publication in the *Federal Register*. *Id.*

## STATEMENT OF ISSUES

The issues presented are:

1.   Whether the rule exceeds EPA's statutory authority.

2.   Whether the rule is arbitrary and capricious.

## STATUTES AND REGULATIONS

All relevant statutes are included in the addendum to this brief.

## STATEMENT OF THE CASE

The Clean Air Act empowers EPA to set "standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles" that "cause, or contribute to, air pollution" and may "endanger public health or welfare." 42 U.S.C. § 7521(a)(1). Since *Massachusetts v. EPA*, 549 U.S. 497 (2007), EPA has, on three occasions, used this authority to set standards for greenhouse-gas emissions that heavy-duty vehicles emit from their tailpipes. Heavy-duty vehicles cover a wide range of vehicles that exceed 8,500 pounds based on gross vehicle weight rating and include vocational vehicles (e.g., snowplows and concrete mixers), shuttle busses, and other vehicles, all the way up to semi-trucks. 89 Fed. Reg. at 29,444.

The two previous rules decreased greenhouse-gas emissions by requiring heavy-duty vehicles to be more fuel efficient. Vehicles that

travel more miles per gallon burn less fuel and therefore emit less carbon dioxide. *See* 76 Fed. Reg. at 57,124–25. The rule here differs significantly because improved fuel-efficiency is not enough to comply. *See Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles—Phase 3*, 89 Fed. Reg. 29,440 (Apr. 22, 2024). Instead, companies must make vehicles with "zero tailpipe emissions" powered by an electric battery or fuel cell. *Id.* at 29,444 n.24. The standards take effect in 2027 for some vehicles. *Id.* at 29,451.

EPA outlines two pathways to comply with the new standards. The first assumes that electric vehicles will account for up to 60 percent of some lighter heavy-duty vehicles by 2032, *id.* at 29,452, and 45 percent of all heavy-duty vehicles sold that same year, *id.* at 29,568. The second pathway outlines a mix of powertrain technologies a manufacturer could use to comply with the rule that does not include additional battery-electric vehicles. *Id.* at 29,453. But that pathway assumes the availability of a hydrogen-powered engine that EPA admits does not "exist today." *Id.* at 29,452. EPA did not even consider the cost of complying with the second pathway because it is unrealistic. That is why EPA assumes the first pathway will be pursued—i.e., that the rule is an electric-vehicle mandate.

## SUMMARY OF THE ARGUMENT

No statute gives EPA the power to electrify the Nation's trucking fleet. In *West Virginia v. EPA*, the Supreme Court struck down EPA's attempt to "substantially restructure the American energy market." 597 U.S. 697, 724 (2022). EPA tries again here, this time targeting the logistics industry. If it stands, EPA's rule would disrupt a heavy-duty trucking industry that moves over $30 billion in freight every day. It would jeopardize electric-grid stability. And it would short circuit the lively debate over vehicle electrification playing out in Washington and the States.

For these and other reasons, the rule implicates a major question. That requires EPA to point to clear congressional authorization to electrify the Nation's heavy-duty vehicle fleet. *See id.* at 732. EPA does not come close. Its authority to set standards for vehicles that emit air pollutants gives it power to "set emissions standards for new motor vehicles" only "if they emit harmful air pollutants." *Truck Trailer Mfrs. Ass'n v. EPA*, 17 F.4th 1198, 1201 (D.C. Cir. 2021). Yet the entire premise of EPA's rule is that electric vehicles are "zero-emission" vehicles. As such, regulating—indeed, mandating—electric vehicles exceeds EPA's statutory power.

The rule is also arbitrary and capricious for its unexplained and flawed methodologies, unexplained assumptions, and flawed cost-benefit analysis. It assumes that the electric grid will meet increased demand,

that new technologies will have wide-spread existence, that the rule will mitigate weather-related grid disruptions, and that past reliability of the grid will continue. Not to mention, the rule relies on dubious metrics such as the "social cost" of greenhouse gases that inflate the purported benefits of the rule. The downplayed costs and overplayed benefits related to those assumptions and metrics belie EPA's cost-benefit analysis.

## STANDING

State Petitioners have standing to challenge EPA's rule. They suffer multiple injuries-in-fact that are traceable to the rule and would be redressed by the rule's reversal. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The rule harms State Petitioners in at least five ways. *First*, the rule will increase the cost of the internal-combustion vehicles that State Petitioners purchase and use to provide state services like plowing snow and repairing roads. State Petitioners own and purchase new heavy-duty vehicles of the type covered by the rule.[1] Many State Petitioners plan to buy only internal-combustion trucks.[2] Under the rule, manufacturers

---

[1] *E.g.*, Beach Decl. para. 4; Carlton Decl. paras. 4–5; Cobb. Decl. paras. 4–6; Glass Decl. paras. 4–7; Gregg Decl. para. 3; Kerttula Decl. paras. 4–6; Oliver Decl. paras. 4–5; Syslo Decl. paras. 4–8; Wiggins Decl. para. 4; Wilkinson Decl. paras. 7–10; Zycher Decl. paras. 5, 7, 17.

[2] *See, e.g.*, Carlton Decl. paras. 7–8; Cobb. Decl. para. 7; Glass Decl. 8–9; Kerttula Decl. paras. 8–13; Oliver Decl. paras. 8–11; Syslo Decl. 8–13; Wilkinson Decl. paras. 7–10.

will make fewer vehicles with internal-combustion engines. 89 Fed. Reg. at 29,452–53; *see* Zycher Decl. paras. 10–11. The decrease in supply and generally unchanged demand for internal-combustion trucks "will increase the cost of procuring heavy-duty trucks"—both those "powered with internal-combustion engines" as well as those "powered with electric, hydrogen, and hybrid technologies." Zycher Decl. para 5. And increased prices for goods and services are "certainly an injury-in-fact." *Competitive Enter. Inst. v. Fed. Commc'ns Comm'n*, 970 F.3d 372, 383 (D.C. Cir. 2020).

*Second*, the decrease in internal-combustion vehicles caused by the rule will limit State Petitioners' choice as consumers. Many State Petitioners prefer and plan to buy only internal-combustion heavy-duty vehicles. *See* p. 5 n.2, *supra*. Because the rule will limit the availability of internal-combustion vehicles, 89 Fed. Reg. at 29,452–53; *see* Zycher Decl. paras. 10–11, State Petitioners will have less choice in procuring the internal-combustion vehicles they prefer. This "lost opportunity to purchase vehicles of choice is sufficiently personal and concrete to satisfy Article III requirements." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 113 (D.C. Cir. 1990); *see Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1324 (D.C. Cir. 1986).

*Third*, the rule will force State Petitioners to spend tens of billions of dollars to build out their electric grids. *See* 89 Fed. Reg. at 29,520;

Daimler Truck N. Am. LLC Comment App. C, at 3 (June 2023); Am. Fuel & Petrochemical Mfrs. Comment at 20 (June 16, 2023); *see also* Watts Decl. paras. 13–14 (additional charging stations). By increasing the use of electric heavy-duty vehicles, the rule will boost demand for electricity beyond what the grid can handle now. *See* 89 Fed. Reg. 29,521; Clean Fuels Dev. Coal. Comment at 30 (June 16, 2023). The increased grid-related expenditures that will be borne by the States are "attributable to the HD Phase 3 rule itself." 89 Fed. Reg. 29,516.

*Fourth*, the rule will make road maintenance more expensive for State Petitioners. State Petitioners are responsible for maintaining roads in their States. *E.g.*, Neb. Rev. Stat. § 39-2105(1); Mont. Code Ann. §§ 60-2-203, 60-2-204. Electric vehicles are significantly heavier than comparable internal-combustion vehicles. *See* 89 Fed. Reg. at 29,538–41; Response to Comments ("RTC") at 635. Electric trucks, for example, are 2,100 to 13,800 pounds heavier than comparable internal-combustion vehicles. Western States Trucking Ass'n Comment at 14 (June 16, 2023). In general, heavier vehicles cause greater wear and tear to roads than lighter vehicles. *See* Anderson Decl. paras. 6–13; Jackson Decl. paras. 5–31; Syslo Decl. paras. 33–54; Watts Decl. paras. 8–12. Because the rule will place more electric trucks on State Petitioners' roads, *see* 89 Fed. Reg. at 29,452, those roads will degrade at an accelerated rate. That will

force State Petitioners to spend more to maintain roads.[3] Anderson Decl. para. 12; Jackson Decl. para. 31; Syslo Decl. paras. 53–54; Watts Decl. para. 10.

*Fifth*, at the same time the rule creates new costs for State Petitioners, the rule will decrease state fuel tax revenues. State Petitioners levy a tax on purchases of gasoline, diesel, and biofuels. As explained, the rule will reduce the number of vehicles powered by gasoline, diesel, and biofuels on State Petitioners' roads. *See* 89 Fed. Reg. at 29,452–53; *see* Zycher Decl. paras. 10–11. This will lower State Petitioners' fuel tax revenues. *E.g.*, McCray Decl. paras. 2–9; Nawrocki Decl. paras. 5–8; Tolman Decl. paras. 4–10; *see also* Miller Decl. paras. 18–19, 22 (loss of tax revenue from energy-sector revenues). This too is a legally cognizable injury in fact. *See Wyoming v. Oklahoma*, 502 U.S. 437, 448–51 (1992).

Each of State Petitioners' injuries is traceable to EPA's rule and would be redressed by a judicial decision reversing the rule. The rule targets vehicles with model years as far as eight years away, giving manufacturers ample time to respond to the rule's reversal. 89 Fed. Reg.

---

[3] The heaviest heavy-duty electric trucks may need to seek overweight permits to comply with federal on-road weight limits. If they do, the rule will cause State Petitioners to spend more time and money issuing those permits. *See* Gregg Decl. para. 5; Marten Decl. paras. 15–24; Syslo Decl. paras. 25–32.

at 29,451; *cf. Ohio v. EPA*, 98 F.4th 288, 302 (D.C. Cir. 2024) (rule affected model year cars at most three years away). And EPA itself projects that the rule "*will* lead to an increase in [heavy-duty zero-emission vehicles] relative to our reference case (*i.e.,* without the rule)." 89 Fed. Reg. at 29,455. Without the rule, there would be no such increase. State Petitioners' injuries caused by that increase "would be reduced to some extent" if the rule were reversed, making those injuries redressable. *Massachusetts*, 549 U.S. at 526.

## STANDARD OF REVIEW

Under the Clean Air Act, this Court shall "reverse" a final rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 42 U.S.C. § 7607(d)(9)(A), (C). This standard is "indistinguishable from the Administrative Procedure Act equivalent." *Nat'l Petrochemical & Refiner Ass'n v. EPA*, 287 F.3d 1130, 1135 (D.C. Cir. 2002).

## ARGUMENT

## I. The Rule Exceeds EPA's Statutory Authority.

EPA's rule is invalid because it decides a "major question" that Congress has not authorized the agency to rule on. *See West Virginia v. EPA*, 597 U.S. 697, 723 (2022). Congress must "speak clearly when authorizing an agency to exercise powers of 'vast "economic and political

significance.""" *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). EPA's decision to force manufacturers to make fewer internal-combustion vehicles and more electric vehicles satisfies this significance standard. No statute contains a clear statement permitting EPA's rule. *See* Ariz. Legislature Comment at 3–7 (June 16, 2023).

## A. Forced electrification of heavy-duty vehicles is a major question.

An agency decides a "major question" when it asserts a "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 597 U.S. at 724. Rules that decide issues of "economic and political significance" involve major questions. *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). "[T]he 'history and the breadth of the authority that [the agency] has asserted'" is also relevant in identifying a major question. *Id.* (quoting *Brown & Williamson*, 529 U.S. at 159–60).

### 1. The rule is economically significant.

a. Two years ago, the Supreme Court held that an EPA rule aimed at "substantially restructur[ing] the American energy market" presented a major question. *West Virginia*, 597 U.S. at 724. The *West Virginia* rule capped power plant emissions, "'shift[ing]' polluting activity 'from dirtier to cleaner sources.'" *Id.* at 725 (quoting 80 Fed. Reg. 64,662,

64,726). In essence, the rule "simply announc[ed] what the market share of coal, natural gas, wind, and solar must be" for all power plants. *Id.* at 731 n.4.

EPA's heavy-duty vehicles emissions rule puts the *West Virginia* rule on wheels. Like the *West Virginia* rule, this rule caps emissions and forces changes in technology. *See* 89 Fed. Reg. at 29,559–61. The rule makes manufacturers cut internal-combustion-vehicle production and start making vehicles with alternative powertrains. *See id.* at 29,452–53. And as its sales projections show, EPA is "simply announcing what the market share of" "zero-emission" heavy-duty vehicles should be. *West Virginia*, 597 U.S. at 731 n.4; *see* 89 Fed. Reg. at 29,452–53. The specific type of energy produced (*West Virginia*) and heavy-duty vehicles sold (here) are both economically significant questions.

The almost nonexistence of "zero-emission" heavy-duty vehicles heightens the rule's economic significance. Today, internal-combustion engines power almost every heavy-duty vehicle in America. In 2023, only 750 of the more than 731,000 heavy-duty vehicles sold had something other than an internal-combustion engine. *See* Regulatory Impact Analysis ("RIA") at 20, Tbl. 1-4. Battery-electric, hybrid, and fuel-cell heavy-duty vehicles made up one tenth of one percent of all heavy-duty sales. EPA envisions its rule will induce exponential increases to these alternative technologies' market share. The agency projects that by 2032, 60 percent of light heavy-duty vehicles sold (e.g., urban delivery trucks

and shuttle buses) and 25 percent of sleeper-cab trucks sold will be powered by a battery or hydrogen fuel cell. 89 Fed. Reg. at 29,452, Tbl. ES-3. In total, under its "lowest cost" pathway to compliance, EPA predicts that 45 percent of all heavy-duty vehicles sold in 2032 will be electric. *Id.* at 29,567; *see id.* at 29,484. A slighter market change satisfied the economic significance factor in *West Virginia. See* 597 U.S. at 714 (agency projected 11 percent decrease in coal's market share over 16 years).

b. This market transformation will affect "a significant portion of the American economy." *Util. Air*, 573 U.S. at 324. "Practically every" American consumes goods delivered by truck. *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023). Trucks move over 70 percent of the Nation's freight, and over 80 percent of U.S. communities "rely *exclusively* on trucking" to receive freight. Am. Trucking Ass'ns, *supra*, App. 2, at 3. EPA estimates that heavy-duty trucks move 33 million tons of freight worth $30 billion *every single day*. RIA at 5. No other mode of transportation comes close to moving the amount of cargo that trucks do—and the share of the transportation market dominated by trucks is projected to increase. *Id.* at 5–6. There can be "no serious dispute" that the rule attempts to exercise control over a major driver of the American economy. *Nebraska*, 143 S. Ct. at 2373; *see West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring).

Given the trucking industry's broad reach, disruptions to the transportation industry will have drastic downstream supply chain effects. Truck purchasers will pay up to three times more for battery-electric trucks and up to seven times more for fuel-cell trucks than they would for comparable internal-combustion trucks. Am. Trucking Ass'ns, *supra*, at 10. And one recent study finds that switching to a battery-electric sleeper cab would increase operation costs by as much as 114 percent per year. *See* Petition for Reconsideration, The Transport Project at 3 (June 21, 2024). Not only that, the decreased payload capacity of battery-electric trucks, *see* RTC at 634–37, and ten-hour charging stops will weaken critical supply chains and slow down the swift movement of goods that keeps the economy humming. Valero Energy Corp. Comment at 23–25, 31–32 (Apr. 27, 2023).

These costs and delays will ultimately be borne by consumers in the form of higher prices for goods and services that depend on the logistics industry. This means more expensive products that travel on trucks: from food to furniture to fuel. *See, e.g.*, Am. Trucking Ass'ns, *supra*, App. 2, at 4; Ariz. Legislature, *supra*, at 26; Valero, *supra*, at 37, 54. It also means higher costs for services, like truck rentals for moves. Finally, as Private Petitioners underscore, the rule would crimp the oil and gas industry, as well as disrupt the biofuel sector and farmers who support it. Private Petitioners Br. 22. On their own, the compliance,

infrastructure, and indirect costs of the rule are enormous. Combined, they plainly make the rule one of vast economic significance.

c. The rule will also require state and local governments to spend significant sums to expand electric grid capability. EPA concedes that this anticipated electric grid demand "is attributable to the HD Phase 3 rule itself." 89 Fed. Reg. 29,516. One study estimates that the rule requires $30 billion for charging equipment and installation and another $36 billion for electric grid updates. Daimler, *supra*, App. C, at 3. Another predicts that the "total investment cost could range from $15 to $100 billion, not including up to an additional $80 billion for [electricity] storage." Am. Fuel & Petrochemical Mfrs., *supra*, at 20. A Department of Energy study reports that $12 billion in grid infrastructure and charging stations is needed by 2032. U.S. Dep't of Energy, *Multi-State Transportation Electrification Impact Study* viii (Mar. 2024) ("TEIS"); *see* 89 Fed. Reg. at 29,520. But that study represents the capital costs of only *five States*. TEIS at v.

Any of these grid-buildout cost estimates alone land EPA's rule in major-questions territory. Even the most conservative estimate—a combined $66 billion investment—exceeds the projected $50 billion cost of the eviction moratorium vacated in *Alabama Association of Realtors*, 594 U.S. at 764. The costlier estimates approach the $200 billion price tag of the power plant rule struck down in *West Virginia*, 597 U.S. at 746 (Gorsuch, J., concurring). Both of those rules were economically

significant. *See Ala. Ass'n of Realtors*, 594 U.S. at 764; *West Virginia*, 597 U.S. at 728–29. This rule is too.

## 2. The rule is politically significant.

The rule also has a major question's political significance. Electric-vehicle mandates are the subject of an "'earnest and profound debate' across the country." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 735 (1997)). For example, State Petitioners and State Intervenors strongly disagree on whether governments should create electric-vehicle mandates. *E.g.*, *Iowa v. EPA*, No. 23-114 (D.C. Cir) (19-State challenge to California electric-truck mandate); *Nebraska v. Cliff*, No. 2:24-cv-1364 (E.D. Cal.) (17-State challenge to California ban on internal-combustion trucks). And one of the candidates for President is campaigning on a "promise[]" to "cancel the electric vehicle mandate" at issue here. *See Agenda 47*, Donald J. Trump, https://perma.cc/EM9V-S6JT (Sept. 24, 2024).

EPA's rule is also politically significant because it threatens electric grid reliability. "[E]lectricity is a necessity with few ready substitutes." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 269 (2016). Heating, lighting, air conditioning, office equipment, kitchen appliances, and, of course, electric vehicles all need a reliable supply of electricity. And that supply is increasingly interrupted by blackouts. *See* Clean Fuels Dev. Coal., *supra*, at 30. Given modern demands, policies that threaten grid reliability are strongly disfavored and are against the public interest.

*See, e.g.*, *Benton Cnty. Wind Farm LLC v. Duke Energy Ind., Inc.*, 843 F.3d 298, 299 (7th Cir. 2016); *Sierra Club v. Ga. Power Co.*, 180 F.3d 1309, 1311 (11th Cir. 1999); *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 357–58 (10th Cir. 1986).

Agency action threatening grid reliability also presents a major question because it "significantly alter[s] the balance between federal and state power." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 622 (2020)). EPA does not dispute that its rule will artificially increase the demand for electricity. *See* 89 Fed. Reg. at 29,514–18. States, not the federal government (nor EPA), have primary control over electricity generation. *See* 16 U.S.C. § 824(b). The "[n]eed for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States," and "in great detail." *PG&E v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205, 206 (1983). EPA flips that tradition upside down, arrogating to itself the power to dictate a massive increase in electricity production across the country. Both the federalism canon and the major-questions doctrine require clear congressional approval before EPA exercises such consequential authority. *See Ala. Ass'n of Realtors*, 594 U.S. at 764; *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

Finally, EPA's rule is politically significant because it makes America's logistics industry dependent on critical minerals controlled by foreign adversaries. *E.g.*, Am. Fuel & Petrochemical Mfrs., *supra*, at 36–

40; Ariz. Legislature, *supra*, at 31–33; Valero, *supra*, at 27–30. Two "key" minerals used in electric vehicles are graphite and cobalt, which the United States does not supply. 89 Fed. Reg. at 29,495. China does. It produces over 60 percent of the world's graphite, and the Democratic Republic of the Congo mines over 70 percent of the world's cobalt—half of which is controlled by China. *Id.* at 29,511; RTC at 1669–70. EPA acknowledges that China already limits its critical-mineral exports. 89 Fed. Reg. at 29,501. That supports the inference that Congress did not intend EPA to weigh "the many vital considerations of national policy" that come with electrifying the Nation's heavy-duty fleet. *West Virginia*, 597 U.S. at 729.

### 3. The rule vastly expands the agency's power.

The final consideration in a major-question analysis is the "breadth of the Government's claimed authority." *Id.* Recent major-question cases have considered whether upholding a particular regulation could sanction even more significant claims of authority in the future. In *West Virginia*, for example, the Court noted that if EPA could shift energy production from one source to another, then "it could go further, perhaps forcing coal plants to 'shift' away virtually all of their generation—*i.e.*, to cease making power altogether." 597 U.S. at 728. And in *Nebraska*, the Court worried that the Secretary of Education "would enjoy virtually unlimited power to rewrite the Education Act" if it agreed with "the Government's reading of the HEROES Act." 143 S. Ct. at 2373;

*see also Ala. Ass'n Realtors*, 594 U.S. at 764–65. In both cases, the sweeping future implications of a presently claimed authority added one more "'reason to hesitate before concluding that Congress' meant to confer such authority." *Nebraska*, 143 S. Ct. at 2372 (quoting *West Virginia*, 597 U.S. at 721).

EPA's theory of its authorizing statute likewise warrants hesitation here. If EPA's rule stands, EPA could likely ban the sale of all internal-combustion vehicles. If EPA can enact a partial electric-vehicle mandate, then "it could go further, perhaps forcing" manufacturers to "'shift' away virtually all" internal-combustion vehicle production—"*i.e.*, to cease making [traditional vehicles] altogether." *West Virginia*, 597 U.S. at 728. The 1970 Congress that passed the statute on which EPA relies would be surprised to learn that it delegated the power to ban nearly every vehicle then in existence. EPA only recently set emission standards that require electrification. *See Texas v. EPA*, No. 22-1031 (D.C. Cir.). And this rule is its first attempt to electrify heavy-duty vehicles, making its claim of authority novel and all the more suspect. *See West Virginia*, 597 U.S. at 725; *Util. Air*, 573 U.S. at 324.

Upholding EPA's electric-vehicle mandate would allow it to wield "extravagant statutory power over the national economy" through a future ban on internal-combustion vehicles. *Util. Air*, 573 U.S. at 324. Under the major-questions doctrine, such a vast expansion of regulatory

power should be met with "skepticism." *Id.* That is especially true where, as here, the rule under review is economically and politically significant.

## B.   EPA lacks clear congressional authorization.

Because EPA's rule is economically and politically significant and strikingly expands EPA's authority, the agency must point to "clear congressional authorization" for the rule. *West Virginia*, 597 U.S. at 732 (quoting *Util. Air*, 573 U.S. at 324). It has not done so. No statute gives EPA the power to force manufacturers to make heavy-duty vehicles with specific powertrains. Nor does any statute allow EPA to impose a cap on the number of internal-combustion vehicles that can be sold.

EPA attempts to justify the rule based on its power to set "standards applicable to the emission of any air pollutant" for "classes" of those new motor vehicles. 42 U.S.C. § 7521(a)(1); *see* 89 Fed. Reg. at 29,459–61. But that authority would be an "oblique or elliptical" way for Congress to empower EPA to suppress the production of internal-combustion vehicles. *West Virginia*, 597 U.S. at 723. Under its statutory power to "establish[] standards of performance" for power plants, EPA cannot "direct existing [power plants] to effectively cease to exist." *Id.* at 728 n.3. So too here. EPA's authority to set "standards applicable to the emission of any air pollutant from . . . new motor vehicles" does not allow it to direct manufacturers to cease making internal-combustion vehicles. 42 U.S.C. § 7521(a)(1). Because EPA lacks clear congressional authorization to phase out internal-combustion vehicles in favor of

electric ones, that consequential decision "rests with Congress itself." *Id.* at 735.

Even if the rule did not implicate a major question, it still exceeds EPA's statutory authority. The statute allows EPA to set "standards applicable to the emission of any air pollutant." 42 U.S.C. § 7521(a)(1). As this Court has explained, EPA can "set emissions standards for new motor vehicles . . . if they emit harmful air pollutants." *Truck Trailer Mfrs. Ass'n v. EPA*, 17 F.4th 1198, 1201 (D.C. Cir. 2021). Accordingly, if a vehicle does not emit a harmful air pollutant, EPA cannot set emission standards for it.

Yet that is exactly what EPA's rule does. The premise of the rule is that battery-electric and fuel-cell vehicles, "by definition, emit zero tailpipe emissions." 89 Fed. Reg. at 29,706. The rule's use of fleetwide averaging—which is itself contrary to the statute, *see* Private Petitioners Br. 32–50— applies the emission standards to all heavy-duty vehicles, including battery-electric and fuel-cell ones. *See id.* at 29,460. By including these purportedly non-emitting vehicles in the class of vehicles subject to the rule, EPA exceeded its statutory authority to set standards for vehicles that "emi[t]" air pollutants. 42 U.S.C. § 7521(a)(1).

EPA's prior emission standards for heavy-duty vehicles did not regulate non-emitting vehicles. Under the Phase 1 and Phase 2 rules, "electrification [was] an option for compliance but [was] not required." 77 Fed. Reg. at 62,917. Neither rule was "premised on the application of

[zero-emission vehicle] technologies." 89 Fed. Reg. at 29,483. The rule here abandons those previous limitations and requires the production (or creation) of new powertrains. By overtly regulating heavy-duty vehicles that EPA assumes do not "emi[t] any air pollutant" EPA has exceeded its statutory authority to limit the tailpipe emissions of new motor vehicles. 42 U.S.C. § 7521(a)(1).

*　　*　　*

Nothing in the Clean Air Act authorizes EPA to mandate electric vehicles or suppress the production of internal-combustion vehicles. EPA therefore exceeded its statutory authority, and this Court should reverse the rule.

## II. The Rule Is Arbitrary and Capricious.

This Court should also "reverse" this final rule because it is arbitrary and capricious. 42 U.S.C. § 7607(d)(9)(A). Agencies must engage in reasoned decision-making. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). Thus, an agency action is arbitrary and capricious if it relies on unsupported assumptions, *Small Ref. Lead Phase-Down Task Force v. EPA*, 705 F.2d 506 (D.C. Cir. 1983), ignores important aspects of the problem, *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024), considers impermissible factors, *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983), or relies on a flawed cost-benefit analysis, *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). This rule does all the above.

## A.    EPA ignored significant harms to the electric grid's reliability.

As explained, by forcing exponential increases to the number of heavy-duty battery-electric vehicles on State Petitioners' roads, EPA's rule will increase electricity demand. *See* p. 16, *supra*. This jeopardizes the stability of State Petitioners' electric grids. The agency's contrary conclusions that the rule is "unlikely" to harm, and might "benefit[]," the electric grid are wrong.  89 Fed. Reg. at 29,521–22. They also are not sufficiently supported. Because the agency "has no expertise on grid reliability," EPA "must support its arguments [regarding grid reliability] more thoroughly." *Texas v. EPA*, 829 F.3d 405, 432 (5th Cir. 2016).

To begin, EPA used a sleight of hand by focusing on "grid reliability in the sense of adequacy." 89 Fed. Reg. at 29,524. But adequacy assumes reliability, the very thing EPA uses adequacy to prove. To illustrate, take the central tool EPA used: the Integrated Planning Model ("IPM"). *See* TEIS at 10; EPA, *Resource Adequacy Analysis: Final Rule Technical Memorandum* 3, 9 (Mar. 2024), https://perma.cc/LCP8-759T. That tool makes an unwarranted presumption; it "assumes that adequate transmission capacity *exists* to deliver any resources." *Resource Adequacy Analysis*, *supra*, at 9 (emphasis added). Thus, the model adds enough new resources to ensure there is sufficient electric generating capacity in the future to "*meet* its total demand." RIA, at 561–62. But it does not prove that the future resources added by EPA's model will or can be built within

the required timeframe. *See EPA's Power Sector Modeling Platform 2023 Using IPM* at 4-1 (Apr. 25, 2024), https://perma.cc/ZNL7-DJLE. Models like this allow the modeler to obtain almost any desired result because key inputs can be chosen arbitrarily. Ariz. Legislature, *supra*, at 21. And whether the grid has adequate generation resources does not answer whether the system can reliably serve the unique demands of non-existent infrastructure.

Next, EPA assumed that just because the grid has been reliable, it will "continue[] to be very reliable." 89 Fed. Reg. at 29,524; *see id.* at 29,521. Assuming the future will be the same as the past is not analysis. Nor is it clear that it is correct or that the present will be comparable to the future in all relevant respects. *See* Valero, *supra*, at 23. Not to mention, it is questionable that the grid is reliable considering multiple already-existing grid reliability issues unaddressed by EPA. *See id.* at 37–43; Ariz. Legislature, *supra*, at 28–29.

EPA also assumed that because utilities have "routinely upgrade[d]" the power system to meet demands for air conditioners, data centers, and cryptocurrency mining operations, they will also meet future demand in the required timeframe, *see* 89 Fed. Reg. at 29,522 n.466, despite the multiple changes on the demand and supply sides of electricity generation and distribution. *See* Daimler, *supra*, at 47 (noting data centers, and the like, were greenfield projects). EPA ignored all the comments that raised concerns over the many changes on the supply and

demand sides of electric energy that preexist and result from EPA's other regulations. *See, e.g.,* Am. Fuel & Petrochemical Mfrs., *supra*, at 21; Ariz. Legislature, *supra*, at 30. And it skirted concerns related to interconnection backlogs, supply-chain shortages, and labor shortages for existing projects. *See* Am. Fuel & Petrochemical Mfrs., *supra*, at 22.

Finally, EPA made other unfounded assumptions about grid reliability. It cited various technologies that could be used to increase reliability and assumes that they will be used—and used at such a scale as to have a meaningful effect. EPA's statements regarding bidirectional charging, 89 Fed. Reg. at 29,521, onsite renewable generation, RIA at 130, and vehicle to grid technology, *id.* at 125, relied on the unexplained assumption that they will actually be used on a widespread scale. Valero, *supra*, at 39; Daimler, *supra*, at 68. Furthermore, EPA never explained the feasibility of off-peak charging, RIA at 125—especially given off-peak charging often relies on the same "baseload fossil fuels" that EPA is targeting for elimination. Most new renewable energy sources are weather-dependent, intermittent, and are not suitable for generating baseload power, while EPA's several other recent rulemakings phase out reliable fossil fuel energy generation. *See* Ariz. Legislature, *supra*, at 30.

And EPA assumed the rule's purported global greenhouse gas reductions will decrease weather-related grid disruptions. *See* 89 Fed. Reg. at 29,524. Yet it never provided facts supporting that claim. It even acknowledged that it "did not conduct modeling" on certain weather-

changes that it claims might affect grid reliability. *Id.* at 29,675. The use of the social cost of greenhouse gases is no substitute because it provides no information on such weather-changes.

Most of EPA's analysis of grid reliability depended on inapt statistics that assume EPA's best case—that the grid will be reliable. All the rest of EPA's analysis relied on assumptions on various aspects of the electric grid and unsupported assertions that the rule will decrease weather-related grid disruptions. That analysis is hardly "thorough[]." *Texas*, 829 F.3d at 432.

## B. EPA improperly analyzed the "social cost of greenhouse gases."

The rule is also fatally flawed because of its reliance on the social cost of greenhouse gases. EPA describes the social cost of greenhouse gases as "the monetary value of the net harm to society associated with a marginal increase in [greenhouse-gas] emissions in a given year, or the net benefit of avoiding that increase." 89 Fed. Reg. at 29,708.

In the first place, EPA's justification for relying on a "social cost" of greenhouse gas emissions does not withstand scrutiny. EPA's predictions are "subject to the restraints of reasonableness" and cannot "open the door to 'crystal ball' inquiry." *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 629 (D.C. Cir. 1973). But that defines EPA's analysis of this intangible harm. Ariz. Legislature, *supra*, at 16. The inputs into its models purport to monetize the effect of a discrete amount of greenhouse

gas emissions on global wars, famines, technological developments, and other unknowable future events—out to the year 2300. *Id.*

Even if EPA could reasonably rely on that metric, it must be limited to the domestic effect of the social cost of greenhouse gas emissions. The agency erred by going beyond the Nation's borders to credit the *global* benefits from the reduction of greenhouse gas emissions. RIA at 758; Office of Management & Budget, *Circular No. A-4* (Nov. 9, 2023). The Clean Air Act is legislation, and "Congress generally legislates with domestic concerns in mind." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 336 (2016) (quoting *Smith v. United States*, 507 U.S. 197, 204, n.5 (1993)); Clean Fuels Dev. Coal., *supra*, at 37. Congress declared that one of the Act's "purposes" is "to protect and enhance the quality of *the Nation's* air resources so as to promote the public health and welfare and the productive capacity of *its population.*" 42 U.S.C. § 7401(b)(1) (emphasis added). The statute says nothing of extraterritorial impacts or those on the residents of foreign countries. Considering the global social cost of greenhouse gases, thus, is reliance on a factor that "Congress has not intended" EPA to consider. *State Farm*, 463 U.S. at 43.

Including global benefits also creates an apples-and-oranges problem because the rule did not calculate the global effects of the rule on, for example, the electric grid. The rule acknowledged increased demands on the domestic electric grid and need for domestic grid upgrades. *See, e.g.,* 89 Fed. Reg. at 29,521–22. But it did not acknowledge

the same effects in Mexico, Canada, and other countries where American trucking companies operate. *See id.* EPA never addressed why it makes sense to include benefits for noncitizens who do not pay for compliance or enforcement costs in a cost-benefit analysis. As commenters pointed out, it exaggerates the rule's benefits while diluting its costs. Ariz. Legislature, *supra*, at 2, 9–22. Adding noncitizens to one side of the cost-benefit analysis and not the other skews the results, allowing regulators to consider the regulatory benefits to billions of noncitizens while considering costs imposed on only U.S. residents burdened by the rule.

Next, the rule is arbitrary and capricious because EPA changed positions without "display[ing] awareness" that it was doing so, much less providing the requisite "reasoned explanation" for its change. *Navarro*, 579 U.S. at 222. The 2003 version of Circular A-4 that governs cost-benefit analyses considered domestic, not global, benefits, and used a higher discount rate. *See* Office of Management & Budget, *Circular No. A-4* (Sept. 17, 2003). Yet EPA never explained its switch.

The unreasoned transition to an unrealistic discount rate only compounds the inflated social benefits related to reduction in global greenhouse gas emissions. A discount rate is simply how much to value present costs to future benefits. Higher discount rates give less present value to benefits or costs that are assumed to occur in the future, and lower discount rates give more present value. Future benefits should be discounted to a present value using a reasonable, realistic rate. The 2003

Circular A-4 framework used 3 and 7 percent discount rates. *See id.* Without explanation, the rule uses a 2-percent discount rate to costs and benefits, which causes a gross overestimation of the rule's benefit and harm related to climate change. RIA at 660, 668. Put another way, EPA's new methodology causes a multiplied increase in the alleged "benefit" of its new rule, all based on speculative and unreasonable assumptions. *See* Ariz. Legislature, *supra*, at 16–18.

### C.  EPA's cost-benefit analysis is flawed.

A "serious flaw" in an agency's cost-benefit analysis can make a rule unreasonable. *Nat'l Ass'n of Home Builders*, 682 F.3d at 1040. Here, EPA said the rule's costs and benefits related to the electric grid were "reasonable," 89 Fed. Reg. at 29,520, and greenhouse gas emissions were "[a]n essential factor" supporting the rule, *id.* at 29,591. Yet EPA's analysis embraces multiple serious flaws.

1.  EPA downplayed several grid reliability costs. The rule, for example, fails to consider who will pay for grid improvements and how much those improvements will cost. *See* Nat'l Rural Elec. Coop. Ass'n Comment at 3 (Jun. 19, 2023); Schneider Nat'l, Inc. Comment at 2 (Jun. 16, 2023). The answer is fleets, States, and Americans. Daimler, *supra*, at 34, 45–52; *see* pp. 14–15, *supra*. Costs related to a forced shift in electricity generation coupled with increased demand for electricity will be passed down to the end user. *See* p. 13, *supra*. EPA failed to account for this shift. EPA also failed to consider the costs of all the technology it

lauds. *See, e.g.,* 89 Fed. Reg. at 29,521; RIA at 125. And EPA tiptoed past costs of basic aspects of infrastructure to ensure grid reliability. *See* Edison Elec. Inst. Comment at 17 (Jun. 15, 2023). The EPA did not sufficiently consider supply and labor shortages. *Id.* at 15. Nor did it sufficiency consider permitting issues. *Id.* at 15–16.

2.    EPA downplayed costs and overplayed benefits associated with the social cost of greenhouse gases. EPA revised greenhouse gas cost estimations to include global, not just domestic, benefits and modified its discount rate, resulting in a stunning exaggeration of the rule's projected "benefits." 89 Fed. Reg. at 29,456, 29,710 & n.1364. Indeed, including global impacts produces drastically different calculations. Considering global effects puts the social cost of greenhouse gases between $35 and $41 per ton. *See* Ariz. Legislature, *supra*, App. at 9. But the former administration, which factored in only domestic damages and used a higher discount rate, puts costs at around $7 per ton. *See id.* EPA failed to address that massive disparity. Indeed, the basic premise underlying the use of a "discount rate" is that the more speculative a prediction, the higher the discount rate to account for that risk. But EPA selected an extremely low two-percent discount rate that cannot reflect such speculative estimates related to the global effect of human migration, wars, natural disasters, mitigation of purported consequences of climate change, and technological development over the next 300 years. *Id.* at 2, 9–22.

Furthermore, EPA's cost-benefit analysis is "internally inconsistent." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018) (vacating agency order as arbitrary and capricious). Although EPA used the new discount rates and global focus for assessing the costs of greenhouse gases, the rest of its cost-benefit analysis employed the old Circular A-4 methodology. *See* RIA at 754, 760. This inconsistency resulted in another comparison of apples (the costs of greenhouse gases) to oranges (the costs and benefits of the other aspects of EPA's analysis). *See* 89 Fed Reg. at 29,457.

## Conclusion

The Court should reverse EPA's rule.

Dated: October 16, 2024

Respectfully submitted.

MICHAEL T. HILGERS
Attorney General of Nebraska

/s/ Eric J. Hamilton

ERIC J. HAMILTON
Solicitor General
eric.hamilton@nebraska.gov

Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
Fax: (402) 471-3297

ZACHARY B. POHLMAN
GRANT D. STROBL
Assistant Solicitors General

*Counsel for State of Nebraska*

Additional counsel below

STEVE MARSHALL
Attorney General of Alabama

/s/ Edmund G. LaCour Jr.
EDMUND G. LACOUR JR.
*Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel.: (334) 242-7300
Fax: (334) 353-8400
edmund.lacour@alabamaag.gov

*Counsel for State of Alabama*

TREG R. TAYLOR
Attorney General of Alaska

/s/ Masha Kazakova
MASHA KAZAKOVA
*Assistant Attorney General*
Environmental Section
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
Tel.: (907) 269-5211
masha.kazakova@alaska.gov

*Counsel for State of Alaska*

TIM GRIFFIN
Attorney General of Arkansas

/s/ Nicholas J. Bronni
NICHOLAS J. BRONNI
*Solicitor General*
DYLAN L. JACOBS
*Deputy Solicitor General*
Office of the Arkansas
Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel.: (501) 682-2007
nicholas.bronni@arkansasag.gov
dylan.jacobs@arkansasag.gov

*Counsel for State of Arkansas*

ASHLEY MOODY
Attorney General of Florida

/s/ Henry C. Whitaker
HENRY C. WHITAKER
*Solicitor General*
JAMES H. PERCIVAL
*Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Tel.: (850) 414-3300
Fax: (850) 410-2672
henry.whitaker@myfloridalegal.com
james.percival@myfloridalegal.com

*Counsel for State of Florida*

CHRISTOPHER M. CARR
Attorney General of Georgia

/s/ Stephen J. Petrany
STEPHEN J. PETRANY
*Solicitor General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
Tel.: (404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

THEODORE E. ROKITA
Attorney General of Indiana

/s/ James A. Barta
JAMES A. BARTA
*Solicitor General*
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, Indiana 46204
Tel.: (317) 232-0709
james.barta@atg.in.gov

*Counsel for State of Indiana*

RAÚL R. LABRADOR
Attorney General of Idaho

/s/ Alan M. Hurst
ALAN M. HURST
*Solicitor General*
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
Tel.: (208) 334-2400
alan.hurst@ag.idaho.gov

*Counsel for State of Idaho*

BRENNA BIRD
Attorney General of Iowa

/s/ Eric H. Wessan
ERIC H. WESSAN
*Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel.: (515) 823-9117
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

KRIS W. KOBACH
Attorney General of Kansas

/s/ Anthony J. Powell
ANTHONY J. POWELL
*Solicitor General*
Office of the Kansas
Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Tel.: (785) 368-8539
Fax: (785) 296-3131
anthony.powell@ag.ks.gov

*Counsel for State of Kansas*

RUSSELL COLEMAN
Attorney General of Kentucky

/s/ Matthew F. Kuhn
MATTHEW F. KUHN
*Solicitor General*
JACOB M. ABRAHAMSON
*Assistant Solicitor General*
Office of Kentucky
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Tel.: (502) 696-5300
matt.kuhn@ky.gov
jacob.abrahamson@ky.gov

*Counsel for Commonwealth
of Kentucky*

ELIZABETH B. MURRILL
Attorney General of Louisiana

/s/ J. Benjamin. Aguiñaga
J. BENJAMIN AGUIÑAGA
*Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70802
Tel.: (225) 506-3746
aguinagab@ag.louisiana.gov

*Counsel for State of Louisiana*

LYNN FITCH
Attorney General of Mississippi

/s/ Justin L. Matheny
JUSTIN L. MATHENY
*Deputy Solicitor General*
Office of the Mississippi Attorney
General
P.O. Box 220
Jackson, Mississippi 39205-0220
Tel.: (601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ANDREW BAILEY
Attorney General of Missouri

/s/ Caleb Rutledge
CALEB RUTLEDGE
*Assistant Attorney General*
Attorney General's Office of
Missouri
Post Office Box 899
Jefferson City, MO 65102
Tel.: (573) 751-0812
Fax: (573) 751-0774
caleb.rutledge@ago.mo.gov

*Counsel for State of Missouri*

GENTNER DRUMMOND
Attorney General of Oklahoma

/s/ Garry M. Gaskins, II
GARRY M. GASKINS, II
*Solicitor General*
JENNIFER L. LEWIS
*Deputy Attorney General*
Office of the Attorney General
of Oklahoma
313 NE Twenty-First St.
Oklahoma City, Oklahoma 73105
Tel.: (405) 521-3921
garry.gaskins@oag.ok.gov
jennifer.lewis@oag.ok.gov

*Counsel for State of Oklahoma*

AUSTIN KNUDSEN
Attorney General of Montana

/s/ Christian B. Corrigan
CHRISTIAN B. CORRIGAN
*Solicitor General*
PETER M. TORSTENSEN, JR.
*Deputy Solicitor General*
Montana Department of Justice
215 N. Sanders
Helena, Montana 59601
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for State of Montana*

ALAN WILSON
Attorney General of South Carolina

/s/ Joseph D. Spate
JOSEPH D. SPATE
*Assistant Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
Tel.: (803) 734-3371
josephspate@scag.gov

*Counsel for State of South Carolina*

MARTY J. JACKLEY
Attorney General of South Dakota

/s/ Steve Blair
STEVE BLAIR
*Deputy Attorney General*
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501-8501
Tel.: (605) 773-3215
atgservice@state.sd.us

*Counsel for State of South Dakota*

JONATHAN SKRMETTI
Attorney General and Reporter
of Tennessee

/s/ J. Matthew Rice
J. MATTHEW RICE
*Solicitor General*
WHITNEY HERMANDORFER
*Director of Strategic Litigation*
Office of the Attorney General and
Reporter of Tennessee
P.O. Box 20207
Nashville, Tennessee 37202-0207
Tel.: (615) 532-6026
matt.rice@ag.tn.gov

*Counsel for State of Tennessee*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
*First Assistant Attorney General*
JAMES LLOYD
*Deputy Attorney General for Civil Litigation*
KELLIE E. BILLINGS-RAY
*Chief, Environmental Protection Division*
/s/ Wesley S. Williams
WESLEY S. WILLIAMS
*Assistant Attorney General*
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel.: (512) 463-2012
Fax: (512) 320-0911
wesley.williams@oag.texas.gov

*Counsel for State of Texas*

SEAN REYES
Attorney General of Utah

/s/ Stanford Purser
STANFORD PURSER
*Solicitor General*
Office of the Utah Attorney General
160 East 300 South, Fifth floor
Salt Lake City, Utah 84111
Tel.: (385) 382-4334
spurser@agutah.gov

*Counsel for State of Utah*

JASON MIYARES
Attorney General of Virginia

/s/ Kevin M. Gallagher
KEVIN M. GALLAGHER
*Principal Deputy Solicitor General*
BRENDAN T. CHESTNUT
*Deputy Solicitor General*
Virginia Attorney General's Office
202 North 9th Street
Richmond, Virginia 23219
Tel.: (804) 786-2071
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for Commonwealth of Virginia*

BRIDGET HILL
Attorney General of Wyoming

/s/ Ryan Schelhaas
RYAN SCHELHAAS
*Chief Deputy Attorney General*
Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, Wyoming 82002
Tel.:(307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for State of Wyoming*

PATRICK MORRISEY
Attorney General of West Virginia

/s/ Michael R. Williams
MICHAEL R. WILLIAMS
*Solicitor General*
Office of the Attorney General of West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, West Virginia 25301
Tel.: (304) 558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,990 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used to calculate the word count).

/s/ Eric J. Hamilton
ERIC J. HAMILTON

## CERTIFICATE OF SERVICE

On October 16, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that the document has been scanned for viruses and is free of viruses.

/s/ Eric J. Hamilton
ERIC J. HAMILTON