U.S. COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

State of Nebraska, et al.,
Petitioners,

v.

U.S. Environmental Protection Agency and Michael S. Regan, in his official capacity as Administrator, U.S. Environmental Protection Agency, Respondents.

———————————

Petition for Review of a Rule of
the U.S. Environmental Protection Agency

———————————

**EPA's Proof Answering Brief**

———————————

Todd Kim
Assistant Attorney General

*Of counsel*           Sarah A. Buckley
Andrea Carrillo     Alex J. Hardee
Stacey S. Garfinkle  Jin Hyung Lee
Ryland Shengzhi Li  U.S. Department of Justice
U.S. Environmental Protection  Environment & Natural Resources Div.
Agency              Environmental Defense Section
Office of General Counsel  P.O. Box 7611
Washington, D.C.     Washington, D.C. 20044
                           202.616.7554
                           sarah.buckley@usdoj.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

As required by D.C. Circuit Rule 28(a)(1), EPA certifies:

## A.    Parties and amici

All petitioners, respondents, and intervenors appearing here are listed in petitioners' opening briefs.

In addition, amici for petitioners are:

- Chamber of Commerce of the United States

- American Trucking Associations, Inc.

- National Association of Wholesale-Distributors

Amici for respondents are:

- International Council on Clean Transportation, The University of California, Davis Institute of Transportation Studies

## B.    Rulings under review

Under review is the action "Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles—Phase 3," 89 Fed. Reg. 29440 (Apr. 22, 2024).

## C.    Related cases

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

*/s/ Sarah A. Buckley*
Counsel for EPA

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ................................. i

Table of Contents ........................................................................................ ii

Table of Authorities ....................................................................................v

Glossary..................................................................................................... xiv

Introduction .................................................................................................1

Statement of Jurisdiction............................................................................3

Issues Presented ..........................................................................................3

Statutes and Regulations ............................................................................5

Statement of the Case.................................................................................5

    I.     Legal framework. .......................................................................5

    II.    Structuring the standards.........................................................7

    III.   The most effective emission-control technologies............................13

    IV.   Charting EPA's vehicle-emission rules. ...........................................16

    V.    The Heavy Duty Rule................................................................18

        A.    Basis for the standards. .........................................................19

        B.    Cost-benefit analysis................................................................21

Standard of Review....................................................................................22

Summary of Argument ..............................................................................23

Argument....................................................................................................27

    I.     Petitioners lack a cause of action because they are outside
        Section 7521(a)'s zone of interests. ..................................................27

II.    Petitioners' statutory arguments are time-barred. ...............................28

III.   EPA has authority to promulgate the Heavy Duty Rule. ...................31

       A.    Section 7521(a) authorizes EPA to regulate electric
             vehicles...............................................................................32

             1.    Electric vehicles are "motor vehicles" within
                   EPA's regulatory ambit. ..................................................32

             2.    EPA's authority over motor vehicles does not turn
                   on their emission levels. .................................................39

             3.    Petitioners' remaining arguments are wrong.................48

       B.    The Heavy Duty Rule lawfully uses fleet averaging. ..............50

             1.    Section 7521(a) authorizes fleet averaging. ..................50

             2.    Fleet averaging aligns with other statutory
                   requirements. ..................................................................52

       C.    The major-questions doctrine offers no reason to depart
             from statutory text...............................................................57

             1.    Petitioners' "major question" is untethered to an
                   interpretive question. .....................................................58

             2.    EPA broke no legal ground by tightening earlier
                   standards. .......................................................................60

             3.    The rule hews to the regulatory approach blessed
                   in *West Virginia*.............................................................63

             4.    Petitioners' other arguments are meritless. ...................68

             5.    Even under the major-questions doctrine, clear
                   congressional authorization exists................................72

IV.    The Heavy Duty Rule is reasonable...................................................73

A.    EPA established reasonable standards. .....................73

B.    Petitioners' objections to EPA's analyses are meritless. ..........79

    1.    EPA reasonably accounted for supporting infrastructure buildout. ...................................79

    2.    EPA reasonably considered technology costs. ..............82

    3.    EPA reasonably assessed purchasers' willingness to adopt electric vehicles. ...............................83

    4.    EPA reasonably included electric sleeper cabs in the modeled compliance pathway. ................................87

    5.    EPA reasonably evaluated H2-ICE technologies' feasibility. .......................................88

C.    EPA reasonably determined that the standards are unlikely to adversely affect grid reliability. .............................89

D.    EPA reasonably considered upstream emissions. ....................91

E.    EPA reasonably declined to consider regulating fuels. ............93

F.    EPA's cost-benefit analysis is sound. ........................95

Conclusion ...............................................................................98

Certificates of Compliance and Service.................................................99

# TABLE OF AUTHORITIES

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  594 U.S. 758 (2021) ...................................................................62

*Alon Refin. Krotz Springs, Inc. v. EPA*,
  936 F.3d 628 (D.C. Cir. 2019)....................................................30

*Am. Hosp. Ass'n v. Becerra*,
  142 S. Ct. 1896 (2022)................................................................68

*Am. Iron & Steel Inst. v. EPA*,
  115 F.3d 979 (D.C. Cir. 1997)....................................................84

*Barnhart v. Thomas*,
  540 U.S. 20 (2003) .....................................................................45

*Becerra v. Empire Health Found.*,
  142 S. Ct. 2354 (2022)................................................................68

*Biden v. Missouri*,
  595 U.S. 87 (2022) ............................................................... 61, 68

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023)................................................................57

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) ...................................................................36

*Chevron, USA, Inc. v. NRDC*,
  467 U.S. 837 (1984) ...................................................................51

*City of Portland v. EPA*,
  507 F.3d 706 (D.C. Cir. 2007)............................................... 79, 95

*CSL Plasma Inc. v. CBP*,
  33 F.4th 584 (D.C. Cir. 2022) ....................................................27

*Delta Constr. Co. v. EPA*,
    783 F.3d 1291 (D.C. Cir. 2015)..................................................... 28, 30

*EPA v. EME Homer City Generation, L.P.*,
    572 U.S. 489 (2014) ........................................................................68

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ........................................................................62

*Grocery Mfrs. Ass'n v. EPA*,
    693 F.3d 169 (D.C. Cir. 2012)........................................................28

*Growth Energy v. EPA*,
    5 F.4th 1 (D.C. Cir. 2021) ........................................................ 30, 31

*\* Int'l Harvester Co. v. Ruckelshaus*,
    478 F.2d 615 (D.C. Cir. 1973)................................... 7, 28, 35, 67

*Lockhart v. United States*,
    577 U.S. 3474 (2016) ......................................................................45

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ................................. 22, 23, 35, 42, 51

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) .......................................................... 8, 42, 73

*Med. Waste Inst. v. EPA*,
    645 F.3d 420 (D.C. Cir. 2011)................................................ 7, 28, 30

*Motor & Equip. Mfrs. Ass'n v. EPA*,
    627 F.2d 1095 (D.C. Cir. 1979).....................................................68

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................... 23, 38

*Nat'l Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012).....................................................95

*Nat'l Biodiesel Bd. v. EPA*,
  843 F.3d 1010 (D.C. Cir. 2016).................................................31

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ...........................................................68

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
  595 U.S. 109 (2022) ...........................................................62

*New York v. FERC*,
  535 U.S. 1 (2002) ...............................................................68

*NextEra Energy Res., LLC v. FERC*,
  118 F.4th 361 (D.C. Cir. 2024) ..........................................22

* *NRDC v. EPA*,
  655 F.2d 318 (D.C. Cir. 1981)............................. 35, 67, 73

* *NRDC v. Thomas*,
  805 F.2d 410 (D.C. Cir. 1986)............................. 12, 29, 51

*NRDC v. EPA*,
  571 F.3d 1245 (D.C. Cir. 2009).........................................31

*NRDC v. EPA*,
  954 F.3d 150 (2d Cir. 2020) ..............................................44

* *Save Jobs USA v. DHS*,
  111 F.4th 76 (D.C. Cir. 2024) ............................. 57, 58, 65

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ...........................................................22

*Truck Trailer Mfr. Ass'n v. EPA*,
  17 F.4th 1198 (D.C. Cir. 2021) .........................................44

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001) .............................................................45

vii

*Twin Rivers Paper Co. LLC v. SEC*,
  934 F.3d 607 (D.C. Cir. 2019)....................................................28

*U.S. Sugar Corp. v. EPA*,
  113 F.4th 984 (D.C. Cir. 2024) ..................................................31

*Util. Air. Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ...................................................................62

\* *West Virginia v. EPA*,
  597 U.S. 697 (2022) ........................ 2, 57, 60, 61, 62, 63, 64, 67, 69, 72

*White Stallion Energy Ctr., LLC v. EPA*,
  748 F.3d 1222 (D.C. Cir. 2014),
  *rev'd on other grounds sub nom. Michigan v. EPA*, 576 U.S. 743 (2015) .........51

*Zero Zone, Inc. v. Dep't of Energy*,
  832 F.3d 654 (7th Cir. 2016) ......................................................97

**Statutes**

15 U.S.C. §§ 2501–14................................................................14

15 U.S.C. § 2501 ........................................................................35

15 U.S.C. § 2501(a)(1).................................................................14

26 U.S.C. § 30B(b)(3)(B) ...........................................................52

26 U.S.C. § 30D(d)(1)(D) ...........................................................36

26 U.S.C. § 30D(f)(7)(A)..........................................................36, 52

42 U.S.C. §§ 7401–7515...............................................................93

42 U.S.C. § 7401(a)(3)...............................................................42, 49

42 U.S.C. § 7401(b)(1)................................................................98

42 U.S.C. § 7404(a)(2)(B) ...........................................................36

42 U.S.C. § 7412(d) ....................................................................52

42 U.S.C. § 7432(d)(3)............................................................8, 36, 39

42 U.S.C. §§ 7521–90.................................................................5, 93

42 U.S.C. § 7521(a) ........................... 1, 31, 34, 35, 56, 74, 92

42 U.S.C. § 7521(a)(1)–(2)........................................................27, 37

42 U.S.C. § 7521(a)(1)...................... 5, 6, 33, 34, 36, 41, 43, 44, 45, 47, 48, 62, 72

42 U.S.C. § 7521(a)(2)...............................................6, 34, 49, 51, 67

42 U.S.C. § 7521(a)(3)(A)(ii) ......................................................40

42 U.S.C. § 7521(a)(6)..................................................................55

42 U.S.C. § 7521(b)(1)(A)............................................................55

42 U.S.C. § 7521(b)(1)(c)............................................................62

42 U.S.C. § 7521(b)(3).................................................................55

42 U.S.C. § 7521(b)(3)(C) ........................................................8, 39

42 U.S.C. § 7521(g)(1).................................................................55

42 U.S.C. § 7521(g)(2).................................................................55

42 U.S.C. § 7521(i)(3)(B)(iii) ......................................................62

42 U.S.C. § 7521(j).......................................................................55

42 U.S.C. § 7522...........................................................................54

42 U.S.C. § 7522(a)(1).............................................................7, 52

42 U.S.C. § 7525...........................................................................54

42 U.S.C. § 7525(a)(1).............................................................7, 52

42 U.S.C. § 7525(b)(2)(A)(ii) ......................................................54

42 U.S.C. § 7541...........................................................................54

42 U.S.C. § 7545(c)(2)(A)............................................................94

42 U.S.C. § 7545(k)(1)(B)(v)(II) .................................................56

42 U.S.C. § 7545(*o*)(12) ...........................................................49

42 U.S.C. § 7550(2) ............................................5, 31, 33, 36, 47, 64

42 U.S.C. § 7550(10)–(11) .......................................................33

42 U.S.C. § 7581(2) .................................................................40

42 U.S.C. § 7582(b) ................................................................33

42 U.S.C. § 7583(g) ................................................................40

42 U.S.C. § 7585(a) ................................................................40

42 U.S.C. § 7607(b)(1) ....................................................3, 7, 28, 30

42 U.S.C. § 7607(d)(7)(B) .....................................................7, 23

42 U.S.C. § 7607(d)(9)(A) ........................................................22

42 U.S.C. § 7651f(d) ...............................................................46

42 U.S.C. § 13212(f)(3)(C) .......................................................52

42 U.S.C. § 17013(a)(1)(A)(i) ...................................................52

Pub. L. No. 89-272, 79 Stat. 992 (1965)......................................5

Pub. L. No. 95-95, 91 Stat. 685 (1977).....................................8, 56

Pub. L. No. 101-549, 104 Stat 2399 (1990)..................................13

Pub. L. No. 110-343, 122 Stat 3765 (2008)..................................14

Pub. L. No. 111-5, 123 Stat. 115 (2009).....................................14

Pub. L. No. 117-58, 135 Stat. 429 (2021)................................15, 36

Pub. L. No. 117-169, 136 Stat. 1818 (2022)............................15, 36

**Code of Federal Regulations**

40 C.F.R. § 1036.801 ...............................................................60

40 C.F.R. § 1037 subpt. H .......................................................................10

40 C.F.R. § 1037.1 ...................................................................................34

40 C.F.R. § 1037.1(a)..........................................................................40, 43

40 C.F.R. § 1037.101(a)(2).....................................................................49

40 C.F.R. § 1037.105(d) ..........................................................................10

40 C.F.R. § 1037.106(d) ..........................................................................10

40 C.F.R. § 1037.115(e)...........................................................................39

40 C.F.R. § 1037.140(g) .....................................................................11, 39

40 C.F.R. § 1037.140(g)(5)......................................................................40

40 C.F.R. § 1037.230. ..............................................................................53

40 C.F.R. § 1037.230(a) ...........................................................................12

40 C.F.R. § 1037.235 ..........................................................................12, 53

40 C.F.R. § 1037.241 ...............................................................................53

40 C.F.R. § 1037.241(a)(2) ......................................................................12

40 C.F.R. § 1037.401(a).....................................................................12, 54

40 C.F.R. §§ 1037.701–1037.755 ..........................................................12

40 C.F.R. § 1037.701(c)...........................................................................11

40 C.F.R. § 1037.710 ...............................................................................11

40 C.F.R. § 1037.715 ...............................................................................11

40 C.F.R. § 1037.720 ...............................................................................11

40 C.F.R. § 1037.725 ..........................................................................53, 54

40 C.F.R. § 1037.740(a)...........................................................................11

40 C.F.R. § 1037.745 ...............................................................................54

40 C.F.R. § 1037.801 ................................................. 7, 9, 12, 34, 36, 39, 47, 53, 60

**Federal Registers**

36 Fed. Reg. 22369 (Nov. 25, 1971) ................................................................7

46 Fed. Reg. 50475 (Oct. 13, 1981) ................................................................39

48 Fed. Reg. 33456 (July 21, 1983) ................................................................10, 16

50 Fed. Reg. 10606 (Mar. 15, 1985) ................................................................10, 29

54 Fed. Reg. 22652 (May 25, 1989) ................................................................29

55 Fed. Reg. 30584 (July 26, 1990) ................................................................29

58 Fed. Reg. 51735 (Sept. 30, 1993) ................................................................21

65 Fed. Reg. 6698 (Feb. 10, 2000) ................................................................17, 29

65 Fed. Reg. 59896 (Oct. 6, 2000) ................................................................17, 29, 60

74 Fed. Reg. 66496 (Dec. 15, 2009) ................................................................8, 43

75 Fed. Reg. 25324 (May 7, 2010) ................................................................17, 29

76 Fed. Reg. 57106 (Sept. 15, 2011) ................................................................8, 10, 11, 17, 30, 40

77 Fed. Reg. 62624 (Oct. 15, 2012) ................................................................17

79 Fed. Reg. 23414 (Apr. 28, 2014) ................................................................17

81 Fed. Reg. 73478 (Oct. 25, 2016) ................................................................8, 17, 30

85 Fed. Reg. 24174 (Apr. 30, 2020) ................................................................17

86 Fed. Reg. 74434 (Dec. 30, 2021) ................................................................17

89 Fed. Reg. 16820 (Mar. 8, 2024) ................................................................93

89 Fed. Reg. 27842 (Apr. 18, 2024) ................................................................17

89 Fed. Reg. 29440 (Apr. 22, 2024) ........................................ i, 8, 9, 10, 11, 12, 15, 16, 18, 19, 20, 21, 22, 30, 31, 32, 33, 34, 35, 36, 37, 38, 40, 41, 46, 49, 53, 54,

56, 60, 61, 62, 65, 66, 67, 70, 71, 72 , 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 88, 89, 90, 91, 92, 95, 97

89 Fed. Reg. 39798 (May 9, 2024) ...........................................................93

**Legislative History**

136 Cong. Rec. 35367 (1990) ....................................................13, 51, 52

136 Cong. Reg. 36713 (1990) .........................................................13, 52

H.R. Rep. No. 89-899 (1965)..........................................................13, 41

Joint Hearings Before the Committees on Commerce and Public Works
   for S.451 and S.453, 90th Cong. 297 (1967) ...............................13, 14

S. Rep. No. 89-192 (1965) ....................................................................51

S. Rep. No. 90-403 (1967) ..........................................................13, 35

S. Rep. No. 91-1196 (1970) ....................................................................6

Staff of Spec. Subcomm. on Air & Water Pollution, 88th Cong.,
Rep. on Steps Toward Clean Air (Comm. Print 1964)..........................6, 40, 41, 44

**Rules**

Circuit Rule 28(a)(1)(C) .............................................................................i

# GLOSSARY

| | |
|---|---|
| EPA | U.S. Environmental Protection Agency |
| DOE | Department of Energy |
| Fuel Br. | Brief for Private Petitioners |
| Greenhouse-gas Report | Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances (Nov. 2023) |
| H2-ICE | Hydrogen-fueled internal-combustion vehicle |
| Integrated Planning Model Documentation | Documentation for EPA's Power Sector Modeling Platform v6 Using the Integrated Planning Model Post-IRA 2022 Reference Case (Mar. 2023) |
| JA | Joint Appendix |
| NHTSA | National Highway Traffic Safety Administration |
| Resource Adequacy Analysis | Resource Adequacy Analysis Final Rule Technical Memorandum (Mar. 2024) |
| RIA | Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles: Phase 3 – Regulatory Impact Analysis (Mar. 2024) |
| RTC | Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles: Phase 3 – Response to Comments (Mar. 2024) |
| State Br. | Brief for State Petitioners |

**INTRODUCTION**

The Clean Air Act directs EPA to control and prevent motor vehicle emissions using standards based on feasible technologies, considering cost and lead time for the technologies' development. The "motor vehicles" regulated by the Act are defined by their function, not their power source. They can be powered by diesel, electricity, or any other energy source.

Emissions from the nation's vast motor-vehicle fleet contribute to harmful air pollution. To regulate those emissions, Congress enacted a statutory scheme, 42 U.S.C. § 7521(a), that seeks to foster not just the "development" of effective emission-control technologies, but also their broad "application."

Electric motors and corresponding technologies fit that bill. Since the 1960s, Congress has recognized that electric vehicles could become, as a Senate report put it, a "nonpolluting alternative[]" to diesel-fueled vehicles. Today, electric vehicle technologies are the most effective and widespread emission controls available: They allow electric vehicles to emit no tailpipe emissions at all. And they are growing in popularity in the diverse heavy-duty vehicle market, with industry and congressional investment aimed at proliferating electric vehicle technologies and infrastructure to support the nation's heavy-duty fleet. Against this backdrop, in 2024 EPA tightened greenhouse-gas emission standards for 25 categories of heavy-duty vehicles.

Petitioners here are not entities regulated by those standards. Indeed, the only vehicle manufacturer that is a party to this case (Ford Motor Company) supports the standards. Instead, Petitioners are a group of states, the liquid-fuel industry, and others who fall outside Section 7521(a)'s zone of interests.

Setting that and other threshold problems aside, Petitioners are wrong on the merits. Their chief objection is that EPA's rule will accelerate the shift from internal-combustion-engine vehicles to electric vehicles. But Section 7521(a)'s plain text authorizes EPA to regulate "motor vehicles," electric or otherwise, as necessary to "prevent" pollution. Petitioners' objections rest on a distinction between motor vehicle types irrelevant to Section 7521(a).

The major-questions doctrine cannot save Petitioners' argument. That doctrine is a tool of—not a replacement for—statutory interpretation that applies to only a handful of "extraordinary" cases. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). That is not this case. Petitioners present no textual question anchored to their "major question." And far from doing something unexpected or novel, EPA merely tightened existing standards using the same statutory authority and method it has always used. The major-questions doctrine thus does not apply. Even if it did, Congress authorized EPA's action with pristine clarity.

And EPA's action here was reasonable. EPA demonstrated that the standards are feasible through multiple potential compliance pathways, with manufacturers free to choose how to comply with the standards.

The Court should reject Petitioners' challenges.

## STATEMENT OF JURISDICTION

The Court lacks jurisdiction over Petitioners' challenge to EPA's statutory authority to regulate electric vehicles and to establish standards that use fleet averaging. That challenge is time-barred. *See* Argument § II. The Court has jurisdiction to review Petitioners' remaining arguments. 42 U.S.C. § 7607(b)(1).

## ISSUES PRESENTED

The threshold issues are:

1.      Section 7521(a) protects the public from harmful vehicle emissions and regulates vehicle manufacturers. Petitioners do not claim to represent either the public or vehicle manufacturers. Are they outside Section 7521(a)'s zone of interests?

2.      The Clean Air Act gives parties 60 days from an action's publication in the Federal Register to challenge that action. EPA adopted the structure of its heavy-duty vehicle greenhouse-gas standards in 2011. Are Petitioners' challenges to this structure time-barred?

If the Court were to go further, the merits issues are:

3.    Section 7521(a) authorizes EPA to regulate emissions "from any class or classes" of "motor vehicles."

a.    "Motor vehicles," defined by the Act based on function and classified based on load capacity, include electric vehicles. Section 7521(a) specifies that emission standards apply to motor vehicles that, like electric vehicles, have emission controls that "prevent" pollution. Does Section 7521(a) authorize EPA to continue regulating electric vehicles within covered classes?

b.    Section 7521(a) authorizes standards for "classes" of motor vehicles, so EPA has long used fleet averaging in setting standards and assessing compliance. Both this Court and Congress have approved EPA's averaging program, on which vehicle manufacturers have long relied. Does EPA have authority to continue to use fleet averaging in the Heavy Duty Rule?

4.    Did EPA act reasonably when:

a.    Determining that the standards are feasible based several potential compliance pathways projecting different technology mixes;

b.    Determining that the standards are unlikely to impair electrical-grid reliability;

c. Considering upstream emissions of all vehicles (electrified or not) when assessing the standards' environmental impact but not when assessing compliance;

d. Declining to regulate fuel under Section 7521(a), which authorizes EPA to set standards for vehicles, not fuels; and

e. Analyzing costs and benefits per Executive Order 12866, not for setting the standards?

## STATUTES AND REGULATIONS

Pertinent statutes, regulations, and legislative history are in the addendum to this brief.

## STATEMENT OF THE CASE

### I. Legal framework.

Title II of the Clean Air Act directs EPA to regulate mobile sources. 42 U.S.C. §§ 7521–90. Section 7521 governs "motor vehicles," defined as "any self-propelled vehicle designed for transporting persons or property on a street or highway." *Id.* § 7550(2); *see id.* § 7521(a)(1). Cars, trucks, and most other vehicles on public roads are motor vehicles.

First enacted in 1965, Section 7521 was Congress's response to pollution from the country's growing motor-vehicle fleet. Pub. L. No. 89-272, 79 Stat. 992 (1965). The problem was cumulative: The sheer number of motor vehicles created

dangerous levels of air pollution. *See* Staff of Spec. Subcomm. on Air & Water Pollution, 88th Cong., Rep. on Steps Toward Clean Air 3 (Comm. Print 1964) (noting the "omnipresence" of vehicles, responsible for some 50% of the national air pollution problem).

Section 7521(a) targets that problem. It requires EPA to set and periodically revise standards applicable to the "emission of any air pollutant from any class or classes of new motor vehicles" that "in [the EPA Administrator's] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1). Those standards apply to motor vehicles "whether [they] are designed as complete systems or incorporate devices to prevent or control such pollution." *Id*.

The standards "shall take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period." *Id*. § 7521(a)(2).

Congress's aim here was twofold: First, Congress wanted standards to be feasible for vehicle manufacturers, hence its attention to compliance costs and lead time.

Second, Congress wanted Section 7521(a) to drive the "development and application" of better emission-control technologies. *Id*.; *see* S. Rep. No. 91-1196,

at 24 (1970) (stating that standards should be a "function of the degree of [emission] control required, not the degree of technology available"). The idea was that the standards would "force" vehicle manufacturers "to study new types of engines and new control systems." *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 635 (D.C. Cir. 1973).

The statute also requires all new motor vehicles to be covered by a certificate of conformity. 42 U.S.C. § 7522(a)(1). EPA issues certificates, "upon such terms" as "[the Administrator] may prescribe," to motor vehicles that conform with "the regulations prescribed under section 7521." *Id*. § 7525(a)(1).

Petitions challenging Section 7521 standards must be filed within 60 days of the action's Federal Register publication. *Id*. § 7607(b)(1). This time-bar is jurisdictional. *Med. Waste Inst. v. EPA*, 645 F.3d 420, 427 (D.C. Cir. 2011). The Court can consider only objections raised with "reasonable specificity" during the comment period. 42 U.S.C. § 7607(d)(7)(B).

## II.      Structuring the standards.

Section 7521(a) directs EPA to regulate emissions from "classes" of motor vehicles but left it to the agency to define that term. EPA has long classified motor vehicles functionally, based on load capacities. 36 Fed. Reg. 22369, 22449/3 (Nov. 25, 1971). Heavy-duty vehicles are those with a gross vehicle weight rating above 8,500 pounds. 40 C.F.R. § 1037.801 (defining heavy-duty vehicle). Congress

likewise uses weight to define heavy-duty vehicles, Pub. L. No. 95-95, § 224(b), 91 Stat. 685, 767 (1977); 42 U.S.C. § 7521(b)(3)(C), and has ratified EPA's long-standing definition, *see id*. § 7432(d)(3). EPA has established categories within the heavy-duty class based on their specific application and operational needs. *See* 89 Fed. Reg. 39798, 29482/2–83/2 (May 9, 2024).

In 2009, EPA found that an aggregate group of greenhouse gases from certain classes of motor vehicles contributes to harmful air pollution. 74 Fed. Reg. 66496, 66499/3 (Dec. 15, 2009) (making finding for "passenger cars, light- and heavy-duty trucks, buses, and motorcycles"); *see id*. at 66537/3. That finding triggered EPA's duty under Section 7521(a)(1) to set greenhouse-gas standards for the covered motor vehicle classes. *See Massachusetts v. EPA*, 549 U.S. 497, 528 (2007).[1] The first set of heavy-duty vehicles standards was promulgated in 2011. 76 Fed. Reg. 57106 (Sept. 15, 2011) ("Phase 1"). EPA tightened those standards in 2016. 81 Fed. Reg. 73478 (Oct. 25, 2016) ("Phase 2").

The 2024 Heavy Duty Rule further tightens those standards for model-year 2032 and beyond, with standards gradually phasing-in starting in model-year 2027. 89 Fed. Reg. at 29440/2. The standards are expressed as grams of carbon dioxide per ton-mile and apply to two broad groups of heavy-duty vehicles: vocational

---

[1] Heavy-duty vehicles account for 25% of greenhouse-gas emissions from the transportation sector, the nation's largest source of such emissions. 89 Fed. Reg. at 29474/2.

vehicles, like delivery trucks and school buses; and tractors, like line-haul semi-trucks that move freight across the country. *Id*. at 29444/1, 29450/1–51, tbls.ES-1, ES-2. Within each group, there are distinct standards for categories.

These standards are based on EPA's assessment that many diverse technologies are feasible to deploy, to different extents for different categories, and on varying timelines. EPA evaluates standards' feasibility through potential "compliance pathways." So, in developing the Heavy Duty Rule, EPA modeled one compliance pathway—call it Pathway A—that includes a mix of internal-combustion-engine vehicle efficiency improvement (like better aerodynamics and improvements in tire rolling resistance) and electric vehicle technologies.[2]

EPA also evaluated how different technology mixes could feasibly comply with the standards without additional electric vehicles (beyond those projected to exist without the Rule). These two other pathways used a mix of further internal-

---

[2] We use "electric vehicle technologies" collectively to include battery-electric vehicles and fuel-cell electric vehicles, which are motor vehicles powered solely by an electric motor. 40 C.F.R. § 1037.801 (defining "battery electric vehicle" and "fuel cell electric vehicle"). *Contra* Fuel Br. 9 n.3 (using "electric vehicle" to refer to a broader set of vehicles). We use "hybrids" to mean motor vehicles powered by an electric motor and internal combustion engine, including plug-in hybrids. *See* 40 C.F.R. § 1037.801.

Heavy-duty internal-combustion-engine vehicles are most commonly fueled by diesel, but can also be fueled by gasoline, hydrogen, natural gas, biofuels, and other fuels. We use "diesel-fueled" to refer to internal-combustion-engine vehicles that run on diesel or gasoline.

combustion-engine vehicle efficient improvements, natural-gas-fueled internal-combustion-engine technologies, hybrid and plug-in hybrid technologies, and hydrogen-fueled internal-combustion-engine technologies ("H2-ICE") (different from hydrogen-electric vehicles). One of these, call it Pathway B, uses a heavier mix of plug-in and other hybrid vehicles. 89 Fed. Reg. at 29584, tbl.II-50. Another, call it Pathway C, used more H2-ICE. *Id.* EPA evaluated these pathways' technological-effectiveness and costs and determined each is a feasible pathway to compliance with the Heavy Duty Rule standards and a basis to conclude that the standards are feasible.

Like its predecessors, the Heavy Duty Rule sets standards for each category based on a fleet-average technology mix. 89 Fed. Reg. at 29561/1–2, 29600/2; 76 Fed. Reg. at 57208/1–12/3, 57233/1–3. To comply with the fleet-average standard, the manufacturer can make each vehicle hit the category emission standard. But in practice, it is often easier and cheaper to reduce more emissions from some vehicles than from others. 89 Fed. Reg. at 29590/2–3. EPA's Averaging, Banking, and Trading program, which has existed in one form or another since the 1980s, allows manufacturers to reduce emissions where and when it is most efficient. *See* 40 C.F.R. §§ 1037.105(d), 1037.106(d), 1037 subpt. H; 48 Fed. Reg. 33456, 33456/1–57/3 (July 21, 1983); 50 Fed. Reg. 10606, 10607/2–09/1 (Mar. 15, 1985).

*Averaging* allows vehicles that emit less than their targets to offset those that emit more. 40 C.F.R. § 1037.710. *Banking* allows vehicle manufacturers to get credits for "unused" emissions and save those credits for compliance in future model years. *Id*. § 1037.715. *Trading* allows manufacturers to sell their extra credits. *Id*. § 1037.720. Together, the program offers flexibility in how and when vehicle manufacturers design their vehicles to meet the standards. The choice of how to comply—of what kind, how much, and the timing of technologies to use— lies with manufacturers.

The Heavy Duty Rule, like EPA's prior rules, uses those longstanding flexibilities. 89 Fed. Reg. at 29471/3, 29600/1–2. Manufacturers can average the performance of lower-emitting heavy-duty vehicles with higher-emitting vehicles from the same "averaging set." *See* 40 C.F.R. §§ 1037.701(c), 1037.740(a); 89 Fed. Reg. at 29600/2–3 (explaining that EPA was retaining (and not reopening) the Phase 2 Averaging, Banking, and Trading program). The averaging sets, established in 2011, are light heavy-duty vehicles, medium heavy-duty vehicles, and heavy heavy-duty vehicles. 76 Fed. Reg. at 57427/2; 40 C.F.R. §§ 1037.740(a), 1037.140(g). Averaging is permitted between all vehicles in an averaging set, whatever their power source. 89 Fed. Reg. at 29484/1.

Vehicle manufacturers may demonstrate compliance by dividing their vehicles into "families" and "subfamilies" and certifying that individual vehicles in

each family or sub-family meets a designated "family emission limit." 40 C.F.R. §§ 1037.230(a), 1037.801, 1037.241(a)(2); 89 Fed. Reg. at 29600/3. Manufacturers that choose to participate in the Averaging, Banking, and Trading program demonstrate compliance with the standards by all families within each averaging set having a zero or positive credit balance, using a production-weighted average of family emission limits, determined at the end of the model-year. 89 Fed. Reg. at 29600/3; 40 C.F.R. §§ 1037.701–1037.755; Response to Comments ("RTC") 1354–57, JA_____.

To verify a manufacturer's certification of its individual vehicles, representative vehicles are subject to precertification testing. 40 C.F.R. § 1037.235. EPA may also perform in-use testing on individual vehicles. *Id*. § 1037.401(a). Certificates are conditioned on the automaker's fleet-average compliance with the standards after the production year is complete. *Id*. §§ 1037.701–1037.755; 89 Fed. Reg. 29611/1 n.870.

Both this Court and Congress have approved EPA's averaging program. Decades ago, environmental groups challenged averaging in certain heavy-duty standards. *See NRDC v. Thomas*, 805 F.2d 410 (D.C. Cir. 1986). They argued that "dirty" trucks were improperly averaged into the fleet, allowing them to escape a statutory penalty. *Id*. at 425. This Court disagreed, reasoning that "a manufacturer whose entire fleet of engines does not—even on average—meet an emissions

standard will still pay [those penalties]." *Id*. Absent "any clear evidence that Congress meant to prohibit averaging," the Court rejected petitioners' argument. *Id*.

A few years later, when Congress amended the Clean Air Act, the House and Senate considered—and rejected—proposals to either extend or curtail EPA's authority to allow emission averaging for motor vehicles. 136 Cong. Rec. 35367 (1990); 136 Cong. Reg. 36713 (1990); *see generally* Pub. L. 101-549, 104 Stat. 2399; RTC 1346–48, JA_____–___. Congress, noting *NRDC* and EPA's subsequent averaging regulations, instead opted to let the existing law "remain in effect." 136 Cong. Rec. 36713. "The intent[ion was] to retain the status quo." *Id*. at 35367. The House Report also noted that averaging has "very positive impacts on air quality," while also "reducing the costs of controlling emissions" and "encourag[ing] the development and early use of improved emission control technologies." *Id*.

## III. The most effective emission-control technologies.

Since at least 1965, Congress has known that electric vehicle technologies offer a promising way to cut emissions. H. R. Rep. No. 89-899, at 44–45 (Federal Power Commission report). By 1967, Congress realized that electric vehicles could become a "nonpolluting alternative[]" to internal-combustion-engine vehicles. S. Rep. No. 90-403 at 59 (1967); Joint Hearings Before the Committees on

Commerce and Public Works for S.451 and S.453, 90th Cong. 297 (1967)

(hearings on "electric vehicles and other alternatives to the internal combustion

engine") (cleaned up). Congress also saw diesel-fueled vehicles as creating a

"dependence on foreign sources of petroleum" that "jeopardizes national security,

inhibits foreign policy, and undermines economic well-being." 15 U.S.C.

§ 2501(a)(1).

　　And so for decades, Congress has promoted electric vehicles. Early on, it

supported research and development of electric vehicle technologies. *See id.*

§§ 2501–14 (Electric and Hybrid Vehicle Research, Development, and

Demonstration Act). Once those technologies matured, Congress encouraged

electric vehicle adoption through subsidies like tax credits. *E.g.*, Energy

Improvement and Extension Act of 2008, Pub. L. No. 110-343, Div. B, Tit II,

§ 205, 122 Stat 3765, 3835; American Recovery and Reinvestment Act of 2009,

Pub. L. No. 111-5, § 1141, 123 Stat. 115, 326.

　　Thanks in part to Congress's longstanding support, electric vehicles are now

the lowest-emitting vehicles in the heavy-duty market. Electric vehicles do not

combust fossil fuels to generate propulsion, a process that produces carbon dioxide

(a greenhouse gas). Regulatory Impact Analysis ("RIA") 51, 131–32, JA_____,

_____–__. In this way, electric vehicle technologies control a vehicle's emissions

by preventing pollutants from forming, rather than blocking emissions after the

pollutant is created. And although other commercially available carbon-dioxide controls prevent pollutant-formation, electric-vehicle technologies are one of the most effective controls available. 89 Fed. Reg. at 29465/1.

Although the heavy-duty fleet is currently primarily powered by diesel-fueled internal-combustion engines, an increasing number are powered by electric motors. *Id.* at 29444/1–2. Many heavy-duty vehicle manufacturers have included electric vehicles in their upcoming production plans and have announced billions of dollars in investments to transition to an electric fleet over the next 10 to 15 years. *Id*. at 29445/2–3.

Congress has spent many billions of dollars on charging infrastructure and other electrification efforts. *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, 480–82, 546–58, 915–18, 963–75, 1008–14, 1321–25, 1421–26, 1442 (2021); Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818, 1924–31, 1982–97, 2044–49, 2063–67, 2086–87 (2022); *see* 89 Fed. Reg. at 29446/1–2. It has enacted tax credits to incentivize the production and purchase of heavy-duty zero-emission vehicles and to support supply chains for critical minerals and other necessary components. 89 Fed. Reg. at 29446/1–2; *see* 136 Stat. at 1935–41, 1964–81.

States have also established programs to accelerate the adoption of heavy-duty zero-emission technologies. These include the Advanced Clean Trucks

program adopted by 11 states and a 17-state Memorandum of Understanding establishing goals to support electrification of the heavy-duty market. 89 Fed. Reg. at 29446/2–3.

Market forces and congressional spending are each expected to hasten the ongoing transition to electric vehicles. Even without the Heavy Duty Rule, electric vehicles are projected to grow from 0.2% in model-year 2021 to 20% in model-year 2032. RIA 79, JA_____; 89 Fed. Reg. at 29568, tbl.II-31.

## IV.    Charting EPA's vehicle-emission rules.

For four decades, EPA has used fleet averaging in its vehicle-emission standards. 48 Fed. Reg. at 33456/1–57/3. And in at least ten sets of standards issued by four different presidential administrations, EPA has explicitly included electric vehicles as part of the covered class:

**Table 1**

| Rule | Uses fleet averaging | Applies to electric vehicles |
|---|---|---|
| Criteria-pollutant Tier 2 standards (model-year 2004 and later), 65 Fed. Reg. 6698 (Feb. 10, 2000) | 6743/3–44/2 | 6851/1 |
| Heavy-duty criteria-pollutant standards (model-year 2004 and later), 65 Fed. Reg. 59896 (Oct. 6, 2000) | 59921/1–3 | 59963/3 |
| Light-duty greenhouse-gas standards (model-year 2012 and later), 75 Fed. Reg. 25324 (May 7, 2010) | 25405/1, 25412/1–3 | 25375/1, 25682/1 |
| Heavy-duty greenhouse-gas standards (model-year 2014 and later), 76 Fed. Reg. 57106 (Sept. 15, 2011) | 57119/1, 57238/2–39/1 | 57196/2, 57376/2 |
| Light-duty greenhouse-gas standards (model-year 2017 and later), 77 Fed. Reg. 62624 (Oct. 15, 2012) | 62627/3–28/2 | 62706/1 |
| Criteria-pollutant Tier 3 standards (model-year 2017 and later), 79 Fed. Reg. 23414 (Apr. 28, 2014) | 23480/3–81/2, 23488/2–89/1 | 23725/2 |
| Heavy-duty greenhouse-gas standards (model-year 2021 and later), 81 Fed. Reg. 73478 (Oct. 25, 2016) | 73495/2–3, 73568/2–69/1, 73730/2–3, 73733/2–34/1 | 73500/3, 73985/3 |
| Light-duty greenhouse-gas standards (model-year 2021 and later), 85 Fed. Reg. 24174 (Apr. 30, 2020) | 24246/3–47/3, 25103/3–04/1 | 24469/1 |
| Light-duty greenhouse-gas standards (model-year 2023 and later), 86 Fed. Reg. 74434 (Dec. 30, 2021)[3] | 74446/3–51/1, 74453/1–56/1 | 74473/2, 74484/2–87/3 |
| Light- and medium-duty greenhouse-gas and criteria-pollutant standards (model-year 2027 and later), 89 Fed. Reg. 27842 (Apr. 18, 2024) | 27903/1–2, 27915/3–16/3 | 27933/1, 28168/2–3 |

---

[3] In September 2023, argument was held in the challenges to the 2021 rule. *Texas v. EPA*, Case No. 22-1031 and consolidated cases (D.C. Cir.).

## V.    The Heavy Duty Rule.

Since EPA promulgated greenhouse-gas standards for heavy-duty vehicles in 2011 and 2016, continued technological advancements have been made to further reduce greenhouse-gas emissions from heavy-duty motor vehicles. *See* 89 Fed. Reg. at 29442/2. Major trucking fleets, heavy-duty vehicle manufacturers, states, and the federal government have announced plans to increase the use of heavy-duty electric vehicles and electric and hydrogen infrastructure. *Id.* at 29442/3. Considering these advancements, in 2024, EPA, after notice and comment, finalized greenhouse-gas emission standards for heavy-duty motor vehicles for model-years 2027 to 2032. *Id.* at 29440/1. Specifically, EPA adopted more stringent model-year 2027 standards for most heavy-duty vehicles (compared to Phase 2) and set new standards for model-years 2028 to 2032 with year-over-year increases in stringency. Standards for day cab tractors start in model-year 2028; for heavy heavy-duty vocational vehicles, model-year 2029; and for sleeper cabs, model-year 2030. *Id.* at 29449/3–50/1; *see id.* at 29451, tbls.ES-1, ES-2. These standards, when accounting for vehicles' tailpipe and upstream emissions, will achieve nearly 1 billion metric tons in net reductions of carbon dioxide. *Id.* at 29591/2; RTC 1494, JA_____.

## A. Basis for the standards.

To set and support the standards' feasibility and appropriateness, EPA considered greenhouse-gas emissions reductions, technological feasibility and effectiveness, lead time to implement the technologies, and costs, among other factors. 89 Fed. Reg. at 29587/3. EPA concluded that three potential compliance pathways represent feasible ways for manufacturers to meet the standards, although they are free to use any technology mix to comply. *Id.* at 29587/3, 29588/2.

Each pathway includes a mix of technologies that currently are or are projected to be available during the relevant timeframe (model-years 2027 to 2032). *See* 89 Fed. Reg. at 29484/2. Pathway A, which EPA predicted would be the most cost- and technologically effective of the three, includes internal-combustion-engine, battery-electric, and fuel-cell electric vehicle technologies. *Id.* at 29484/2. Under this pathway, EPA projected that most new heavy-duty vehicles would remain internal-combustion-engine vehicles employing the sort of greenhouse-gas-reducing technologies that meet the prior standards (*see* Table 2), and 22% of all on-road heavy-duty vehicles would be electric vehicles by 2040. *Id.* at 29567/1, 29568/1. Pathways B and C, in contrast, show how vehicle manufacturers can meet standards without additional electric vehicles (beyond the projected baseline). *Id.* at 29576/1–2, 29583–84 & tbls.II-48, II-49, II-50.

**Table 2. Pathway A: projected percentage of internal-combustion-engine vehicles. 89 Fed. Reg. at 29567, tbl.II-30.**

| Vehicle Category | MY 2027 | MY 2028 | MY 2029 | MY 2030 | MY 2031 | MY 2032 |
|---|---|---|---|---|---|---|
| Light heavy-duty vocational | 83% | 78% | 73% | 68% | 54% | 40% |
| Medium heavy-duty vocational | 87% | 84% | 81% | 78% | 69% | 60% |
| Heavy heavy-duty vocational | 100% | 100% | 87% | 85% | 77% | 70% |
| Medium heavy-duty all cab & heavy heavy-duty day cab tractors | 100% | 92% | 88% | 84% | 73% | 60% |
| Sleeper cab tractors | 100% | 100% | 100% | 94% | 88% | 75% |
| Heavy haul tractors | 100% | 100% | 99% | 99% | 97% | 95% |
| Optional custom chassis: | | | | | | |
| School Bus | 87% | 84% | 81% | 78% | 69% | 60% |
| Other Bus | 100% | 100% | 87% | 85% | 77% | 70% |
| Coach Bus | 100% | | | | | |
| Refuse Hauler | 100% | 90% | 90% | 85% | 84% | 84% |
| Concrete Mixer | 100% | | | | | |
| Emergency Vehicles | 100% | | | | | |
| Recreational Vehicles | 100% | | | | | |
| Mixed Use | 100% | | | | | |

EPA evaluated the standards' feasibility by, among other methods, using a model known as HD TRUCS. *Id.* at 29532/1. HD TRUCS identified what design features would be needed in electric and hybrid vehicles to meet the operational needs of different heavy-duty vehicle types. *Id.*

Considering available technologies, and the costs and lead-time necessary to deploy them and supporting infrastructure, EPA concluded there is sufficient lead time under each of the three compliance pathways. *Id.* at 29491/3–92/1, 29514/2–

3, 29525/1–31/2, 29532/2, 29569/3–73/1, 29583/1–84, tbls.II-48, II-49, II-50; RTC 914–17, JA_____–__; RIA 110–17, 434–42 JA_____–__, _____–__.

EPA also assessed the standards' impact on the electricity grid and found that the modest electricity demand increase projected under Pathway A, the most electric-heavy potential compliance pathway, was unlikely to adversely affect grid reliability. *Id.* at 29514/2, 29520/3–25/1, 29592/3. EPA came to the same conclusion considering the combined impacts of other vehicle-emission and power-sector rules. *Id.* at 29520/3–23/2.

Weighing these among other factors, EPA determined that the standards were appropriate under Section 7521(a). *Id.* at 29587/2–88/3.

## B.  Cost-benefit analysis.

Executive Order 12866 directs agencies to assess expected costs and benefits before proposing "significant" actions. E.O. 12866, § 6(a)(3)(B)–(C), 58 Fed. Reg. 51735 (Sept. 30, 1993); *see* E.O. 12866 § 3(f)(1) (defining "significant"). The Office of Management and Budget's Circular A-4 guides agencies in developing their cost-benefit analyses. Circular A-4 (2003), JA_____–__.

This cost-benefit analysis is separate from EPA's feasibility analysis that principally informs the stringency of the vehicle emissions standards. *See* 89 Fed. Reg. at 29708/2–3, 29593/3–94/1. For that separate cost-benefit analysis, EPA estimated annualized net benefits of $12–13 billion, considering benefits like

monetized vehicle technology and charging costs and fuel savings (excluding tax credits and taxes) and climate benefits from reducing greenhouse-gas emissions. *Id.* at 29715/1–2, 29720, tbl.VIII-8. The existence of net benefits, though not a factor under Section 7521(a), "reinforce[d]" EPA's conclusion that its choice of standards is appropriate. *Id.* at 29708/3, 29593/3–94/1.

## STANDARD OF REVIEW

To resolve the meaning of disputed statutory language, a court adopts the interpretation that it concludes is "best" "after applying all relevant interpretive tools[.]" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). "[C]ourts should prefer textually permissible readings that would advance statutory or regulatory goals over ones that would frustrate them." *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 371 (D.C. Cir. 2024).

EPA's interpretations, "'made in pursuance of official duty' and 'based upon . . . specialized experience,' 'constitute a body of experience and informed judgment to which courts and litigants [could] properly resort for guidance,' even on legal questions." *Loper Bright*, 603 U.S. at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944)).

Under the Clean Air Act, like under the Administrative Procedure Act, the Court may reverse any action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A). This

standard is narrow, and the Court cannot substitute its policy judgment for EPA's. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). EPA need only consider the relevant factors and articulate a rational connection between the facts found and the choices made. *Id.*; *see Loper Bright*, 603 U.S. at 391–92 (holding that judicial review of agency factfinding is deferential). Review is limited to the administrative record. 42 U.S.C. § 7607(d)(7)(B).

## SUMMARY OF ARGUMENT

This court should dismiss or deny the petitions.

**I.** Petitioners fall outside Section 7521(a)'s zone of interests. Section 7521(a) protects the public from harmful motor-vehicle emissions by regulating vehicle manufacturers. Petitioners—states, fuel producers, and others—defend their alleged pecuniary and sovereign interests. But they represent neither the public nor vehicle manufacturers and cannot be expected to police the interests Section 7521(a) safeguards.

**II.** Petitioners' statutory arguments are time-barred. They attack a long-settled framework for vehicle standards: the use of averaging, and the standards' application to electric vehicles. Both elements of that framework were used when EPA first promulgated heavy-duty-vehicle greenhouse gas standards in 2011, and neither was reopened in this rule, which merely increased the standards' stringency

within the established framework. The Clean Air Act's 60-day window for challenging agency actions has long passed with respect to these issues. The Court thus lacks jurisdiction over Petitioners' statutory arguments.

**III.** The rule lies within EPA's statutory authority.

*First*, Section 7521(a) authorizes EPA to regulate electric vehicles. Section 7521(a) governs "motor vehicles." The Act defines that term functionally: Any vehicle—whether powered by diesel or electricity—with the requisite functions is a motor vehicle. Petitioners' objection, to a potential shift from largely diesel-fueled internal-combustion-engine vehicles to electric ones, relies on a distinction that Section 7521(a) declined to draw.

Context confirms EPA's authority. Congress designed Section 7521(a) to foster broad adoption of effective emission controls. Congress has long supported electric motors and their corresponding technologies, which are now the most effective controls available. Other technologies, including hybrids and H2-ICE, offer a range of effectiveness in emissions control. But Petitioners would require EPA to ignore electric vehicle technologies when setting standards simply because electric vehicles are not diesel-fueled internal-combustion vehicles. Doing so would depart from Section 7521(a)'s text and design. Indeed, it would be arbitrary and capricious.

That technologies—like electric vehicles—completely eliminate tailpipe emissions does not remove them from EPA's regulatory ambit. Congress enacted Section 7521(a) to tackle harmful pollution created by fleets of motor vehicles. That provision directs EPA to set standards for emissions "from any class or classes" of motor vehicles. The standards thus cover electric vehicles in the regulated classes, which are defined by load capacity, not emission level. Standards apply, moreover, to motor vehicles that, like electric vehicles, have emission controls that "prevent" pollution. Petitioners' counter-textual reading of EPA's statutory authority is incoherent.

*Second*, Section 7521(a) authorizes EPA to use fleet averaging. Averaging reduces emissions while ensuring that reductions can be achieved as flexibly and cost-effectively as possible by vehicle manufacturers. And because Section 7521(a) targets emissions of groups—"classes" of vehicles—it authorizes EPA to use fleet averaging in regulations. Both this Court and Congress have affirmed that authority. Averaging also aligns with other statutory provisions.

*Third*, the major-questions doctrine does not change the interpretive calculus. That doctrine is reserved for extraordinary cases and does not apply here. The Heavy Duty Rule is an ordinary exercise of EPA's authority setting the same sort of standards regulating the same sources as earlier vehicle-emission rules. The standards focus on source-based emission control, a regulatory approach the

Supreme Court endorsed in *West Virginia*. And the standards' impacts are the kind that Congress accepted when it directed EPA to set standards using all feasible technologies. There is no reason to hesitate before applying the statute as written. Even if the major-questions doctrine were to apply, Congress authorized EPA's action with clarity.

IV. The Heavy Duty Rule is reasonable. EPA demonstrated the standards' feasibility through multiple potential compliance pathways, including electric, hybrid, and other internal-combustion-engine vehicle technologies. EPA evaluated whether electric vehicles could meet operational requirements of comparable internal-combustion-engine vehicles and determined there was sufficient lead time to deploy electric vehicle technologies and their supporting infrastructure at a reasonable cost. EPA evaluated two other compliance pathways that did not include additional electric vehicles and found that both were feasible considering lead time and cost.

Additionally, in consultation with federal energy-regulatory agencies, EPA reasonably determined that the Heavy Duty Rule is anticipated to only modestly increase electricity demand and is unlikely to adversely affect the electricity grid. EPA also reasonably accounted for upstream emissions of all vehicles in evaluating the Rule. But in assessing compliance with the standards, EPA measures only direct emissions from the vehicle—whether it is electric or not.

Finally, EPA appropriately declined to regulate fuel as an alternative to regulating emissions. Petitioners' remaining sundry criticisms of EPA's cost-benefit analysis ignore the record and should be rejected.

## ARGUMENT

### I. Petitioners lack a cause of action because they are outside Section 7521(a)'s zone of interests.

Petitioners lack a cause of action because they fall outside Section 7521(a)'s zone of interests. In this inquiry, the question is whether Petitioners "can be expected to police the interests that the statute protects." *CSL Plasma Inc. v. CBP*, 33 F.4th 584, 589 (D.C. Cir. 2022). The answer is no.

Section 7521(a) protects the public from harmful vehicle pollution while ensuring that emission standards are reasonably feasible for vehicle manufacturers. *See* 42 U.S.C. § 7521(a)(1)–(2). Petitioners, however, do not claim to represent either the public or manufacturers. They cannot be expected to police the interests of those groups.

To begin, State Petitioners allege that the standards will cause them various pocketbook injuries, which have nothing to do with public health or compliance with the standards. State Br. 5–8; *see also* Fuel Br. 19. The same is true of their asserted sovereign interest in protecting "their electric grids." State Br. 6.

Fuel Petitioners include entities that "produce or sell liquid fuels, including biofuels, and the raw materials used to produce them." Fuel Br. 18. But the Court

has already held that such interests—selling fuels allegedly made "economically infeasible" by the rule—fall outside the relevant zone of interests. *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1295 (D.C. Cir. 2015).[4]

Other Fuel Petitioners contend the standards will foist electric vehicles on them or "limit the vehicles available to conduct their members' businesses." Fuel Br. 19. Even if the standards forced anyone to buy electric vehicles (they do not), purchaser choice is not an interest protected by Section 7521(a). *See Int'l Harvester Co.*, 478 F.2d at 640 (noting that emission standards may limit choice of vehicle models).

Because none of Petitioners' claimed injuries falls within Section 7521(a)'s zone of interests, the petitions should be denied.

## II. Petitioners' statutory arguments are time-barred.

Petitioners' statutory arguments challenge elements of EPA's standards established years ago and not reopened here. But the Clean Air Act requires challenges to final actions to be filed within 60 days after their Federal Register publication. 42 U.S.C. § 7607(b)(1). Petitioners missed that deadline, so the Court lacks jurisdiction over those arguments. *See Med. Waste*, 645 F.3d at 427.

---

[4] *See also Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 617 (D.C. Cir. 2019) (holding that paper manufacturers fall outside zone of interests protected by securities laws); *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 179 (D.C. Cir. 2012) (holding that higher corn prices did not allow food groups to challenge EPA's waiver allowing ethanol blend).

The elements of EPA's standards challenged here—fleet averaging and the standards' application to electric vehicles—were established long ago. For example, in 1985, EPA found that its averaging flexibilities were key in supporting the technological feasibility and lead-time of nitrogen-oxide standards. *See* 50 Fed. Reg. 10606, 10634/1-35/3 (Mar. 15, 1985). Countless subsequent rules have followed the same approach. *See, e.g.*, 65 Fed. Reg. 6698, 6743/3–46/3 (Feb. 10, 2000) (using fleet-average standards to regulate ozone precursors and applying emission standards to classes that include electric vehicles); 65 Fed. Reg. 59896, 59921/1–3, 59963/3 (Oct. 6, 2000) (same); 75 Fed. Reg. 25324, 25412/1–13/3 (May 7, 2010) (describing setting fleet average light-duty greenhouse-gas standards).

Indeed, the legality of averaging was already decided in EPA's favor in *NRDC v. Thomas*, 805 F.2d 410. In that decision's aftermath, EPA received and responded to copious comments on its averaging framework in a 1990 rule that included adding banking and trading in the program for certain emission credits for heavy-duty engines. RTC 1342–43, JA_____–___ (citing 54 Fed. Reg. 22652, 22665–66 (May 25, 1989); 55 Fed. Reg. 30584, 30593–94 (July 26, 1990)).

At the very latest, Petitioners should have raised their challenges in 2011, when EPA promulgated its first heavy-duty greenhouse-gas vehicle standards. Those used fleet averaging to set the standards and applied those standards to

electric vehicles. 76 Fed. Reg. at 57119/1, 57196/2, 57238/2–39/1, 57376/2. Many

petitioners in fact challenged the Phase 1 Rule. *See Delta Constr.*, 783 F.3d at

1294. But none made the statutory arguments now advanced. *See id.* at 1295–96,

1298. Nor did anyone raise that claim about the Phase 2 Rule, which also set fleet-

average heavy-duty greenhouse-gas standards that applied to electric vehicles. 81

Fed. Reg. at 73715/2.

Now, the 60-day window to challenge EPA's "longstanding practice" has

"closed." *Med. Waste*, 645 F.3d at 427; *Growth Energy v. EPA*, 5 F.4th 1, 12–13

(D.C. Cir. 2021) (per curiam). The Court thus lacks jurisdiction over those

challenges. *See* 42 U.S.C. § 7607(b)(1); *Med. Waste*, 645 F.3d at 427.[5]

EPA also did not reopen the disputed elements here. Reopening requires "a

serious, substantive reconsideration" of the relevant determination. *Growth*

*Energy*, 5 F.4th at 21. But EPA said it was *not* reopening the averaging issue or the

decision to include electric vehicles in fleet averaging. *See* 89 Fed. Reg. at

29443/3–444/1, 29471/3. Granted, EPA changed some compliance flexibilities and

tweaked certain definitions. *See id.* at 29573/3, 29600/1. But that is an *application*

of EPA's longstanding regulatory framework, not a "serious, substantive

---

[5] Petitioners do not assert that their claim is based "solely on grounds arising after" the 60-day deadline. 42 U.S.C. § 7607(b)(1). Nor do they challenge an EPA refusal to amend the structure established in 2000 or 2011. *See Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 646–47 (D.C. Cir. 2019). These arguments are forfeited. *Growth Energy*, 5 F.4th at 15.

reconsideration" of it. *Growth Energy*, 5 F.4th at 21; *see also NRDC v. EPA*, 571 F.3d 1245, 1265–66 (D.C. Cir. 2009) (stating that amending one aspect of a regulation does not automatically reopen aspects "already decided"). EPA also offered no "new rationale" to suggest that it seriously reconsidered its approach to averaging or classes. *See U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 992 (D.C. Cir. 2024); RTC 101 n.38, 1341–44, JA_____, _____–__.

Nor was EPA's approach "constructively" reopened. The "basic regulatory scheme remains unchanged," and Petitioners could have reasonably anticipated the gradual tightening of the standards. *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1017 (D.C. Cir. 2016). The Court therefore should not reach Petitioners' arguments about EPA's statutory authority.

## III.    EPA has authority to promulgate the Heavy Duty Rule.

Section 7521(a)(1), the keystone of Title II's motor-vehicle program, seeks to reduce emissions using feasible control technologies. EPA did exactly that here.

The two interpretive questions presented are whether EPA can (1) regulate electric vehicles and (2) set fleet-average standards. Both are easily resolved by applying ordinary principles of statutory interpretation. Electric vehicles are "motor vehicles" and thus subject to EPA regulation under Section 7521(a). 42 U.S.C. § 7550(2); *see* RTC 96, JA_____. They use "complete system" of technology that "prevents" pollutant emissions. 42 U.S.C. § 7521(a); 89 Fed. Reg.

31

at 29473/1, RTC 136–40, JA\_\_\_\_\_–\_\_.[6] And EPA can set standards for "classes" of vehicles using averaging, giving manufacturers compliance flexibility.

Petitioners disagree. They contend that the Heavy Duty Rule mandates a "shift" from vehicles propelled by liquid fuel to vehicles propelled by electricity. *See* Fuel Br. 21; State Br. 18. They attack the use of electric vehicle technologies that prevent vehicles from "actually emit[ting]" the regulated pollutant. Fuel Br. 41. And they argue that electrification is not the "type" of technology Congress contemplated would be used to address motor vehicle emissions. *See* Fuel Br. 45.

Petitioners are wrong. Their arguments draw distinctions that Congress did not endorse, toward an end—*less* effective emission control and *less* compliance flexibility for regulated entities—that Congress did not desire. The Court should deny their petitions.

## A. Section 7521(a) authorizes EPA to regulate electric vehicles.

### 1. Electric vehicles are "motor vehicles" within EPA's regulatory ambit.

Section 7521(a)'s plain text authorizes EPA to regulate "motor vehicles," a term that encompasses electric vehicles. Petitioners' objection, to a "shift" from

---

[6] As EPA explained, it is also reasonable to view electric vehicles "as incorporating devices (e.g., batteries and e-motors) that prevent pollution from being created." RTC at 138, JA\_\_\_\_\_.

diesel-fueled internal-combustion-engine vehicles to electric vehicles, rests on a distinction without a legal difference.

Section 7521(a) directs EPA to regulate "motor vehicles." 42 U.S.C. § 7521(a)(1). The Clean Air Act defines a motor vehicle as "any self-propelled vehicle designed for transporting persons or property on a street or highway." *Id.* § 7550(2). This definition turns on function, not power source. *See* RTC 98, JA_____. So EPA's regulatory ambit covers more than just vehicles powered by internal-combustion-engines. It covers "any" vehicle having the requisite functions, *id.*, including vehicles propelled in whole or in part by electricity.[7]

Both internal-combustion-engine and electric vehicles are designed for the same function: transporting people or cargo on public roads. Both are thus equally "motor vehicles" under the Act. As a practical matter, both rely on electricity not only to control emissions but to operate. *See* 89 Fed. Reg. at 29463/2–3 (giving examples). Except for tailpipes, they often look similar. Some vehicles are a hybrid of the two. Manufacturers even offer the same models in diesel-fueled and electric versions. *Compare* RIA 85–96, tbl.1-23, JA_____, *with* RIA 96–103, tbl.1-24, JA_____, _____–___.

---

[7] When Congress wanted to specify internal-combustion-engine vehicles, it did so. It defined "nonroad vehicles" (like snowmobiles) to require "internal combustion engine[s]," 42 U.S.C. § 7550(10)–(11), and elsewhere specifically used the words "gasoline and diesel-fueled . . . vehicles." *E.g.*, *id.* § 7582(b).

The "emission standards" that EPA promulgates apply "to the emission of any air pollutant from any class or classes" of motor vehicles. 42 U.S.C. § 7521(a). The Heavy Duty Rule applies, as its name suggests, to the heavy-duty vehicle class, a "diverse array of vehicles" over 8,500 pounds by gross vehicle weight rating. 89 Fed. Reg. at 29444/1; 40 C.F.R. § 1037.801 (defining heavy-duty vehicle and heavy-duty vehicle engine). The class explicitly includes electric vehicles. 40 C.F.R. § 1037.1.

The standards applied to motor vehicle *classes* are set with a technology-based approach: EPA must consider compliance costs and lead time for the "development and application of the requisite technology." 42 U.S.C. § 7521(a)(2); *see also* RTC 96, 99, JA_____, _____. Congress did not exclude any technology from EPA's consideration. Just the opposite: Emission standards apply to vehicles whether they are "designed as complete systems or incorporate devices to prevent or control" pollution. 42 U.S.C. § 7521(a)(1); *see* 89 Fed. Reg. at 29464/1; RTC 102–03, 108 & n.73, JA_____–___, _____ (noting the statute contemplates "preventing" emissions in whole or in part).

Congress, in short, wanted EPA to consider all emission-control technologies—whether they are complete systems or discrete devices, whether they work by preventing pollution or controlling it—so long as they are feasible. Congress also did not limit EPA's consideration to tried-and-true technologies that

have already saturated the market. By expecting EPA to consider technologies that still require "development" and "application," 42 U.S.C. § 7521(a), Congress wanted "to force the industry to broaden the scope of its research—to study new types of engines and new control systems." *Int'l Harvester*, 478 F.2d at 635; *NRDC v. EPA*, 655 F.2d 318, 328 (D.C. Cir. 1981).

Having made that policy decision, Congress delegated the technical task of accounting for technological developments to EPA. *See Loper Bright*, 603 U.S. at 394–95 (recognizing that statutes can give agencies "a degree of discretion" by using terms that leave them with "flexibility").

Today, a growing number of heavy-duty vehicles are powered by electric motors that can eliminate tailpipe emissions. 89 Fed. Reg. at 29444/2; *see also id.* at 29445/3 (describing the heavy-duty industry's billions of dollars' worth of investments in electric vehicle technologies); RTC 103 & n.51, JA_____ (describing supportive manufacturer comments noting ongoing development of electric vehicles).

Congress has long anticipated this development. Since the 1960s—before EPA even existed—Congress has known that electric vehicles could become a "nonpolluting alternative[]" to diesel vehicles. S. Rep. No. 90-403, at 59 (1967). Congress has supported efforts to make electric vehicles such an alternative. *See, e.g.*, 15 U.S.C. § 2501 (stating policy to use electric vehicles in lieu of diesel-

fueled vehicles); 42 U.S.C. § 7404(a)(2)(B) (encouraging "low emission alternatives" to the internal-combustion engine). Congress has spent many billions of dollars to encourage electric vehicle adoption and to build battery-electric charging and hydrogen-refueling infrastructure. 89 Fed. Reg. at 29449/2 (citing Inflation Reduction Act, Pub. L. No. 117-169 (2022), and Bipartisan Infrastructure Law, Pub. L. No. 117-58, 135 Stat. 429 (2021)); *see* RIA 23–24, JA_____–___.[8] Indeed, many statutory incentives even define eligibility by reference to those motor vehicles regulated under the Clean Air Act.[9]

All this plain statutory text and context dooms Petitioners' chief argument that, absent clear text, EPA cannot consider electric vehicles in setting standards. The text *is* clear: Congress directed EPA to set emission standards for "motor vehicles," defined by function, not power source. 42 U.S.C. §§ 7521(a)(1), 7550(2). In setting standards, EPA should consider all "requisite technolog[ies],"

---

[8] Though Petitioners emphasize various failed bills, Fuel Br. 26–27, that "offers a particularly dangerous basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." *Bostock v. Clayton County*, 590 U.S. 644, 670 (2020) (internal quotation marks omitted); *see* RTC 133–34, JA_____–___.

[9] *See, e.g.*, 42 U.S.C. § 7432(d)(3) (identifying eligible zero-emission vehicles by reference to EPA's regulatory definitions at 40 C.F.R. § 1037.801); 26 U.S.C. § 30D(d)(1)(D) (qualifying new clean vehicles are those "treated as a motor vehicle for purposes of title II of the Clean Air Act"), 26 U.S.C. § 30D(f)(7)(A) (disqualifying vehicles if they fail to meet applicable Clean Air Act standards).

whether "designed as complete systems or incorporate devices to prevent or control" the targeted pollution. *Id.* § 7521(a)(1)–(2).

Under Section 7521(a), then, any shift from one technology to another is legally irrelevant to EPA's authority, which hinges on the definition of "motor vehicles." Indeed, past emission standards have catalyzed transitions from one type of fuel to another: the use of catalytic converters to control emissions prompted the "switch to unleaded fuel and the development of massive new infrastructure (not present at the time the standard was finalized) to support the distribution of this fuel." 89 Fed. Reg. at 29465/3 & n.146; RTC 118, 120–22, JA_____, _____–__. Whether a given standard is too strict, in turn, is a separate question for arbitrary-and-capricious review.

Petitioners' argument—which would limit EPA to regulating vehicles with internal combustion engines—rewrites the statute based on a misapprehension of Congress's intent. Congress sought to prevent and even eliminate motor vehicle pollution; not to freeze the internal combustion engine in time. *See* RTC 102–03, JA_____–__.

Their argument would also undercut Congress's longstanding support for electric vehicles. *See* RTC 133, JA_____. Congress has promoted the very shift to electric vehicles that Petitioners object to: It crafted Section 7521(a) to encourage adoption of feasible and effective control technologies—like electric vehicles. And

it devoted billions of dollars to expedite that shift. It defies common sense to think, as Petitioners do, Fuel Br. 26, 47, that EPA must ignore electric vehicles *because* Congress supports them. *See* RTC 134, JA\_\_\_\_\_.

By considering electric vehicles in the feasibility analysis, EPA did its job under Section 7521(a). Indeed, given that provision's technology-based framework, electric-vehicle technologies' effectiveness in preventing pollution, and regulated entities' investment in those technologies, it would have been arbitrary and capricious for EPA to ignore them in setting standards. *See State Farm*, 463 U.S. at 43; 89 Fed. Reg. at 29464/1–65/1 (noting the statute "compels" or at a minimum "allows" EPA "to consider available technologies that reduce emissions of air pollutants most effectively").

Ultimately, Petitioners' fixation on "shifting heavy-duty vehicles from liquid fuel to electricity," Fuel Br. 21, confuses the means with the ends of what Congress and EPA seek to achieve. What matters under Section 7521(a) is reducing harmful motor-vehicle emissions using feasible standards. Electric motors, used in electric vehicles, are superb emission controls that vehicle manufacturers continue to invest and deploy in their heavy-duty fleets. The Heavy Duty Rule accounts for those technological and market developments just as EPA has done in prior standards, and as Congress intended.

## 2. EPA's authority over motor vehicles does not turn on their emission levels.

The fact that a motor vehicle has zero emissions does not remove it from EPA's regulatory ambit.[10] Section 7521(a)(1) directs EPA to set standards applicable to the emission from any class or classes of motor vehicles. EPA has long defined classes of motor vehicles functionally, based on weight and purpose, not by propulsion type, or pollution-control technology employed.

Congress has ratified that approach. For example, Congress has referred to "heavy-duty vehicles" as those exceeding certain vehicle weights at several points. *See, e.g.*, 42 U.S.C. §§ 7432(d)(3) (incorporating EPA's regulatory definition of heavy-duty vehicle at 40 C.F.R. § 1037.801), 7521(b)(3)(C) (defining heavy-duty vehicle based on weight). That tracks EPA's historic classification, *see, e.g.*, 46 Fed. Reg. 50475 (Oct. 13, 1981) (defining heavy-duty vehicle as any motor vehicle above 8,500 pounds gross vehicle weight rating), which continues to this day with sub-classifications also based on weight and function, *see* 40 C.F.R. § 1037.140(g).

The heavy-duty class includes vehicles with zero tailpipe emissions, including "battery electric vehicles" and "fuel cell electric vehicles." 40 C.F.R.

---

[10] For simplicity, in this argument we use Petitioners' (incorrect) assumption that electric vehicles emit no pollutants. *E.g.*, Fuel Br. 41, 47–48. Although electric vehicles have no tailpipe emissions, they do emit greenhouse gases, for example through leaks in their air-conditioning systems. RTC 1369, JA_____; 40 C.F.R. § 1037.115(e).

§§ 1037.1(a), 1037.140(g)(5); Phase 1 Rule, 76 Fed. Reg. at 57399/2 (specifying that the greenhouse gas standards apply to "electric vehicles and vehicles fueled by conventional and alternative fuels"). Again, Congress endorsed this power-source-neutral approach: The 1990 Clean Air Act Amendments established a program for vehicles powered by clean alternative fuels, such as "electricity" and "hydrogen," 42 U.S.C. § 7581(2), and applied that program to certain "heavy-duty vehicles"—those "having a [gross vehicle weight rating] greater than 8,500 lbs." *Id*. §§ 7583(g), 7585(a).

EPA's approach is consonant with Congress's direction that when "establishing classes or categories of vehicles or engines" for certain heavy-duty vehicle standards, EPA "may base such classes or categories on gross vehicle weight, horsepower, type of fuel used, or other appropriate factors." *Id*. § 7521(a)(3)(A)(ii); 89 Fed. Reg. at 29460/1–2. This demonstrates Congress's understanding that EPA may classify heavy-duty vehicles by functional and weight-based factors and is certainly not compelled to exclude vehicles from a class based on fuel type.

Petitioners' contrary approach flouts both the statute's plain text and congressional intent. In Section 7521(a), Congress addressed a specific problem: harmful emissions from an ever-growing number of motor vehicles, resulting in dangerous levels of pollution. *See* Staff of Spec. Subcomm. on Air & Water

Pollution, 88th Cong., Rep. on Steps Toward Clean Air 3 (Comm. Print 1964) (noting the "omnipresence" of motor vehicles); *id.* at 7–9 (emphasizing the sheer number of vehicles on roads and the volume of pollutants they produce). The problem was the cumulative harm that the "motor vehicle population" inflicts on public health and welfare. H.R. Rep. No. 89-899, at 4.

Section 7521(a)(1) tackles that problem. It directs EPA to regulate emissions from groups of vehicles, or, in Congress's words, pollutants emitted "from *any class or classes* of new motor vehicles" that EPA finds to cause or contribute to harmful air pollution. 42 U.S.C. § 7521(a)(1) (emphasis added). Defining classes is left to EPA.[11]

Standards apply even to motor vehicles that emit no pollutants: The emission standards "shall be applicable to such vehicles" whether they are "designed as complete systems or incorporate devices to prevent or control such pollution." *Id*. As Congress saw it, the standards "appl[y]" to regulated vehicles that comply with the standards using a broad range of technologies, including those that "prevent" pollution. *See* 89 Fed. Reg. at 29464/1. This makes sense: Without control technologies, motor vehicles can potentially emit pollutants. When designing

---

[11] To borrow Petitioners' analogy, Fuel Br. 37, the problem that Congress targeted is not like riding roller coasters, where safety turns on *each* rider being tall enough. The problem is more like riding elevators, where safety turns on riders' combined weight. *See* RTC 1345–46, JA_____–___.

motor vehicles, vehicle manufacturers must incorporate technologies—be they complete systems or devices—to prevent or control pollution.

Electric vehicles fit that bill. Because they generate no tailpipe pollutants, they "prevent" pollution by, to use Petitioners' definition, "'keep[ing that pollution] from happening.'" Fuel Br. 50 (quoting dictionary). More to the point, they conform to Congress's definition of "air pollution prevention" as including the "elimination, through any measures, of the amount of pollutants produced or created at the source." 42 U.S.C. § 7401(a)(3).

Thus, to regulate under Section 7521(a)(1), EPA must first find that emissions "from any class or classes" of new motor vehicles cause or contribute to harmful air pollution. Then EPA must set standards to regulate those emissions— The standards apply to all motor vehicles in the regulated classes—including vehicles that, like electric vehicles, use technologies to "prevent" pollution.

Within this basic framework, EPA has a "degree of discretion" to "fill up the details," *Loper Bright*, 603 U.S. at 394–95, like how to group vehicles into classes. *See Massachusetts*, 549 U.S. at 532 (recognizing that Section 7521(a)(1) reflects Congress's "intentional effort" to give EPA "regulatory flexibility"); RTC 99, 137, JA_____–___.

EPA followed Section 7521(a)(1) to the letter. In 2009, EPA found that greenhouse-gas emissions from heavy-duty vehicles contribute to harmful air

pollution. 74 Fed. Reg. at 66537/3. This endangerment finding covered all vehicles in those classes, whether powered by diesel, natural gas, hydrogen, electricity, or something else. *See id.*; RTC 1363, JA_____ (explaining the endangerment finding applied to the heavy-duty class "with no qualification as to the level of emissions, powertrain, or any other characteristic").

Once EPA made the endangerment finding, it began to regulate greenhouse-gas emissions from heavy-duty vehicles. *Supra* Table 1. And because the heavy-duty class includes electric vehicles, EPA has properly regulated electric vehicles in that class. 40 C.F.R. § 1037.1(a). The 2024 Heavy Duty Rule is the latest iteration of that effort.

Petitioners read Section 7521(a)(1) to bar EPA from regulating electric vehicles because they emit no pollutants. Fuel Br. 41–44. That reading conflicts with Section 7521(a)(1)'s plain text and context—and common sense: Why would Congress want to stop one molecule short of eliminating harmful emissions if doing so is reasonably feasible?

It would not, as the statute's text makes clear. Section 7521(a)(1)'s first sentence directs EPA to prescribe "standards applicable to" the emission "from any class or classes of new motor vehicles." 42 U.S.C. § 7521(a)(1). It does not say

that standards apply only to individual vehicles that emit. A standard can "appl[y]" to a class that includes vehicles with zero tailpipe emissions.[12]

Petitioners also misconstrue the phrase "cause, or contribute to," which appears later in the same sentence of Section 7521(a)(1). Fuel Br. 43. They contend that Congress authorized EPA to regulate only individual vehicles that emit pollutants that "cause or contribute" to an endangerment. *Id*. But "cause, or contribute to" simply refers back to emissions "from any class or classes"; the thing that causes or contributes to endangerment is the emission "from" a "class or classes" of motor vehicles, not the individual vehicle. 42 U.S.C. § 7521(a)(1).

That reading makes practical sense: A single vehicle may "contribute" but ordinarily would not "cause" harmful air pollution. RTC 1345–46, JA_____ – ___.[13] Groups of vehicles, by contrast, could. Staff of Spec. Subcomm. on Air & Water Pollution, 88th Cong., Rep. on Steps Toward Clean Air 3 (Comm. Print 1964) (noting that vehicles were responsible for some 50% of the nation's air-pollution problem). Petitioners' reading would make some of the statutory text "superfluous"

_____

[12] Petitioners wrongly claim that this and other courts have "adopted" their reading in shorthand descriptions of Section 7521(a)(1)'s first sentence. Fuel Br. 42 (*citing Truck Trailer Mfr. Ass'n v. EPA*, 17 F.4th 1198, 1201 (D.C. Cir. 2021); *NRDC v. EPA*, 954 F.3d 150, 152 (2d Cir. 2020)). Whether Section 7521(a) applies to electric vehicles was not at issue in those cases.

[13] In practice, EPA would not regulate an individual vehicle for causing harmful pollution.

or "insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). EPA's reading, by contrast, gives effect to every word.

The rule of last antecedent cannot save Petitioners' contrary reading. Fuel Br. 42–43. That rule is sometimes used to interpret "a list of terms or phrases followed by a limiting clause[.]" *Lockhart v. United States*, 577 U.S. 347, 351 (2016); *see Barnhart v. Thomas*, 540 U.S. 20, 22, 26-27 (2003) (interpreting a list). Section 7521(a)(1) has no such list: It does not apply to some "class" *and* "motor vehicles"; it applies to "classes *of* new motor vehicles" (emphasis added).

Regardless, the rule of last antecedent "'can assuredly be overcome by other indicia of meaning.'" *Lockhart*, 577 U.S. at 352 (quoting *Barnhart*, 540 U.S. at 26). That indicator is Section 7521(a)(1)'s second sentence, which specifies that emission standards *do* apply to motor vehicles that use technologies to "prevent" pollution—vehicles "designed" to have zero emissions, like electric vehicles.

Petitioners contend the second sentence's pollution-prevention controls are limited to "self-contained mechanism[s] to block or capture pollution that would otherwise be emitted"; controls that keep the pollutant from forming do not count. Fuel Br. 50. But the statute says nothing of the sort. It says EPA should look broadly at available technologies "whether [they] are designed as complete systems or incorporate devices to prevent or control [harmful] pollution." 42 U.S.C. § 7521(a)(1). Had Congress instead meant to blacklist some technologies, it

would have used different language in a different spot; it would not have limited EPA's authority in a sentence about the standards' applicability. *See* 89 Fed. Reg. at 29459/3 n.94 (citing 42 U.S.C. § 7651f(d)).

Petitioners' reading, moreover, implicitly concedes that emission standards *do* cover at least some zero-emission vehicles—vehicles which fully "block or capture" pollutants. *See* Fuel Br. 50. That concession maims Petitioners' argument that standards can apply only to vehicles that emit. *See id.* at 41. At bottom, then, they argue this: Emission standards apply to vehicles that capture pollution before it is emitted, but not to vehicles that, thanks to advanced technologies, generate no pollution. That arbitrary distinction is found nowhere in Section 7521(a)(1).[14]

Section 7521(a)(1) does not care whether controls prevent pollutants from forming or from emitting. And why should it? Favoring one kind of control over the other would defeat Congress's goal of reducing emissions using all feasible technologies.

Petitioners, however, insist that electric vehicle technologies are a different kind of emission control than what Section 7521(a) envisions. They analogize

---

[14] Petitioners' arbitrary distinction is especially nonsensical when it comes to carbon dioxide. All controls—including those on internal-combustion-engine vehicles, like stop-start technology and better aerodynamic design—work by preventing carbon dioxide from forming. There is no commercially available technology that reduces vehicle emissions by capturing carbon dioxide after it is produced. RTC 139, JA_____.

these electric vehicles to iPods, contending that an iPod "is not a record player with some built-in method of reducing record skips, . . . but a different technology altogether." Fuel Br. 50.

That analogy betrays the chief flaw in Petitioners' statutory arguments. *See supra* Argument § III.A.1. The relevant classification is not record players (just as here, the relevant legal status is not internal-combustion-engine vehicles). 42 U.S.C. § 7521(a)(1). It is music players (and motor vehicles). A record player is a music player, one that does not reduce skips. An iPod is also a music player, but has a built-in mechanism that reduces—indeed, prevents—skips. The ability to prevent skips, however, does not alter an iPod's status as a music player. So too here: An electric vehicle's ability to prevent emissions does not alter its legal status as a motor vehicle. *Id*. § 7550(2).

Regardless, it *is* natural to say that electric vehicles are "designed as complete systems" of emission prevention. *Id*. § 7521(a)(1). In the design process, manufacturers add emission controls to motor vehicles. Electric vehicles are motor vehicles designed as a system that prevents emission. Section 7521(a)(1) thus confirms that emission standards apply to motor vehicles, whether they emit or not.

Petitioners' treatment of plug-in hybrids showcases the incoherence of their position. *See* Fuel Br. 9 n.3, 30–31. Plug-in hybrids drive certain distances on electricity; beyond that, they combust diesel. 40 C.F.R. § 1037.801. In electricity

mode, they emit no tailpipe pollutants; in diesel mode, they do. *Accord* Fuel Br. 9 n.3. Petitioners contend EPA cannot regulate "electric vehicles," which they define as including plug-in hybrids when they operate in electricity mode. *Id*. But Section 7521(a)(1) draws no such distinction. Either a vehicle is a motor vehicle and subject to EPA's authority, or it is not. Part-time regulation is not an option. *See* 42 U.S.C. § 7521(a)(1) ("Such standards shall be applicable to such vehicles[.]").

Ultimately, Petitioners confuse what the standards regulate with their effects. New motor vehicles, absent emission controls, can potentially emit. The standards are "applicable to" those emissions. It is only once manufacturers comply with the standards by installing emission controls, like catalytic converters or electric motors, that emissions are reduced or even eliminated. *See* 89 Fed. Reg. at 29472/3–73/1; RTC 138–39, JA_____–___. The standards' success in controlling emissions does not mean that they are inapplicable in the first place.

### 3.    Petitioners' remaining arguments are wrong.

Petitioners' remaining arguments likewise fail.

*First*, Petitioners wind themselves around the axle arguing that the possibility that emission standards might completely prevent motor vehicle tailpipe pollution would be extraordinary (and unlawful). Fuel Br. 49–50; *see also* State Br. 20. But Congress defined "air pollution prevention" to *include* the "elimination" of

pollution. 42 U.S.C. § 7401(a)(3). It would be an odd statute that authorizes standards that reduce emissions by 99%, but not 100%. 89 Fed. Reg. at 29464/1.

Petitioners' non sequitur response is that "[n]o statute pursues a single policy at all costs." Fuel Br. 48. True—and neither do Section 7521(a) or the Heavy Duty Rule. Vehicle emission standards are guided by what standards are technologically feasible, considering lead time and costs. 42 U.S.C. § 7521(a)(2). But while the statute *does* limit standards' stringency to what is feasible, it does *not* bar EPA from regulating electric vehicles. *See* 89 Fed. Reg. at 29588/1.

*Second*, EPA has not treated electric vehicles "as different in kind" from other motor vehicles. *Contra* Fuel Br. 48. EPA treats them as any other vehicles within its weight-based classes. Their compliance with emission standards, like any other vehicles', is determined by their exhaust emissions. *See* 89 Fed. Reg. at 29474/1; 40 C.F.R. 1037.101(a)(2). That electrification lowers emissions more than, say, internal-combustion-engine vehicles with electrified stop-start technology, does not change their legal status. *See id*. at 29463/2–64/1.

*Finally*, the Clean Air Act renewable-fuels program explicitly declines to prohibit EPA from considering electrification in applying Section 7521(a). *See* 42 U.S.C. § 7545(*o*)(12) (specifying that the renewable-fuels provisions do not limit EPA's other authority to regulate greenhouse gases).

In sum, Section 7521(a) authorizes EPA to regulate electric vehicles and to consider them in standard-setting. The Court should uphold EPA's reading.

## B. The Heavy Duty Rule lawfully uses fleet averaging.

### 1. Section 7521(a) authorizes fleet averaging.

For decades an integral part of EPA's vehicles program, fleet averaging embodies Section 7521(a)'s objectives. It reduces emissions using effective technologies while giving manufacturers compliance flexibility. Though Petitioners blame fleet averaging for allowing EPA to "compel" a shift to electric vehicles, the averaging mechanism has nothing to do with electrification as such. Nor does averaging implicate EPA's authority regulate electric vehicles—or any technologies that prevent or control harmful emissions—in the heavy-duty class.

EPA's authority to average is plain from the statute's text. Section 7521(a) specifies that standards apply to emissions of pollutants "from any class or classes"—meaning groups—of motor vehicles. *See* RTC 1349–52, 1362–69, JA_____–___, _____–___. Nothing in that text supports Petitioners' view that standards can apply only to individual vehicles. Fuel Br. 39.

EPA reasonably exercised its discretion in continuing the averaging program. The program allows manufacturers to reduce emissions where and when it is cheapest to do so, thus achieving greater pollution reduction for the same cost while rewarding manufacturers for using the most effective controls. RTC 1344,

1346, JA\_\_\_\_\_, \_\_\_; 136 Cong. Rec. 35367, 1990 WL 1222469, at *1. In doing so,

averaging encourages technological innovation, advancing Section 7521(a)'s goals

of reducing emissions while giving due consideration to manufacturers' lead time

and compliance costs. 42 U.S.C. § 7521(a)(2); *see* RTC 1340, 1345, JA\_\_\_\_\_,

\_\_\_\_\_. And it lets manufacturers decide how to achieve those emissions given their

business strategies. *See* S. Rep. No. 89-192, at 4 (1965) ("[T]he manner of meeting

the standards . . . should be left to the manufacturer's determination.").

Petitioners would bar averaging, ushering in a more rigid regime and ending

a "longstanding, foundational part of the motor vehicle program with a forty-year

pedigree" that manufacturers have come to rely on. RTC 1344, JA\_\_\_\_\_; *see*

*generally* RTC 103, 1343–44, JA\_\_\_\_\_, _____–\_\_\_ (describing manufacturer

comments supporting the standards, including averaging).

Petitioners' argument is wrong. This Court upheld the averaging program

soon after its creation. *See NRDC v. Thomas*, 805 F.2d at 425. Noting the absence

of "any clear congressional prohibition of averaging," this Court held that the

averaging framework "makes sense." *Id.*;[15] *cf. White Stallion Energy Ctr., LLC v.*

*EPA*, 748 F.3d 1222, 1253 (D.C. Cir. 2014) (allowing averaging in regulation of

---

[15] To the extent *NRDC*'s holding relied on *Chevron USA, Inc. v. NRDC*, 467 U.S.
837 (1984), the Supreme Court has explained that though it overruled *Chevron*, it
did "not call into question prior cases that relied on the *Chevron* framework,"
which "are still subject to statutory *stare decisis*." *Loper Bright*, 603 U.S. at 412.

stationary sources under 42 U.S.C. § 7412(d), which "neither expressly allows nor disallows emissions averaging"), *rev'd on other grounds sub nom. Michigan v. EPA*, 576 U.S. 743 (2015); *see* RTC 1342, JA_____.

Subsequent congressional ratification dispels any doubts about averaging's legality. When Congress amended the Clean Air Act in 1990, it acknowledged *NRDC* and left existing emissions averaging in place. *See* 136 Cong. Rec. 35,367; 136 Cong. Rec. 36713; RTC 1346–47, JA_____–___. Elsewhere in the U.S. Code, Congress often recognizes EPA's authority to set fleet-average standards.[16] The Court should heed Section 7521(a)'s text and Congress's intent.

## 2. Fleet averaging aligns with other statutory requirements.

Petitioners' chief argument to the contrary is that averaging is incompatible with other statutory provisions. *Id.* at 32–40. That is wrong.

A new motor vehicle must be covered by a certificate of conformity before entering commerce. 42 U.S.C. § 7522(a)(1). To be certified, a vehicle must "conform[] with the regulations prescribed under section 7521" and any additional terms specified by EPA. *Id.* § 7525(a)(1). Fleet-average standards are one such

---

[16] *See, e.g.*, 26 U.S.C. §§ 30B(b)(3)(B), 30D(f)(7)(A) (providing tax credits to certain vehicles certified to EPA's standards); 42 U.S.C. § 17013(a)(1)(A)(i) (defining "advanced technology vehicle" by reference to compliance with bins averaging); *id.* § 13212(f)(3)(C) (referencing "fleet average grams per mile of carbon dioxide-equivalent emissions for that class of vehicle"); RTC 1347–48, JA_____–___.

regulation. But so are a host of others. Together, those regulations form EPA's regulatory program. All new motor vehicles must comply with that program to be certified for conformity.

Here is how it works:

Vehicle manufacturers demonstrate compliance with heavy-duty emission limitations by grouping vehicles into "families" and "sub-families" based on categories. 40 C.F.R. § 1037.230. Each family is assigned a "Family Emission Limit" to which individual vehicles within that family must conform. *Id*. § 1037.801. To comply with EPA's standards, either the family emission limit meets the standards, or the vehicle families comply with the standard on average (within the applicable weight-based averaging set), using a production-weighted average of the family emission limits determined at the end of the model-year. *Id*. § 1037.241; 89 Fed. Reg. at 29600/3; RTC 1354, 1356–57, JA_____, _____–___.

Representative individual vehicles are tested to demonstrate that they will meet their family emission limit for the vehicle's useful life. 40 C.F.R. § 1037.235. A manufacturer must also demonstrate that production levels will result in compliance with its projected fleet average for each averaging set. Conditions are placed on the certificates to ensure compliance with the fleet average after the year's production is completed. *Id*. § 1037.725. A manufacturer also warrant that

each new vehicle is designed to comply with all applicable emission standards and will be free from defects that may cause noncompliance. 42 U.S.C. § 7541.

EPA may void a certificate of conformity *ab initio* for a vehicle family or subfamily if the manufacturer does not have sufficient credits from an averaging set at the end of the model year to meet the applicable standard, and if the manufacturer has not developed a plan to remedy the credit deficit within three model years. 40 C.F.R. § 1037.745. EPA also may perform in-use testing on individual vehicles. 40 C.F.R. § 1037.401(a).

Petitioners' objections to fleet averaging generally riff on two themes: (1) the statute contemplates that "*individual* vehicles will be tested for conformity," and have their certificates suspended or revoked, Fuel Br. 34 (citing, *e.g.*, 42 U.S.C. §§ 7522, 7525(b)(2)(A)(ii)); and (2) averaging makes it "impossible" to determine compliance with applicable emission standards before a vehicle enters commerce, *id.* at 34–35 (citing 42 U.S.C. § 7525).

Neither objection works. First, EPA's regulatory program does provide for individual conformity testing, both pre-certification and when EPA performs in-use testing. *See* RTC 1356, JA_____. Second, individual vehicles *are* certified, before entering commerce, to their applicable Family Emission Limit. 40 C.F.R. § 1037.725; *see* 89 Fed. Reg. 29600/2–3. If, after the model year ends, a manufacturer's averaging-set emissions exceed the applicable standard, that

manufacturer must make up its deficits. Otherwise, EPA will void the manufacturer's certificates until the remaining fleet complies. Averaging simply shifts some elements of the compliance demonstration later. Nothing in the statute prohibits that approach, which EPA has successfully used for decades.

Congress itself has relied on delayed compliance demonstrations when it mandated phase-ins over time of certain emission standards. *See* 42 U.S.C. § 7521(a)(6), (g)(1), (g)(2), and (j); *see* RTC 1357–58, JA_____–__. One provision requires an increasing percentage of certain model-year sales to meet specified criteria-pollutant standards. 42 U.S.C. § 7521(g)(1). Another allows EPA to impose less stringent criteria-pollutant standards for up to 5% of certain model-year light-duty productions. *Id*. § 7521(b)(3); Fuel Br. 37–38. In both cases, model-year sales are a core element of the standards—just as in fleet averaging. Because those sales cannot be known until after the model year ends, Congress's own standards also delay compliance demonstration—just like fleet averaging does. *See* RTC 1357–58, JA_____–__. Congress thus confirmed that delayed compliance demonstration is compatible with other Clean Air Act provisions.

Petitioners' remaining arguments fare no better. One is that Section 7521(b) precludes averaging under Section 7521(a). *See* Fuel Br. 37–38; *e.g.*, 42 U.S.C. § 7521(b)(1)(A) (setting model-year 1977–1979 hydrocarbons and carbon-monoxide standards at certain numerical levels). Subsection (b) is an exception to

EPA's general standard-setting authority under Subsection (a). *See* 42 U.S.C. § 7521(a) ("Except as otherwise provided in subsection (b) . . . ."). It does not limit Subsection (a)'s scope. RTC 1350, JA_____. Anyway, Subsection (b) predates Congress's express decision, in 1990, to let the averaging program stand. *See* Pub. L. No. 95-95, § 201 (1977). It cannot be read to restrict EPA's averaging authority.

Another argument is that, because Congress expressly allowed averaging in other contexts, Section 7521(a) must bar that approach. Fuel Br. 38–39. But Petitioners' two examples say little about what Section 7521(a) allows. The first, a narrow provision addressing reformulated gasoline, details the consequences of not reducing the "average annual aggregate emissions of toxic air pollutants" in certain areas. 42 U.S.C. § 7545(k)(1)(B)(v)(II). It does not inform what Section 7521(a), which addresses vehicle emissions, allows EPA to do. The second is the Energy Policy and Conservation Act, which directs NHTSA to set average fuel-economy standards. *See* Fuel Br. 39. Section 7521(a) is necessarily written more broadly because it authorizes EPA to regulate many pollutants, each with distinct features. *E.g.*, 89 Fed. Reg. at 29458/1. In any event, Petitioners' interpretation cannot be right when Congress ratified EPA's averaging approach in 1990.

None of Petitioners' arguments, in short, shows that fleet averaging under Section 7521(a) creates tension with other statutory provisions.

**C.    The major-questions doctrine offers no reason to depart from statutory text.**

The major-questions doctrine is a "tool of statutory interpretation." *Save Jobs USA v. DHS*, 111 F.4th 76, 80 (D.C. Cir. 2024). It instructs courts only in "certain extraordinary cases" involving transformative claims of statutory authority. *West Virginia*, 597 U.S. at 723. It is not a license to override a statute's plain text. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2376 (2023) (Barrett, J., concurring).

Cases applying the major-questions doctrine are rare. *See West Virginia*, 597 U.S. at 721 (citing only a handful). In those cases, the "history and the breadth" of the newly asserted authority with such profound economic and political significance, give "reason to hesitate" before concluding that Congress meant to confer that authority. *Id.* Thus, in *West Virginia* the Supreme Court invoked the doctrine when it concluded that EPA found, in the "vague language" of a "rarely used," "ancillary" statutory provision, an "unheralded power" representing a "transformative expansion" of its authority. *Id.* at 724. In that scenario, the Court demanded "clear congressional authorization." *Id*.

Though clear authorization exists here, *see supra* Argument § III.A–B, the major-questions doctrine does not even apply. Petitioners' real disagreement with EPA is over policy, not statutory interpretation.

And the hallmarks of an extraordinary case are absent: EPA acted within the heartland of its Section 7521(a) authority in setting fleet-average standards that apply to all vehicles in covered classes. That is what EPA has done in every vehicle greenhouse-gas rule (and even earlier for other pollutants). By focusing on making the regulated source cleaner, EPA followed the approach approved in *West Virginia*. In every way that matters, this case bears no resemblance to those extraordinary ones that trigger the major-questions doctrine.

**1.    Petitioners' "major question" is untethered to an interpretive question.**

The major-questions doctrine is a tool of statutory interpretation anchored in questions of statutory meaning. *See Save Jobs USA*, 111 F.4th at 80. It is not a free-roaming inquiry into whether EPA can "effectively mandate a nationwide transition from internal-combustion-engine heavy-duty vehicles to electric ones," Fuel Br. 4, or take actions with big impacts. State Br. 12.

State Petitioners' major questions argument offers no clear textual interpretation that is contrary to EPA's. State Br. 9–21. Fuel Petitioners' major questions argument, in turn, refers to Section 7521's text only once, Fuel Br. 31, and never gives a plausible competing textual interpretation to resolve the purported "major question" about vehicle electrification, *id.* at 20–32.

Fuel Petitioners do offer two textual arguments in the second part of their brief. One is that EPA lacks authority to use fleet averaging. *Id.* at 32–40. The

other is that EPA lacks authority to regulate electric vehicles. *Id.* at 40–47. But neither addresses Fuel Petitioners' major question, whether EPA can mandate a shift to electric vehicles.

To begin, Fuel Petitioners' primary averaging arguments do not address electric vehicles as such; they would apply even if a fleet has only diesel-fueled internal-combustion-engine vehicles. *See id.* at 32–39. Fuel Petitioners' "major question," meanwhile, centers on a "shift" to electric vehicles. *See id.* at 23. So, even if Fuel Petitioners were right, averaging would be irrelevant to whether EPA has authority to require new vehicles to use electric motors to control their emissions.

Fuel Petitioners' secondary argument is that averaging sets cannot include electric vehicles, because vehicles must "emit" the relevant pollutant to be covered by Section 7521(a) standards. *Id*. at 40–44. But they *concede* that a technology that fully "block[s] or capture[s]" pollutants would pass muster under their interpretation. *Id*. at 50. Fuel Petitioners' distinction between that hypothetical technology and electric vehicles flows not from the statutory text, but from their idiosyncratic policy preferences.

Beyond that, if "emit" were truly key to their textual reading, then Fuel Petitioners should agree that EPA can regulate plug-in hybrids, which undisputedly emit pollutants. *But see* Fuel Br. 9 n.3. And Fuel Petitioners seem to have no

problem with EPA regulating other hybrids even though those vehicles, like plug-in hybrids, use electricity to cut diesel use. *See* 40 C.F.R. §§ 1036.801, 1037.801 (defining "hybrid vehicle" and "mild" and "plug-in" hybrids).

So understood, Fuel Petitioners' "major question" is not whether Section 7521(a) authorizes EPA to regulate electric vehicles; it is how much electrification is too much. *Cf.* 89 Fed. Reg. at 27463/1–3; RTC 1343, JA_____ (explaining that all vehicles, including diesel vehicles, rely on electrification technologies to control emissions). That is not a matter of statutory interpretation but a policy preference. And policy preferences do not trigger the major-questions doctrine.

### 2. EPA broke no legal ground by tightening earlier standards.

Nor is there anything extraordinary here to trigger the major-questions doctrine. The doctrine singles out agency actions that claim "newfound," "rarely . . . used" powers to transform society. *West Virginia*, 597 U.S. at 724. It does not apply here because EPA simply tightened existing emission standards under longstanding, oft-invoked authority. *See* RTC 99–103, JA_____–___.

That authority is Section 7521(a), which EPA has used time and again to set and tighten vehicle-emission standards. EPA has considered electrification technology in heavy-duty motor vehicle standards since at least 2000. *See* 65 Fed. Reg. 59896, 59963/3 (Oct. 6, 2000); *see also* RTC 105, JA_____. EPA has considered electric vehicle technologies in both the Phase 1 and Phase 2 heavy-

duty greenhouse gas standards. *See* 89 Fed. Reg. at 29467/2–3. And all EPA's

greenhouse-gas rules apply to electric vehicles in regulated classes and use fleet

averaging sets that include electric vehicles. *Supra* Table 1.

The Heavy Duty Rule is no exception. It is just "one more entry in an

unbroken list" of many vehicle-emission rules. *West Virginia*, 597 U.S. at 726; *see*

RTC 99, JA_____ (explaining that the rule is an "iterative strengthening of the

existing Phase 2 emission standards"); *Biden v. Missouri*, 595 U.S. 87, 94 (2022)

(per curiam) (noting agency's "longstanding practice" of imposing the kind of

condition at dispute and not applying major-questions doctrine despite challengers'

request). The intervention of Ford Motor Company, the sole regulated entity

participating in this case, in support of EPA confirms that the rule is a

"straightforward and predictable" example of Section 7521(a) regulations. *See id.*

at 95. This is not an "expansion" of EPA's authority. *See* Fuel Br. 28–29. This is

EPA using authority to set technology-based standards for motor-vehicle emissions

to do just that: set technology-based standards for motor-vehicle emissions.

The difference between the Heavy Duty Rule and its predecessors is not its

approach, but its stringency. RTC 102, JA_____; *see* Fuel Br. 1 (stating that the

rule is "so stringent" as to effectively require electric vehicles).[17] But stringency is

---

[17] Petitioners contend that only Congress can set standards that impose such steep
emission cuts. State Br. 19–20. But Congress rejected that argument by specifying

*Cont.*

reviewed under the arbitrary-and-capricious standard. It is not a reason to apply the major-questions doctrine, which must be tethered to questions of statutory interpretation. Disagreement with *how* an agency exercises its authority should not masquerade as the agency lacking authority in the first place.

At heart, the major-questions doctrine is about novel assertions of agency authority, not the degree to which an agency uses established authority. That is the concern that animated *West Virginia* and the cases it relied on. 597 U.S. at 721; *see, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) (authority to regulate tobacco after authority disavowed for years); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 309–10, 323–28 (2014) (authority to regulate many previously unregulated smaller sources under a program intended for large industrial sources); *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 761 (2021) ("rarely . . . invoked" authority to impose eviction moratorium); *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 119 (2022) (per curiam) (authority to broadly mandate vaccines for first time).

Ultimately, the major-questions doctrine does not care about an agency's continued progress down the same path where it has long trod. It cares about an

---

that EPA can go still further by "revis[ing]" statutory standards. 42 U.S.C. § 7521(a)(1); *see also id.* § 7521(b)(1)(C), (i)(3)(B)(iii); 89 Fed. Reg. at 29464/2 & n.134.

agency blazing a trail into an unexpected new realm. Because the Heavy Duty Rule falls into the former category, the major-questions doctrine does not apply.

### 3. The rule hews to the regulatory approach blessed in *West Virginia*.

Petitioners play up supposed similarities between the Heavy Duty Rule and the Clean Power Plan challenged in *West Virginia*—similarities that are, at best, superficial. *E.g.*, Fuel Br. 2–3, 23–25. In reality, the rule does precisely what the Supreme Court criticized the Clean Power Plan for not doing: ensure that regulated sources "operate more cleanly." 597 U.S. at 725.

The Supreme Court viewed the Clean Power Plan as a novel attempt to restructure the entire power system. *Id.* at 725–27. In the Court's view, EPA did not take a "technology-based approach" and limit itself to trying to make fossil-fuel-fired plants (the regulated sources) operate more cleanly. *Id.* at 726. It instead designed the plan to shift power generation to wind- and solar-powered sources, sources it lacked authority to regulate under the relevant provision. *See id.* at 725, 728–29.

This approach, the Court said, "fundamental[ly] revis[ed]" the statute, "changing it from one sort of scheme of regulation into an entirely different kind." *Id.* at 728 (cleaned up). The Court also faulted EPA for locating its "newfound power" in the "vague language of an ancillary provision" of the Clean Air Act. *Id.* at 724 (cleaned up).

Had EPA meant to completely restructure the transportation system here (as the Supreme Court viewed the Clean Power Plan and the power system), the Rule would presumably have swept more broadly. It might have sought to phase out sources it regulates (motor vehicles) in favor of transportation it does not (bicycles, for example). And it would have done so by setting standards that regulated vehicles cannot meet. *See* RTC 115, JA_____.

That, of course, is not what happened. The Heavy Duty Rule regulates only the sources that Section 7521(a) authorizes EPA to regulate: motor vehicles. The rule focuses on making those vehicles "operate more cleanly" by using more and better emission-control technologies. *West Virginia*, 597 U.S. at 725–27. And because the Clean Air Act authorizes EPA to regulate motor vehicles, electric or not, there is no phasing out of regulated sources for unregulated ones. *See* 42 U.S.C. § 7550(2); *supra* Argument § III.A.1.

Petitioners contend that the major-questions doctrine applies because EPA asserted the power to "shift[] heavy-duty vehicles from liquid fuel to electricity." Fuel Br. 21; *see* State Br. 10–15. This argument misunderstands the statute, the Heavy Duty Rule, and *West Virginia*.

First, Petitioners' theory that the Rule requires a shift from one kind of motor vehicles to another turns on a distinction without a legal difference. Section 7521(a)(1) does not distinguish motor vehicles by power source. *See supra*

Argument § III.A. Absent a statutory hook, that is no basis for applying the major-questions doctrine. *See Save Jobs USA*, 111 F.4th at 80.

Second, the Rule does not mandate any particular emission-control technology. It increases prior greenhouse-gas standards' stringency, made feasible by electric, hybrid, natural-gas, and H2-ICE vehicle technologies. These are "performance-based standards, not a specific technology mandate." RTC 116, JA_____. EPA's compliance pathways demonstrate means of meeting the standards, but do not foreclose other means. 89 Fed. Reg. at 29575/1–76; *id*. at 29452–53, 29567–68, 29581, 29584 (various tables).

It is true that by tightening standards, heavy-duty fleets must use more emission-control technologies overall. But neither manufacturers' use of certain technologies, nor EPA's projection of what technologies *could* meet the standard transforms standards into a mandate.[18] After all, every diesel vehicle now has a catalytic converter to control ozone precursors and carbon monoxide. That does not transform the relevant standard into a catalytic converter mandate; it simply shows that the catalytic converter is a more effective technology than others. RTC 121–22, JA_____–__.

---

[18] Vehicle manufacturers *have* adopted different compliance strategies than expected. For example, EPA had predicted in its 2001 nitrogen-oxide standards for heavy-duty vehicles that the nitrogen-oxide absorber was the "only likely" control available, but manufacturers were nevertheless able to use a different technology. RTC 118, JA_____ (giving other examples).

Petitioners also ignore changes in the vehicles market. Manufacturers' own goals and other federal and state policies are already catalyzing the growth in heavy-duty electric vehicles. 89 Fed. Reg. at 29445/2–3, 29476/2–3. As EPA's analysis shows:

- The number of electric heavy-duty vehicles EPA has certified has more than doubled each year since 2020. 89 Fed. Reg. at 29444/2; RIA at 79, JA_____;

- *Without* the Heavy Duty Rule, by 2032, about 20% of new heavy-duty vehicles are projected to be electric. 89 Fed. Reg. at 29568 (tbl.II-31) (reference case).

- *With* the Heavy Duty Rule, under Pathway A, electric vehicles are projected to account for 45% of new heavy-duty production by 2032. *Id*.

Within that aggregate projection, the potential mix of electric vehicles within heavy-duty vehicle sub-classes and sub-categories is more varied. Light- and medium- heavy-duty vocational vehicles like delivery trucks and box trucks lean more heavily electric, with 60% and 40%, respectively, projected to be electric vehicles for model-year 2032. 89 Fed. Reg. at 29567, tbl.II-29. By contrast, EPA projects only 5% of heavy-haul tractors will be electric vehicles by model-year 2032. *Id*.

Regardless, those numbers reflect only one potential compliance scenario among many; it is ultimately up to manufacturers to choose which technologies to

use to meet the standards. EPA also determined the standards could feasibly be met with a mix of aerodynamic and tire improvements to diesel-fueled vehicles, natural-gas engines, H2-ICE, and hybrid vehicle technologies. 89 Fed. Reg. at 29577/1, 29581, tbl.II-42. That means neither individual manufacturers nor the heavy-duty industry writ large needs to produce *any* additional electric vehicles (beyond those projected absent the rule) to comply with the standards. Petitioners' mandate objection thus falls flat.

Third, greater technology penetration is no reason to apply the major-questions doctrine. Section 7521(a) itself authorizes EPA to push for the "development and application" of better, more effective technologies. 42 U.S.C. § 7521(a)(2); *see Int'l Harvester*, 478 F.2d at 628–29, 635; *NRDC*, 655 F.2d at 328. Greater fleet adoption of better control technologies—like electric vehicle technologies—is what is supposed to happen. And it is normal for regulations to cause "incidental" changes and even dislocations in a regulated industry. *West Virginia*, 597 U.S. at 731 n.4. Those changes, the Supreme Court said, differ in kind from the Clean Power Plan, which the Court said "simply announc[ed] what the market share of coal, natural gas, wind, and solar must be, and then requir[ed] plants to reduce operations or subsidize their competitors to get there." *Id.* Thus, in *West Virginia*, the Supreme Court saw nothing wrong with requiring fossil-fuel-fired sources to adopt source-based emission-control technologies. *See id.* at 727.

Ultimately, the Heavy Duty Rule sets the kind of conventional emission standards—standards attainable by applying emission-control technologies to regulated sources—that *West Virginia* blessed. Nothing in *West Virginia* suggests that EPA's ordinary exercise of its standard-setting authority triggers the major-questions doctrine. This Court should reject Petitioners' misreading.

### 4. Petitioners' other arguments are meritless.

Petitioners' remaining major-questions arguments are just as flawed.

Though Petitioners trumpet the rule's significant costs, costs alone do not trigger the major-questions doctrine. *E.g.*, Fuel Br. 21–25; State Br. 10–15. To the contrary, courts regularly resolve multi-billion-dollar cases without invoking that doctrine. *See Biden v. Missouri*, 595 U.S. at 89–90; *Becerra v. Empire Health Found.*, 142 S. Ct. 2354 (2022); *Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896 (2022); *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005); *New York v. FERC*, 535 U.S. 1 (2002). Ordinary principles of statutory interpretation suffice for almost all cases.

This case is no different. Congress decided to regulate motor vehicles using technology-based standards. That approach, Congress knew, would entail costs. Even so, Congress accepted that as the price for reducing harmful emissions. *See Motor & Equip. Mfrs.*, 627 F.2d at 1118 (noting that "[e]very effort at pollution

control exacts social costs," but "Congress, not the Administrator, made the decision to accept those costs"). That the rule may have the effects that Congress envisioned gives no "reason to hesitate" under the major-questions doctrine. *West Virginia*, 597 U.S. at 721. Otherwise, the doctrine would apply to every vehicle rule.

That cannot be right: The doctrine is reserved for "extraordinary" cases, not every time EPA tightens vehicle-emission standards. *Id*. at 723. Indeed, the Heavy Duty Rule's costs, however, are comparable to or *lower* than the compliance costs for the Phase 1 and Phase 2 heavy-duty greenhouse gas standards. RTC 110–14, JA_____–__.[19]

**Table 3. Comparison of the Impacts of the HD Phase 1, 2, and 3 Rules (RTC 111, JA_____)**

|  | Phase 1 | Phase 2 | Phase 3 |
|---|---|---|---|
| Publication Date | August 2011 | August 2016 | March 2024 |
| Manufacturer compliance costs (billions in 2022 dollars) | $63 | $110 | -$3.2 |
| Average per-vehicle compliance costs (in 2022 dollars) – Tractors | $3,165 to $11,100 | $12,750 to $17,125 | $3200 to $10,800 |
| Average per-vehicle compliance costs (in 2022 dollars) – Vocational Vehicles | $289 to $506 | $1,860 to $7,090 | -$650 to -$2900 |

---

[19] Petitioners' indignation about the rule's compliance costs rings particularly hollow because those costs are borne not by Petitioners, but by automakers.

Next, Petitioners object to the rule's purported indirect effects on the energy markets, national security, and jobs. *See* Fuel Br. 22, 27–28; State Br. 10–11, 14–17. That argument proves too much. Most regulations, including past EPA vehicle standards, have indirect effects that ripple across the economy and society at large. RTC 122–25, JA_____–__. Yet Congress authorized EPA to regulate motor vehicles using technology-based standards. That authority necessarily imposes costs in the product chain—vehicle manufacturers, fuel producers, consumers, employees, and others—even if electrification were not in play. *Id*. Broad effects alone do not trigger the doctrine.

At any rate, after consulting a host of agencies ranging from NHTSA to the Department of Energy to the Department of State, EPA concluded that the Heavy Duty Rule would not have the disruptive indirect impacts that Petitioners forecast. RTC 127–28 & n.196, JA_____–___, ___; 89 Fed. Reg. at 29458/1–59/1.[20]

To begin, EPA projected that nearly 80% of the on-road fleet will still be internal-combustion-engine vehicles in 2040. *See* 89 Fed. Reg. at 29568/1. This heavily diesel-powered fleet is expected to increase total U.S. electricity

---

[20] EPA has expertise to assess these impacts. *Contra* Fuel Br. 27. Congress entrusted EPA to assess non-environmental impacts under the Clean Air Act. *See* RTC 126–27, JA_____–___ (giving examples); 89 Fed. Reg. at 29493/3–95/2 (noting critical-minerals supply chain considerations for electric vehicles are not unlike EPA's many years of experience with critical-minerals supplies for internal-combustion-engine vehicles).

consumption by only 4.1% by 2050. *Id*. at 29522/1. Based on extensive analysis

and consultation with the Department of Energy, EPA concluded that the power

sector can continue to support more electric vehicles and plug-in hybrids—even

considering other recent rules affecting that sector. *Id.* at 29521/3–23/3. Pathway B

(hybrid-dominant) and Pathway C (H2-ICE-dominant) would involve even less

electrification. *Id.* at 29581/1–3. Further, software can manage vehicle-charging

time to reduce any stress on the electric grid. *Id*. at 29517/3–18/1.

EPA also considered security issues of importing batteries and the minerals

used to make them. After reviewing extensive literature on the subject and

consulting with the Department of Energy, the Department of State, and NHTSA,

EPA concluded that critical-mineral supply chains, both domestically and abroad,

are developing to support compliance with the standards. 89 Fed. Reg. 29494/1–

29495/2, 29458/3; *see also* RTC 1668–72, JA_____–__.

Petitioners attempt to put (inaccurate) words in EPA's mouth, quoting

EPA's explanation of the *concept* of mineral security to argue that the Heavy Duty

Rule will make the market "dependent" on "countries with which the U.S. has

fragile trade relations or significant policy differences." Fuel Br. 28 (quoting 89

Fed. Reg. at 29509). But that is *not* what EPA concluded. Rather, EPA explained

that increased electric vehicle production under Pathway A "is not expected to

adversely impact national security, and in fact may result in national security

benefits by reducing the need for imported petroleum," among other benefits. 89

Fed. Reg. at 29510; *see also* 89 Fed. Reg. 29494/2, 29500/2, 29512/1; RTC 1652,

JA_____.

Nor does the record support Petitioners' claim about job impacts. Detailed

analysis shows that manufacturing electric vehicles (when battery packs are

included) "will require more labor." RIA 744, JA_____; *contra* Fuel Br. 27. So

although fully quantifying electric vehicles' employment impact is difficult,

available evidence suggests a likely increase in jobs.

The Heavy Duty Rule is not extraordinary: This is a routine dispute about

the latest in a long line of stricter emission standards, all cast in the same

regulatory mold. The major-questions doctrine does not apply.

### 5. Even under the major-questions doctrine, clear congressional authorization exists.

Even if the major-questions doctrine were to apply, the Court should still

uphold the Rule. As explained above, Section 7521(a)'s text provides the "clear

congressional authorization" that the doctrine demands. *West Virginia*, 597 U.S. at

723.

Congress authorized EPA to regulate classes of "motor vehicles," and

instructed that standards apply to those vehicles "whether [they] are designed as

complete systems or incorporate devices to prevent or control" pollution. 42 U.S.C.

§ 7521(a)(1); *see supra* Argument § III.A. It need not separately authorize EPA to

regulate vehicles based on their source of propulsion. Petitioners contemplate that Congress would need to list every single potential *application* of an authority to clearly grant it.

"There is no reason, much less a compelling reason, . . . to read ambiguity into a clear statute." *Massachusetts*, 549 U.S. at 531. Whether the Court concludes that the major-questions doctrine does not apply or that Congress's direction is clear, it should decline to use major-questions doctrine to thwart Congressional intent.

## IV.    The Heavy Duty Rule is reasonable.

### A.    EPA established reasonable standards.

EPA established reasonable standards that are projected to meaningfully reduce greenhouse-gas emissions and that manufacturers can meet through various means within the compliance timeframe provided. 89 Fed. Reg. at 29469/2; *see NRDC*, 655 F.2d at 331–32 (approving standards where EPA projected a means of compliance, "answer[ed] any theoretical objections" to that means, and "offe[red] plausible reasons for believing" the "major steps necessary" to achieve compliance could be "completed in the time available"). EPA identified three potential compliance pathways with different technology mixes that could reasonably be deployed within the compliance timeframe. That technical judgment is supported by substantial evidence and merits deference.

To arrive at standards—the grams of carbon dioxide emitted per ton-mile—EPA considers what emissions control can be achieved by various technologies that are or could be available during the relevant timeframe. 89 Fed. Reg. at 29484/2; 42 U.S.C. § 7521(a) (requiring EPA to set standards upon considering lead time and costs). EPA aims to achieve meaningful greenhouse-gas emissions reductions, constrained by technological feasibility, lead time necessary to implement the technologies, and manufacturer costs, among other factors. 89 Fed. Reg. at 29587/3–88/1, 29591/2.

EPA begins by considering the suite of technologies that could be available during the Rule's timeframe, here: further internal-combustion-engine vehicle efficiency improvements; hybrids and plug-in hybrids; electric vehicles; and other technologies like H2-ICE. *Id.* at 29485/2–88/2, 29489/1–31/2. EPA assesses the feasible technologies' suitability for various vehicle uses, costs, lead time, and other factors including especially, effectiveness at controlling emissions. *Id.* at 29587/2–88/3. EPA determines the standards are feasible if there is (at least) one potential compliance pathway with technologies that vehicle manufacturers could feasibly deploy to achieve the grams-per-ton-mile standard within the compliance timeframe. *Id.* at 29587/3.

Here, EPA set standards and determined that each of three potential compliance pathways supported the feasibility of the standards. *Id.* at 29594/3.

Consistent with Section 7521(a)'s focus on reducing motor-vehicle emissions, EPA modeled one compliance pathway (Pathway A) that includes those technologies that would be most technologically-efficient at reducing greenhouse gas emissions in the relevant timeframe—electric-vehicle technologies. *Id.* at 29584/2, 29588/1.

EPA considered how vehicles with the technologies would need to be designed to meet the specific power and energy demands of different vehicle types, including charging and refueling. *Id*. at 29532/1–2, 29536/2. EPA then considered the technologies' performance impacts, like whether battery weight reduces the amount of payload that can be carried, for each heavy-duty vehicle type. *Id.* at 29532/1–2, 29538/1–43/3. EPA narrowed its analysis to only those capable of doing the work of comparable internal-combustion-engine vehicles. *Id.*; *contra* Fuel Br. 58–61.

For those vehicles, EPA evaluated the lead time necessary to commercialize such vehicles and to build supporting infrastructure. *Id.* at 29491/3–520/1, 29528/2–31/2. Electric vehicles already exist and many types are commercially available. 89 Fed. Reg. at 29491/3 (noting over 160 models of commercially available battery-electric vehicles); RIA 141–42, JA_____–__ (listing commercially available fuel-cell electric vehicles). In consultation with the Department of Energy, EPA determined that there would be sufficient lead time to

deploy some battery-electric vehicles starting in model-year 2027 and other

battery-electric and fuel-cell electric vehicles starting in model-year 2030. 89 Fed.

Reg. at 29491/3–92/1, 29525/1, 29530/1–2; RTC 110–17, 914–17, JA_____–__,

_____–__; *contra* Fuel Br. 60–62.

EPA then evaluated the incremental costs of those electric vehicles,

consulting other federal agencies with subject-area expertise to reliably assess

costs. 89 Fed. Reg. at 29458/2, 29532/2, 29548/2, 29569/3–71. For vehicle

manufacturers, EPA evaluated the costs of materials, labor, and other costs

associated to produce the applicable technology, accounting for any available tax

credits. *See id.* at 29532/2, 29544/1–46/3, 29549/2–53/1, 29628/1–2.

EPA also evaluated purchasers' willingness to buy those vehicles. RTC 410,

JA_____. EPA considered the National Renewable Energy Laboratory's TEMPO

model, which provided robust results regarding a purchaser's likelihood to adopt

vehicle technology based on various inputs (e.g., vehicle performance, fuel costs).

RIA 336, JA_____. EPA also considered a vehicle's payback period—the time it

would take for those vehicles' any reduced operating costs (like the costs of

electricity or hydrogen to run the vehicle, maintenance, and repair) to offset any

higher net upfront costs (like installing vehicle-charging equipment, offset by

applicable tax credits) compared to internal-combustion-engine vehicles. 89 Fed.

Reg. at 29558/2, 29628/2–3. Commenters suggested that an extended payback

period for electric vehicles would hinder technology adoption, so EPA excluded those technologies that would take longer than 10 years to pay back. RIA 345, 393, JA_____, _____; *contra* Fuel Br. 55, 57. And EPA considered the inherent uncertainties in predicting future technology adoption, setting electric-vehicle technology adoption caps of 20% for model-year 2027, 37% for model-year 2030, and 70% for model-year 2032. 89 Fed. Reg. at 29592/2–3, 29595/2–3; RTC 717, JA_____; *contra* Fuel Br. 56–57.

Accounting for these and other relevant factors, EPA set standards and identified Pathway A, which included electric vehicles that could perform equivalent to comparable internal-combustion-engine vehicles. 89 Fed. Reg. at 29589/1–3. EPA determined that there was sufficient lead time to include certain battery-electric vehicles starting in model-year 2027, and other battery-electric and fuel-cell electric vehicles starting in model-year 2030; and that estimated compliance costs were reasonable and equivalent to or less than the less-stringent Phase 2 standards' anticipated costs. *Id.* at 29589/1–591/2. For purchasers, EPA determined that lower operating costs will offset any incremental upfront cost of purchasing an electric vehicle within the original purchaser's usual period of ownership. *Id.* at 29592/1. EPA also determined (in consultation with other federal agencies) that grid reliability is unlikely to be impaired. *Id.* at 29592/3. EPA therefore concluded that the standards are reasonable.

That was not all. EPA concluded that the standards were feasible under Pathways B and C, too. Those assume vehicle-manufacturers will not adopt electric vehicles beyond what current market trends anticipate and rely on different technology mixes, one with more H2-ICE and one with more plug-in hybrids. *Id.* at 29469/2, 29584, tbl.II-50.

EPA determined that there was sufficient lead time for each technology and any supporting infrastructure based on technology being currently sold, manufacturers' announcements, private- and public-sector investments, and consultation with federal agencies.[21] RIA 434–42, JA_____–__. EPA also determined that costs were reasonable. For the pathway with more H2-ICE, overall compliance costs were projected to be comparable to the less stringent Phase 2 standards' costs. 89 Fed. Reg. at 29585/1. For the pathway with more plug-in-hybrids, while overall compliance cost were higher than for the Phase 2 standards, the payback period was shorter, which often increases purchaser willingness to buy and makes a better business case for vehicle-manufacturers. *Id.* at 29585/1–2.

EPA therefore set reasonable standards, and this Court may uphold the reasonableness of the standards under any one of the potential compliance

---

[21] EPA reasonably concluded that, because Pathway A, which assumes greater electric vehicle use, is unlikely to adversely affect grid reliability, other pathways with less electrification would also not affect grid reliability. 89 Fed. Reg. at 29581/2–3.

pathways. Put differently, any error in EPA's assessment of one pathway (for a specific category of heavy-duty vehicles or for a specific model-year) is harmless if another pathway (for that heavy-duty vehicle category or model-year) is reasonable. *City of Portland v. EPA*, 507 F.3d 706, 711 (D.C. Cir. 2007) (holding that EPA's error is harmless because it did not affect the outcome); 89 Fed. Reg. at 29562/2–63/1 (explaining that standards are severable by model-year and vehicle type). EPA's technical assessment that the standards were feasible under each of the three potential compliance pathways should be upheld.

### B. Petitioners' objections to EPA's analyses are meritless.

#### 1. EPA reasonably accounted for supporting infrastructure buildout.

Under Pathway A, EPA determined that there is sufficient time to implement certain battery-electric technologies and supporting infrastructure starting in model-year 2027 and other battery-electric and fuel-cell electric technologies and supporting infrastructure starting in model-year 2030. 89 Fed. Reg. at 29484/1–85/2, 29491/3–512/1, 29512/2–20/1, 29525/1–31/2, 29567, tbl.II-30, 29588/3–89/2; *contra* Fuel Br. 60–62.

Petitioners do not dispute that battery-electric heavy-duty vehicle technologies currently exist; their use has grown significantly since model-year 2018; and that they will be commercially available during the Rule's timeframe. 89 Fed. Reg. at 29491/3–92/1. Likewise, Petitioners do not dispute that there will be

adequate time to build *private* depot charging infrastructure—the method most battery-electric heavy-duty vehicles are anticipated to employ. RIA 317, JA_____.

Petitioners argue only that EPA failed to adequately consider the time to build necessary *public* charging infrastructure. Fuel Br. 60–61. They are incorrect.

Under that pathway, only battery-electric sleeper cabs and certain battery-electric day cabs would need to use public charging starting in model-year 2030. 89 Fed. Reg. at 29518/3; RTC 1078, JA_____. This limited public-charging demand can be met with relatively limited infrastructure and station buildout in discrete corridors where freight activity is concentrated. 89 Fed. Reg. at 29518/3–20/1 (considering Department of Energy study and International Council on Clean Transportation report); RTC 1062–72, 1078–81, 1087 & n.544, JA_____–___, _____–___, _____.

Indeed, both the public and private sector have extensively invested in heavy-duty charging infrastructure, with an estimated $30 billion already committed and more having been announced. RIA 110–17, JA_____–__. Although Petitioners suggest that 20-megawatt stations are unlikely to be built by 2030, there are plans for such stations to begin initial operation in 2025. *Id.* at 112 & n.483, JA_____; *contra* Fuel Br. 60.

Petitioners' lead-time argument on fuel-cell electric vehicles—that they would not be commercially available within the modeled potential compliance

pathway's timeframe—also lacks merit. Fuel Br. 61. The record shows that fuel-cell electric vehicle technology is well-established and can meet the modest adoption levels projected in the modeled pathway. 89 Fed. Reg. at 29525/1, 29530/1-2, 29573/2, 29603/3–04/3; RTC 809–10, JA_____–__. Indeed, manufacturers have already begun selling fuel-cell electric vehicles. RIA 141–42, JA_____–___.

Likewise, Petitioners are wrong about EPA's hydrogen infrastructure projections, made in consultation with the Department of Energy. Fuel Br. 61–62; *see* 89 Fed. Reg. at 29528/2–31/2. Several existing government programs are anticipated to increase clean hydrogen production. RIA 155–56, JA_____–__; 89 Fed. Reg. at 29528/3–29/2. The technology for transporting hydrogen to fueling stations already exists. RIA 153, JA_____. And the current hydrogen-refueling-station network buildout in discrete areas supports the modest projected adoption levels of fuel-cell electric vehicles starting in model-year 2030—and will only accelerate with existing programs and incentives. 89 Fed. Reg. at 29528/2–31/2. Record evidence shows that these stations can be built in approximately two years. *See id.* at 29531/1.

Furthermore, hydrogen has been safely transported for over 50 years with federal oversight and industry standards. 89 Fed. Reg. at 29528/1–2; RIA 139–40, JA_____–__. That safety measures for hydrogen transport may continue to be

evaluated does not mean hydrogen transport is unsafe. *See* RTC 814, JA\_\_\_\_\_;
*contra* Fuel Br. 62.

### 2. EPA reasonably considered technology costs.

Petitioners miscast three aspects of EPA's cost assessment for Pathway A.

First, EPA incorporated the costs of grid improvements and electricity demand into purchasers' charging costs. 89 Fed. Reg. at 29532/2, 29555/1–3; RIA 293–96, JA\_\_\_\_\_–\_\_; *contra* State Br. 28–29 (asserting that EPA ignored grid-improvement costs).[22]

Second, EPA reasonably determined, in consultation with the Department of Energy and Argonne National Laboratory, that federal battery tax credits would be fully available by 2030 because the United States is poised to meet projected national demand for electric-vehicle batteries. 89 Fed. Reg. at 29493/3–95/2, 29503/1–05/2, 29551/1–52/3; *contra* Fuel Br. 58. Data and studies by firms, stakeholders, and federal agencies showed that domestic battery production is rapidly growing and anticipated to exceed projected demand through 2030. 89 Fed. Reg. at 29503/2–3, 29505 & fig.II-6.

---

[22] Petitioners erroneously cite Edison Electric Institute's comments to argue that EPA tiptoed past certain grid infrastructure costs. State Br. 29. The Institute commented that EPA would be justified in not including distribution upgrade costs. Edison Elec. Inst. Comment 16–20, JA\_\_\_\_\_–\_\_. Regardless, EPA did analyze those costs. RTC 954, JA\_\_\_\_\_.

Third, EPA considered supply, labor, and permitting needs. *Contra* State. Br. 29. EPA accounted for the supply and costs of all vehicle-technology components and infrastructure equipment. 89 Fed. Reg. 29493/3–531/2, 29544/1–58/2. EPA consulted with federal agencies and engaged with labor groups to account for technician costs for maintaining and repairing electric vehicles. *Id.* at 29553/2–54/3; RTC 1796–98, JA_____–__. And EPA considered the permitting requirements to build electricity generation and transmission. Integrated Planning Model Documentation §§ 3.3.5, 4.4.3, JA_____, _____.

### 3. EPA reasonably assessed purchasers' willingness to adopt electric vehicles.

Petitioners contend that EPA "exclusive[ly] focus[ed]" on payback and that EPA's payback schedule was arbitrary. Fuel Br. 53–58. But as already explained, EPA assessed the standards' reasonableness by balancing many factors; payback was just one component of EPA's analysis of willingness to purchase. And in evaluating payback, TEMPO provided just one source of information regarding technology adoption. RIA 343–46, JA_____–__.

For good reason: TEMPO modeled the entire U.S. transportation sector, including heavy-duty vehicles, and thus, provided highly applicable information. *Id.* at 336, JA_____. Further, TEMPO used validated empirical data, provided robust results regarding technology adoption, and was subject to peer review. *Id.* To be sure, TEMPO did not include certain inputs that implicate a purchaser's

willingness to adopt vehicle technology, including resale value and payload. *See* Fuel Br. 55. But EPA considered those factors (and others) on top of TEMPO's results. *See supra* Arguments. IV.A, IV.B.1 (considering payload and infrastructure buildout); RTC 456, JA_____ (intentionally omitted resale value when calculating payback to include only those vehicles that pay back even if the resale value were hypothetically $0). Petitioners fail to demonstrate why EPA could not rationally consider TEMPO alongside these additional factors. *See* Fuel Br. 54; *Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1005 (D.C. Cir. 1997) (holding that an agency reasonably relies on a model that does not account for every factor if the model bears a rational relationship to the reality it purports to represent).

Petitioners' arguments regarding EPA's use of TEMPO misunderstand TEMPO and EPA's analysis of its results. TEMPO took many inputs (like vehicle costs) and projected the rate of technology adoption in terms of total cost of owning an electric vehicle relative to a diesel-fueled one. *See* RIA 336, JA_____. Generally, TEMPO projected greater technology adoption rates as cost decreased. *See id.* at 337–40, JA_____–__. Costs and time are inputs TEMPO used to calculate total cost of ownership and project adoption rates. *Id.* And the timing input was a "key assumption[]" TEMPO made; TEMPO applied a three- to five-

year timeframe assuming that operating savings accrued beyond that time would not impact adoption. TEMPO Study 13–14, JA_____ – __.

EPA took TEMPO's results and reasonably assessed adoption rates using payback instead of total cost of ownership. *Contra* Fuel Br. 55. In other words, EPA evaluated how the adoption rate would change depending on a vehicle's payback period. *See* RIA 340, fig.2-10, JA_____ (reproduced below).



EPA assessed adoption rate in terms of payback period for two reasons. First, payback-period calculations use the same cost information as total cost of ownership. *Id.* at 337, JA_____. But they remove the need to assume a timeframe

because time (as expressed by the payback period) becomes the output. *Id.* The simplified equations below compare total cost of ownership and payback periods.

| Inputs (with costs and savings assessed incrementally) | | Output |
|---|---|---|
| *Upfront purchasing cost* <br> + <br> *(annual operational costs * # of years)* | = | Total cost of ownership relative to diesel-fueled vehicle ($) |
| $\dfrac{upfront\ purchasing\ cost}{annual\ operational\ savings\ (if\ applicable)}$ | = | Payback period (years) |

Second, because they do not assume a timeframe and have time as an output, payback periods reveal more information about purchasers' likelihood of buying certain technology than total cost of ownership. *Id.* That is because purchasers may prioritize different considerations when buying a vehicle technology even when the payback period is the same. *Id.*; *contra* Fuel Br. 55 (erroneously contending that EPA's approach is unreliable because it shows a range of adoption rates). Evaluating technology adoption in terms of payback periods allows EPA to consider these variations, which cannot be considered using total cost of ownership where the timeframe is assumed.

Because Petitioners misunderstand how EPA evaluated technology adoption and payback periods, they wrongly contend that EPA tinkered with TEMPO's results and ignored real-world considerations to establish a payback schedule and determine purchasers' willingness to buy certain vehicle technologies. Fuel Br. 56–

57. EPA assessed vehicle-technology adoption and set a payback schedule considering factors like purchaser risk aversion, timing of infrastructure deployment, and comments noting that purchasers would not buy technology with payback periods longer than 10 years. *See* RIA 344–45, JA_____–___; RTC 717, JA_____. TEMPO was among the information that EPA reasonably considered.

### 4. EPA reasonably included electric sleeper cabs in the modeled compliance pathway.

Petitioners' targeted challenge to EPA's assessment of the electric sleeper cabs' performance ignores EPA's comprehensive analysis that included only those electric vehicles that could perform the work of comparable internal-combustion-engine vehicles. *See* Fuel Br. 58–61.

EPA reasonably evaluated electric vehicles' performance based on how they would be expected to operate. Sleeper cabs travel long distances and carry heavy loads. *See* RIA 569, JA_____. So if they were to travel to their destination without charging or refueling, they would need large batteries or hydrogen tanks. *See id.* at 189, JA_____. But comments, including from manufacturers like Daimler, showed that sleeper cabs would employ public charging or refueling and thus could operate with smaller batteries or tanks. *Id.* at 188–90, JA_____–__; *contra* Fuel Br. 60–61.

Relatedly, EPA reasonably considered payload concerns. After considering battery technology (and existing regulations that permit battery-electric vehicles to be heavier than internal-combustion-engine vehicles), EPA excluded one electric

sleeper cab (vehicle 54) because its heavy weight would reduce its payload by 22% compared to an equivalent internal-combustion-engine vehicle. RIA 218, 389, JA_____, _____. For the other battery-electric sleeper cabs (vehicles 32 and 78), EPA determined that payload would be reduced only 7.6% and 4.8%, respectively, and so included them because sleeper cabs generally carry within that range of their maximum payload capacity. *Id.* at 388–89, JA_____–__. EPA thus reasonably included a modest amount of electric sleeper cabs in Pathway A. *Id.* at 389, JA_____; *see supra* Table 1 (projecting 6% of sleeper cabs to be electric by model-year 2030); *contra* Fuel Br. 59–60.

### 5. EPA reasonably evaluated H2-ICE technologies' feasibility.

Regarding Pathways B and C, Petitioners challenge only EPA's inclusion of H2-ICE technologies for certain heavy-duty categories starting in model-year 2031. 89 Fed. Reg. at 29579/2–80/1, 29584, tbl.II-50.

Petitioners state that such vehicles are not commercially available *now*. Fuel Br. 62. However, EPA reasonably determined that they *will* be available by model-year 2031 because H2-ICE vehicles are technically similar to their diesel-fueled kin, and manufacturers have announced plans to produce H2-ICE technologies, including one announced for model-year 2026. RTC 1284, JA_____; RIA 439, JA_____; 89 Fed. Reg. at 29579/2–80/1.

Petitioners also contend that purchasers will not buy a certain category of H2-ICE vehicles because they do not pay back. Fuel Br. 62. But EPA reasoned that purchasers may consider buying this specific vehicle for non-cost reasons (e.g., their efficiency in controlling emissions). 89 Fed. Reg. at 29575/3, 29586/2 & n.804.

## C. EPA reasonably determined that the standards are unlikely to adversely affect grid reliability.

In consultation with other expert federal agencies, EPA reasonably determined that the latest vehicle-emissions standards for light-, medium-, and heavy-duty vehicles, along with recent power-sector rules, are unlikely to adversely affect grid reliability. *See id.* at 29520/3–25/1. EPA considered various analyses relating to grid reliability, including the Integrated Planning Model: a peer-reviewed model of the U.S. power sector that simulates electricity-market responses to various scenarios based on the best available information. *Id.* at 29522/3; *contra* State Br. 23. The Model projected that EPA's recent standards and rules will not adversely impact resource adequacy. 89 Fed. Reg. at 29523/1–2; *contra* State Br. 24. Utilities, regulated entities, and expert commenters all corroborated EPA's conclusion. 89 Fed. Reg. at 29523/3.

Petitioners contest EPA's reliance upon the Model and assert that resource adequacy does not bear upon grid reliability. State Br. 22–23. However, resource adequacy—the grid's ability to provide sufficient supply to meet projected

demands and maintain required reserves of electricity to cover unexpected demands—is an essential element of grid reliability and the key metric used in the North American Electric Reliability Corporation's long-term reliability assessments. 89 Fed. Reg. at 29523/1; Resource Adequacy Analysis 2, JA_____.

Petitioners also mischaracterize how the Model works. They claim that the Model assumes new resources or transmission will be built and thus never projects a resource-adequacy problem. State Br. 22. Not so. The Model considers the costs and real-world limits to building onto the electricity grid, such as power plant retirements and costs of investing in new generation. Integrated Planning Model Documentation §§ 2.1.1, 3.3.5, 4.2.4, 4.4.3, JA_____, _____, _____, _____; Resource Adequacy Analysis 3, 9–11, JA_____, _____–__. If the Model cannot add new generation or transmission within those constraints, then it would project a resource-adequacy problem. Further, the Model recognizes that renewable resources are weather-dependent and intermittent, and it accounts for those resources being available variably. Integrated Planning Model Documentation §§ 3.5.1–3.5.2, 4.4.5, JA_____–_____, _____; *contra* State Br. 24.

Relatedly, EPA did not assume that innovative technologies would be used or that weather-related grid disruptions would decrease. *Contra* State Br. 24–25. While EPA discussed those topics as part of its "overview of the electric power system and grid reliability," they were not included in the Model. 89 Fed. Reg. at

29521/1-3; *see also id.* at 29516/3 (stating that its analysis "did not include ameliorative measures available to utilities to apportion demand"); *see generally* Integrated Planning Model Documentation, JA_____–__.

Lastly, Petitioners misunderstand EPA's overall grid reliability assessment. State Br. 23–24. EPA accounted for electricity supply and demand and supply-chain and labor shortages when evaluating the time necessary to install the charging infrastructure needed under the modeled potential compliance pathway. *See, e.g.*, 89 Fed. Reg. at 29546/3–49/2. EPA also considered interconnection backlogs and explained that regulatory orders have been issued to alleviate backlogs and reduce interconnection delays. *Id.* at 29524/1.

### D.    EPA reasonably considered upstream emissions.

Ever since the Phase 1 standards, EPA has considered upstream emissions—emissions from electricity generation and the refining and distribution of fuel to operate a vehicle—when setting standards but not in assessing compliance. *Id.* at 29443/3–44/1. Because EPA did not reopen that approach in this Rule, *see id.*, Petitioners' argument is time-barred. *See supra* Argument II. Nevertheless, EPA's approach was reasonable.

EPA analyzed reasonably foreseeable effects on air quality arising from its standards and concluded that the standards will significantly reduce greenhouse-gas emissions. 89 Fed. Reg. at 29591/2, 29663/1–64/3; RIA 627, JA_____. EPA

used a dynamic model to analyze upstream emissions from *all* motor vehicle types, *contra* Fuel Br. 51–53, including direct vehicle emissions, like tailpipe emissions and upstream emissions from power plants and refineries, RIA 560–62, JA_____–__. This model projects future impacts by building upon earlier projections and captures the complexities associated with major shifts in transportation fuels that the model Fuel Petitioners contend (at 52–53) that EPA should have used cannot do. RTC 1493–94, JA_____–__.

In assessing *compliance* with promulgated standards, EPA counts only emissions from the regulated source, motor vehicles—not emissions from refineries, power plants, or anything else. 89 Fed. Reg. at 29474/1; RTC 1596, JA_____. Upstream emissions play no role in compliance under Section 7521(a). RTC 1594, JA_____.

Petitioners do not challenge this approach for most vehicles. *See* Fuel Br. 51–52. For instance, Petitioners do not contest EPA's omission of upstream emissions from oil extractions when assessing an internal-combustion-engine vehicle's compliance with the standards. EPA takes the same approach for electric vehicles. Upstream emissions, like from battery production, are not "from" classes of motor vehicles. 42 U.S.C. § 7521(a). They thus are not counted in determining compliance with vehicle-emission standards. RTC 1591, JA_____.

EPA's rationale adheres to the Clean Air Act's structure. Title I governs stationary sources. 42 U.S.C. §§ 7401–7515. Title II, home of Section 7521(a), governs mobile sources. *Id.* §§ 7521–90. EPA cannot regulate *stationary*-source emissions using its *mobile*-source authority. RTC 1591, JA_____. Petitioners' approach would treat electric vehicles differently—and contrary to the statutory text.

To the extent electric vehicles "shift emissions elsewhere," Fuel Br. 51, EPA regulates those emissions under Title I, *see, e.g.*, 89 Fed. Reg. 39798 (May 9, 2024). The same is true of the upstream emissions of internal-combustion-engine vehicles. RTC 1596, JA_____; *see, e.g.*, 89 Fed. Reg. 16820 (Mar. 8, 2024).

The line that EPA draws between stationary sources and mobile sources also makes practical sense because vehicle manufacturers can control the emissions from their vehicles components, be it the air-conditioning system or test fuel. Counting upstream emissions would inappropriately require vehicle manufacturers to account for emissions that they cannot control. RTC 1591, JA_____.

### E.     EPA reasonably declined to consider regulating fuels.

EPA established reasonable performance-based standards, which can be met through any mix of vehicle technologies a regulated entity sees fit. *Id.* at 1241, JA_____. If a vehicle manufacturer wants to incorporate technologies that use biofuels to achieve the standards, it may do so. *Id.* at 1242, JA_____.

What EPA did *not* do is establish fuel requirements. Fuel Br. 62–64. That is because Section 7521(a) directs EPA to adopt standards for *vehicles*, not *fuels*. In fact, the Clean Air Act prohibits EPA from regulating fuels to control air pollution except after considering "other technologically or economically feasible means of achieving emission standards under section 7521." 42 U.S.C. § 7545(c)(2)(A).

Petitioners contend that EPA should have considered biofuels as a strategy for reducing greenhouse-gas emissions because the carbon dioxide that biofuels emit when burned is carbon dioxide that their feedstocks absorb. Fuel Br. 63. But there is no legal mandate or compelling reason to assess biofuels' lifecycle emissions when setting standards under Section 7521(a). Doing so would extend EPA's authority under Section 7521(a) beyond mobile sources to include stationary sources like biofuel producers. RTC 1592–94, JA_____–__.

The standards also do not conflict with the renewable-fuels program. *See supra* Argument III.A.3. Renewable fuels simply offer one avenue for EPA to regulate greenhouse-gas emissions. RTC 1898, JA_____; *contra* Fuel Br. 64–65. And the program no longer has an increasing statutory biofuel requirement. *See* RTC 132, JA_____; *contra* Fuel Br. 64 (asserting that Congress mandated "increas[ing] the Nation's use of renewable fuel").

## F. EPA's cost-benefit analysis is sound.

As detailed above, EPA considered relevant costs to manufacturers and purchasers and emissions reductions to assess the standards' reasonableness. Separately, under Executive Order 12866, EPA produced a monetized cost-benefit analysis. 89 Fed. Reg. at 29453/3–54/3. Petitioners conflate that cost-benefit analysis, which monetized net benefits from reducing greenhouse-gas emissions, with EPA's feasibility assessment. *See* State Br. 25–30. EPA's cost-benefit analysis did not drive EPA's selection of the standards. 89 Fed. Reg. at 29591/3, 29708/3; RTC 1834–35, JA_____–__; *contra* State Br. 25. Put differently, EPA "did not seek to select standards that would maximize net benefits" from the cost-benefit analysis. RTC 1885, JA_____. Rather, the analysis merely "reinforce[d]" EPA's conclusion that the standards are appropriate. 89 Fed. Reg. at 29591/3. Thus, any error in EPA's cost-benefit analysis, including calculation of climate benefits, is harmless. *Portland*, 507 F.3d at 711.

Regardless, Petitioners argue that EPA erroneously used a 2% discount rate and wrongly included global climate impacts. State Br. 26–28, 30. Both choices were reasonable and are entitled to deference. *See Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012) (noting that courts review cost-benefit analyses deferentially, making petitioners' burden to show error high).

Petitioners cite Circular A-4, an Office of Management and Budget publication, to argue that EPA should have used 3% and 7% discount rates to calculate the present value of climate benefits, not 2%. State Br. 27–28; *see generally* Circular A-4 (2003) 19–20, JA_____–___ (explaining present value and discount rates). That argument ignores the nature of climate benefits and the current economy.

EPA declined to use a 7% discount rate because it is not well-suited for measuring climate benefits. A 7% rate addresses the costs of displacing capital, but consumption effects use a lower discount rate. Circular A-4 (2003) 20, JA_____. Climate benefits are consumption-based. RIA 668–70, JA_____–__. So discounting climate benefits using 7% would "inappropriately underestimate" those benefits. *Id.*; *cf.* Circular A-4 (2023) 77–79, JA_____–__ (no longer recommending a 7% discount rate). The Office of Management and Budget confirmed that 7% is "not considered appropriate" in these circumstances. Greenhouse-gas Report 9 n.14, JA_____.

Rather than 3%, EPA applied a 2% discount rate consistent with the latest economic information, public comments, and recommendation from the National Academies. RIA 668–69, JA_____–__; RTC 1816, JA_____. Real interest rates have declined significantly since the three-decade period (1973–2002) used to formulate Circular A-4's 3% recommendation. Greenhouse-gas Report 67,

JA_____; *contra* State Br. 29. EPA reasonably explained its use of a 2% discount rate for all costs and benefits. 89 Fed. Reg. at 29715/2–20, tbl.VIII-8; *contra* State Br. 27, 30.

EPA also properly included the global effects of reducing emissions, consistent with Circular A-4. Circular A-4 (2003) 9, JA_____ (stating that where regulations will likely have international effects, those effects should be reported); *contra* State Br. 26–27, 29. Climate change harms U.S. interests through impacts within and beyond U.S. borders that affect Americans' welfare. Greenhouse-gas Report 12–19, JA_____–__; RIA 758–63, JA_____–__. Likewise, international mitigation of greenhouse-gas emissions benefits Americans. RIA 760, JA_____. Given this global nature of greenhouse-gas pollution and the importance of "international cooperation and reciprocity" in addressing climate change, EPA appropriately included global impacts. *Id.*; *see also Zero Zone, Inc. v. Dep't of Energy*, 832 F.3d 654, 679 (7th Cir. 2016) (affirming agency's inclusion of global climate impacts). Assessing climate impacts only within U.S. borders would underestimate Americans' benefits from greenhouse-gas mitigation. RIA 763, JA_____; *contra* State Br. 29.

Nor does the Clean Air Act bar EPA from including global impacts when it monetizes climate benefits. While Petitioners cite the Act's goal of improving the

nation's air quality, that is hardly a requirement to ignore overseas impacts when conducting a cost-benefit analysis. 42 U.S.C. § 7401(b)(1); State Br. 26.

For setting the standards, though, EPA assessed feasibility, including electric-infrastructure needs, only for vehicles sold within the United States. RTC 1836, JA_____; *contra* State Br. 26–27 (conflating EPA's infrastructure assessment with EPA's cost-benefit analysis). Thus, the presumption against extraterritorial application is irrelevant. *See* State Br. 26.

## CONCLUSION

The Court should dismiss or deny the petitions.

Submitted on January 14, 2025

<table>
<tr><td></td><td>Todd Kim<br>Assistant Attorney General</td></tr>
<tr><td></td><td><u>/s/ *Sarah A. Buckley*</u></td></tr>
<tr><td>*Of counsel*<br>Andrea Carrillo<br>Stacey S. Garfinkle<br>Ryland Shengzhi Li<br>U.S. Environmental Protection<br>Agency<br>Office of General Counsel<br>Washington, D.C.</td><td>Sarah A. Buckley<br>Alex J. Hardee<br>Jin Hyung Lee<br>U.S. Department of Justice<br>Environment & Natural Resources Div.<br>Environmental Defense Section<br>P.O. Box 7611<br>Washington, D.C. 20044<br>202.616.7554<br>sarah.buckley@usdoj.gov</td></tr>
</table>

## CERTIFICATES OF COMPLIANCE AND SERVICE

I certify that this brief complies with Fed. R. App. P. 32(a)(5) and (6) because it uses 14-point Times New Roman, a proportionally spaced font.

I also certify that this brief complies with the Court's September 3, 2024 order because by Microsoft Word's count, it has 20,991 words, excluding the parts of the brief exempted under Rule 32(f).

Finally, I certify that on January 14, 2025, I electronically filed this brief with the Court's CM/ECF system, which will serve each party.

*/s/ Sarah A. Buckley*